No. 24-2056

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

CARYN DEVINS STRICKLAND,

*Plaintiff-Appellant*,

v.

NANCY L. MORITZ, ET AL.,

*Defendants-Appellees*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA

## BRIEF OF PLAINTIFF-APPELLANT
## CARYN DEVINS STRICKLAND

Caryn Strickland
Law Office of Caryn Strickland
PO Box 92
Lynn, NC
828-388-7337

*Counsel for Plaintiff-Appellant*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and Local Rule 26.1, Appellant Caryn Strickland makes the following disclosure:

Appellant is not a publicly held corporation or other publicly held entity. Appellant does not have any parent corporation. No publicly held corporation or other publicly held entity owns 10% or more of the stock of Appellant. No publicly held corporation or other publicly held entity has a direct financial interest in the outcome of the litigation. Appellant is not a trade association. This case does not arise out of a bankruptcy proceeding.

Dated: February 18, 2025

/s/ Caryn Strickland
Caryn Strickland
Counsel for Appellant

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................vi

STATEMENT OF JURISDICTION ........................................................1

STATEMENT OF THE ISSUES ............................................................1

STATEMENT OF THE CASE ...............................................................2

I.   Summary of Evidence ...................................................................2

    A.   Hostile Working Environment ................................................4

        1.   Misconduct...................................................................4

        2.   EDR Complaints ..........................................................6

    B.   First Assistant's Sexual Harassment ......................................10

        1.   "Classic sexual harassment" ......................................10

        2.   "*Quid pro quo* request"............................................13

        3.   Retaliation and hostile working environment.............14

    C.   Defender's Deliberate Indifference and Sex Discrimination..............20

        1.   Perpetuating the hostile work environment ................20

        2.   Continued harassment and retaliation.........................22

        3.   Civil rights officer's intervention..............................24

        4.   Continued failure to stop the harassment...................25

        5.   Retaliation for seeking guidance on her civil rights .................27

6.     Discriminatory capstone to *quid pro quo* request ....................30

D.     Federal Officials' Grossly Inadequate Response ................................34

1.     Lack of training .........................................................................34

2.     Accused supervisors' coordination of testimony.....................35

3.     Continued obsessive behavior...................................................37

4.     Continued inaction after Strickland's formal complaint .........37

5.     Failure to conduct an appropriate investigation.......................41

6.     Davis's interference ..................................................................45

7.     Holding disciplinary proceeding "in abeyance" ......................47

8.     Refusal to disqualify Martinez.................................................48

9.     "Kangaroo court" ......................................................................51

10.     JIO's "uncertainty" about remedies .........................................53

E.     Constructive Discharge ......................................................................56

II.     District Court's Rulings..................................................................................59

A.     MeToo Evidence .................................................................................59

B.     Opinion................................................................................................61

SUMMARY OF THE ARGUMENT ...................................................................66

STANDARD OF REVIEW ..................................................................................68

ARGUMENT ........................................................................................................69

I.     Strickland's Exclusion from Title VII is Unconstitutional if the District Court's Legal Reasoning is Correct ...................................................69

     A.     Defendants' conduct violated Title VII standards .............................71

           1.     Sexual harassment, sex discrimination, and retaliation ............71

                  a.     First Assistant .....................................................................71

                  b.     Federal Defender ................................................................77

           2.     Failure to take prompt and effective action ...............................80

     B.     The district court's ruling hinged on perceived differences between Title VII and equal protection claims ...................................85

     C.     Excluding Strickland, a federal public defender employee, from Title VII is arbitrary and infringes on her fundamental right to be free from sex discrimination...........................................................88

II.     The District Court Erred by Refusing to Consider MeToo Evidence ...........93

     A.     The district court erred by granting summary judgment in favor of all Defendants except for Martinez on the equal protection claim without even reviewing the MeToo evidence ...........................94

     B.     The district court erred by excluding MeToo evidence at trial...........98

           1.     The evidence was relevant.......................................................98

           2.     The evidence was not inadmissible hearsay ...........................100

                   a.     Notice to employer .......................................................100

                   b.     Admissions by a party opponent ..................................101

                   c.     Impeachment.................................................................103

                   d.     Residual clause .............................................................104

3. The error was not harmless ................................................... 106

III. Defendants Were Deliberately Indifferent to Sexual Harassment and Subjected Strickland to Continuing Sex Discrimination and Retaliation ............................................................................... 112

 A. The undisputed facts support Strickland's equal protection claim ...................................................................................... 112

 B. Legal errors tainted the district court's analysis ............................... 119

  1. Notice ....................................................................... 119

  2. Official capacity standard ....................................... 122

  3. Discriminatory intent .............................................. 124

  4. Lack of training ....................................................... 126

  5. Expert testimony ..................................................... 127

  6. Vulnerability to further harassment ........................ 129

  7. Constructive discharge ............................................ 132

IV. By Failing to Enforce the EDR Plan's Guarantees, Defendants Violated Strickland's Due Process Rights ...................................... 133

 A. Defendants denied Strickland the Title VII protections to which she was entitled under the EDR Plan ................................. 133

 B. The EDR process was fundamentally unfair ...................................... 134

  1. *Ex parte* communications ....................................... 136

   a. "Disturbing incident" email ............................ 136

   b. Sharing the investigation's findings .............................. 139

iv

2.      Conflicts of interest ................................................................ 140

        a.      Investigation ................................................................ 141

        b.      "Mandatory" counseling and mediation ...................... 142

        c.      Final hearing ................................................................ 143

        d.      Disciplinary action ....................................................... 143

3.      Fundamentally unfair treatment ............................................... 146

4.      Violations of confidentiality .................................................... 148

5.      Holding discipline "in abeyance" ............................................ 149

C.      Strickland reasonably believed that the Defender would be the
final decisionmaker ............................................................................... 151

1.      Mediator .................................................................................. 152

2.      JIO ........................................................................................... 154

3.      Other authorities ...................................................................... 157

D.      The district court had broad discretion to order equitable
remedies .................................................................................................. 158

CONCLUSION ............................................................................................... 160

STATEMENT REGARDING ORAL ARGUMENT ......................................... 160

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*Allen v. Coll. of William & Mary*,
245 F. Supp. 2d 777 (E.D. Va. 2003) ................................ 76

*Autozone, Inc. v. EEOC*,
421 F. App'x 740 (9th Cir. 2011) ................................ 83

*Baldwin v. Blue Cross/Blue Shield*,
480 F.3d 1287 (11th Cir. 2007) ................................ 81

*Bankers Life & Casualty Co. v. Crenshaw*,
486 U.S. 71 (1988) ................................ 89

*Baskin v. Bogan*,
766 F.3d 648 (7th Cir. 2014) ................................ 88

*Basta v. Novant Health Inc.*,
56 F.4th 307 (4th Cir. 2022) ................................ 96, 114

*Bator v. Hawaii*,
39 F.3d 1021 (9th Cir. 1997) ................................ 70

*Baynard v. Malone*,
268 F.3d 228 (4th Cir. 2001) ................................ 96

*Beardsley v. Webb*,
30 F.3d 524 (4th Cir. 1994) ................................ 70, 113

*Behler v. Hanlon*,
199 F.R.D. 553 (D. Md. 2001) ................................ 103, 104

*Bennett v. CSX Transp., Inc.*,
552 F. App'x 222 (4th Cir. 2014) ................................ 100

*Bland v. Fairfax Cty.*,
No. 1:10cv1030 (JCC/JFA), 2011 U.S. Dist. LEXIS 47164
(E.D. Va. May 3, 2011) ................................ 100

*Bolling v. Sharpe*,
347 U.S. 497 (1954) ................................ 89

*Bose Corp. v. Consumers Union*,
466 U.S. 485 (1984) .................................................................. 68, 134

*Bowen v. Hockley*,
71 F.2d 781 (4th Cir. 1934) ............................................................ 158

*Boyer-Liberto v. Fontainebleau Corp.*,
786 F.3d 264 (4th Cir. 2015) (en banc) ..................................... 72, 76

*Bratt v. Genovese*,
782 F. App'x 959 (11th Cir. 2019) ................................................. 103

*Bray v. Alexandria Women's Health Clinic*,
506 U.S. 263 (1993) ....................................................................... 115

*Briggs v. Waters*,
484 F. Supp. 2d 466 (E.D. Va. 2007) ............................................... 70

*Brown v. Perry*,
184 F.3d 388 (4th Cir. 1999) .................................................... 80, 81

*Brown v. United States*,
933 F. Supp. 2d 780 (E.D. Va. 2013) ............................................. 102

*Burlington Indus. v. Ellerth*,
524 U.S. 742 (1998) ......................................................................... 86

*Burns v. Johnson*,
829 F.3d 1 (1st Cir. 2016) ........................................................ 73, 74

*Calobrisi v. Booz Allen Hamilton, Inc.*,
660 F. App'x 207 (4th Cir. 2016) (unpub. per curiam) ........ 95, 96, 99

*Cerros v. Steel Techs., Inc.*,
398 F.3d 944 (7th Cir. 2005) ........................................................... 82

*Cisson v. C.R. Bard, Inc.*,
810 F.3d 913 (4th Cir. 2016) ........................................................... 69

*City of Canton v. Harris*,
489 U.S. 378 (1989) ....................................................................... 126

*City of Cleburne, Tex. v. Cleburne Living Center, Inc.*,
473 U.S. 432 (1985) ............................................................. 88, 89, 92

*Cole v. Tenn. Watercraft, Inc.*
No. 3:06-CV-381, 2008 U.S. Dist. LEXIS 54231
(E.D. Tenn. July 15, 2008) ............................................................ 102

*Davis v. Monroe Cty. Bd. of Educ.*,
526 U.S. 629 (1999) .................................................................... 115

*Davis v. Passman*,
442 U.S. 228 (1979) ...................................................................... 89

*Diaz-Roa v. Hermes Law, P.C.*,
No. 24-cv-2105 (LJL), 2024 U.S. Dist. LEXIS 212472
(S.D.N.Y. Nov. 21, 2024) .............................................................. 85

*Doe v. Alger*,
175 F. Supp. 3d 646 (W.D. Va. 2016) ................................... 148, 151

*Doe v. Coastal Carolina Univ.*,
No. 4:18-cv-268-SAL, 2021 U.S. Dist. LEXIS 82292
(D.S.C. Mar. 8, 2021) ........................................ 116, 117, 127, 128

*Doe v. Columbia Univ.*,
831 F.3d 46 (2d Cir. 2016) .............................................. 118, 143, 150

*Doe v. Fairfax Cnty. Sch. Bd.*,
1 F.4th 257 (4th Cir. 2021) ................................ 113, 119, 120, 129

*Doe v. Rector & Visitors of George Mason Univ.*,
149 F. Supp. 3d 602 (E.D. Va. 2016) ..................................... *passim*

*Doe v. Russell Cty. Sch. Bd.*,
292 F. Supp. 3d 690 (W.D. Va. 2018) ........................................ 127

*Doe v. University of Purdue*,
928 F.3d 652 (7th Cir. 2019) ...................................................... 117

*Dotson v. Griesa*,
398 F.3d 156 (2d Cir. 2005) ......................................................... 92

*Duch v. Jakubek*,
588 F.3d 757 (2d Cir. 2009) ....................................................... 121

*EEOC v. Cromer Food Servs.*
414 F. App'x 602 (4th Cir. 2011).......................................... 83, 84

viii

*Faragher v. City of Boca Raton*,
524 U.S. 775 (1998) ...................................................... 78, 80, 82, 87

*Farmer v. Brennan*,
511 U.S. 825 (1994) ...................................................... 96, 114, 115

*Feminist Majority Found. v. Hurley*,
911 F.3d 674 (4th Cir. 2018) .................................................. *passim*

*Flood v. Bank of Am. Corp.*,
780 F.3d 1 (1st Cir. 2015) .................................................. 72

*Flores v. Morgan Hill Unified Sch. Dist.*,
324 F.3d 1130 (9th Cir. 2003) .............................................. 115, 130

*Ford Motor Co. v. EEOC*
458 U.S. 219 (1982) ...................................................... 158

*Franks v. Bowman Transp. Co.*,
424 U.S. 747 (1976) ...................................................... 159

*Furey v. Temple Univ.*,
884 F. Supp. 2d 223 (E.D. Pa. 2012) ........................................ *passim*

*Gebser v. Lago Vista Indep. Sch. Dist.*,
524 U.S. 274 (1998) ...................................................... 120

*Geleta v. Gray*,
645 F.3d 408 (D.C. Cir. 2011) .............................................. 101

*Goldberg v. Kelly*,
397 U.S. 254 (1970) ...................................................... 94, 95, 145

*Goode v. United States*,
730 F. Supp. 2d 469 (D. Md. 2010) .......................................... 105

*Grabowski v. Ariz. Bd. of Regents*,
69 F.4th 1110 (9th Cir. 2023) .............................................. 85

*Grantham v. Durant*,
471 F. Supp. 2d 1069 (D. Nev. 2006) ........................................ 102

*Grayson v. Peed*,
195 F.3d 692 (4th Cir. 1999) .............................................. 86

*Green v. Adm'rs of the Tulane Educ. Fund*,
  284 F.3d 642 (5th Cir. 2002) ........................................................ 100

*Green v. Brennan*,
  578 U.S. 547 (2016) ............................................................ 150, 151

*Gregory v. Daly*,
  243 F.3d 687 (2d Cir. 2001) ............................................................ 73

*Grier v. Gray*,
  No. 3:17-cv-00486-FDW-DSC, 2021 U.S. Dist. LEXIS 203724
  (W.D.N.C. Oct. 21, 2021) ............................................................ 120

*Griffin v. Illinois*,
  351 U.S. 12 (1956) ............................................................ 90

*Heyer v. United States Bureau of Prisons*,
  984 F.3d 347 (4th Cir. 2021) ............................................... *passim*

*Hunter v. Town of Mocksville*,
  897 F.3d 538 (4th Cir. 2018) ............................................................ 158

*Jansen v. Packaging Corp. of Am.*,
  123 F.3d 490 (7th Cir. 1997) (en banc) ............................................... 72

*Jennings v. Univ. of N.C.*,
  482 F.3d 686 (4th Cir. 2007) ............................................... 69, 70, 114

*Johnson v. J. Walter Thompson U.S.A., LLC*,
  224 F. Supp. 3d 296 (S.D.N.Y. 2016) ............................................... 74, 75

*Johnson v. Johnson*,
  923 F. Supp. 2d 984 (S.D. Tex. 2013) ............................................... 78, 79

*Kentucky v. Graham*,
  473 U.S. 159 (1985) ............................................................ 62, 122

*Koger v. Ball*,
  497 F.2d 702 (4th Cir. 1974) ............................................... 90, 91

*Lewis v. Frayne*,
  No. 3:12-cv-1070 (VLB), 2016 U.S. Dist. LEXIS 92867
  (D. Conn. July 18, 2016) ............................................................ 150

*M.L.B. v. S.L.J.*,
   519 U.S. 102 (1996) ................................................................. 89, 90

*Menaker v. Hofstra University*,
   935 F.3d 20 (2d Cir. 2019) .............................................................. 117

*Mt. Valley Pipeline, LLC v. 0.19 Acres of Land*,
   No. 23-1348, 2025 U.S. App. LEXIS 1722 (4th Cir. Jan. 27, 2025) ............. 127

*Muldrow v. City of St. Louis*,
   601 U.S. 346 (2024) .................................................................... 79, 83

*Mullen v. Princess Anne Volunteer Fire Co.*,
   853 F.2d 1130 (4th Cir. 1988) ............................................................ 95

*Ocheltree v. Scollon Prods.*,
   335 F.3d 325 (4th Cir. 2003) ....................................................... 44, 121

*Okoli v. City of Balt.*,
   648 F.3d 216 (4th Cir. 2011) .............................................. 68, 79, 107

*Oncale v. Sundowner Offshore Servs.*,
   523 U.S. 75 (1998) ......................................................................... 71

*Parker v. Reema Consulting Servs., Inc.*,
   915 F.3d 297 (4th Cir. 2019) ............................................................. 75

*Paroline v. Unisys Corp.*,
   879 F.2d 100 (4th Cir. 1989) ......................................................100, 101

*Penn. State Police v. Suders*,
   542 U.S. 129 (2004) ................................................................ 132, 135

*Pers. Adm'r of Mass. v. Feeney*,
   442 U.S. 256 (1979) ...................................................................... 115

*Pogorzelska v. VanderCook Coll. of Music*,
   No. 19-cv-05683, 2023 U.S. Dist. LEXIS 97170 (N.D. Ill. June 5, 2023) ..... 127

*Polk Cnty. v. Dodson*,
   454 U.S. 312 (1981) ................................................................... 54, 55

*Pollard v. E.I. du Pont de Nemours & Co.*,
   532 U.S. 843 (2001) ...................................................................... 158

*Prudencio v. Runyon,*
  986 F. Supp. 343 (W.D. Va. 1997) .................................................................. 79

*Pryor v. United Air Lines, Inc.,*
  791 F.3d 488 (4th Cir. 2015) ........................................................................ 83

*Rasi v. Dep't of Corr.,*
  Civil Action No. 7:08cv00203,
  2009 U.S. Dist. LEXIS 2540 (W.D. Va. Jan. 13, 2009) ................................. 76

*Ricketts v. Wake Cty. Pub. Sch. Sys.,*
  125 F.4th 507 (4th Cir. 2025) ................................................................. 69, 116

*Rosario v. Dep't of the Army,*
  607 F.3d 241 (1st Cir. 2010) ....................................................................... 73

*S.B. v. Bd. of Educ.,*
  819 F.3d 69 (4th Cir. 2016) ........................................................... 85, 86, 114

*Schiano v. Quality Payroll Sys., Inc.,*
  445 F.3d 597 (2d Cir. 2006) ........................................................................ 71

*Sea "B" Mining Co. v. Addison,*
  831 F.3d 244 (4th Cir. 2016) ..................................................................... 106

*Sedar v. Reston Town Ctr. Prop., LLC,*
  988 F.3d 756 (4th Cir. 2021) ..................................................................... 100

*Simpson v. Univ. of Colo. Boulder,*
  500 F.3d 1170 (10th Cir. 2007) ................................................................. 126

*Smith v. Sheahan,*
  189 F.3d 529 (7th Cir. 1999) ....................................................................... 74

*Southerland v. Sycamore Cmty Sch. Dist. Bd. of Educ.,*
  125 F. App'x 14 (6th Cir. 2004) ................................................................ 100

*Spreen v. Brey,*
  961 F.2d 109 (7th Cir. 1992) ..................................................................... 155

*Sprint/United Mgmt. Co. v. Mendelsohn,*
  552 U.S. 379 (2008) .................................................................................... 99

*Stegall v. Citadel Broad. Co.,*

350 F.3d 1061 (9th Cir. 2003) ................................................... 63, 111

*Stone v. Univ. of Md. Med. Sys. Corp.*,
    855 F.2d 167 (4th Cir. 1988) ................................ 135, 154

*Strickland v. United States*,
    32 F.4th 311 (4th Cir. 2022) ................................... *passim*

*Suteerachanon v. McDonald's Rests. of Md., Inc.*,
    No. RWT-13-2889, 2014 U.S. Dist. LEXIS 164419
    (D. Md. Nov. 24, 2014) ............................................ 79

*United States v. Ayala*,
    601 F.3d 256 (4th Cir. 2010) .................................... 99

*United States v. Bellinger*,
    652 F. App'x 143 (4th Cir. 2016) ............................. 99

*United States v. Clarke*,
    2 F.3d 81 (4th Cir. 1993) ....................................... 104

*United States v. Foreman*,
    369 F.3d 776 (4th Cir. 2004) ................................... 19

*United States v. Singh*,
    518 F.3d 236 (4th Cir. 2008) ................................... 69

*United States v. Workman*,
    860 F.2d 140 (4th Cir. 1988) ................................. 105

*Vaughan v. Boeing Co.*,
    229 F. Supp. 3d 339 (E.D. Pa. 2017) ..................... 102

*Williams v. Prince William Cty.*,
    645 F. App'x 243 (4th Cir. 2016) .................. 75, 80, 136

*Wills v. Brown Univ.*,
    184 F.3d 20 (1st Cir. 1999) ................................... 113

*Zeno v. Pine Plains Cent. Sch. Dist.*,
    702 F.3d 655 (2d Cir. 2012) ........................... 112, 113

*Ziskie v. Mineta*,
    547 F.3d 220 (4th Cir. 2008) ................................. 111

## Statutes and Rules

18 U.S.C. § 3006A ............................................................ 5, 54, 92, 153

28 U.S.C. § 1291 ...................................................................... 1, 4, 5

28 U.S.C. § 1331 ............................................................................... 1

42 U.S.C. § 1983 ............................................................................. 70

42 U.S.C. § 2000e ........................................................................... 88

Fed. R. Civ. P. 54 .......................................................................... 158

Fed. R. Civ. P. 56 ...................................................................... 94, 95

Fed. R. Evid. 201 ............................................................................ 29

Fed. R. Evid. 702 .................................................................... 127, 128

Fed. R. Evid. 801 .................................................................... 101, 102

Fed. R. Evid. 807 .......................................................................... 104

## Other

1993 Report of the Committee to Review the Criminal Justice Act
(Mar. 1993) ................................................................................... 55

2017 Report of the Ad Hoc Committee to Review the Criminal Justice Act
(Apr. 2018) .................................................................................... 54

Deborah Epstein, *Discounting Credibility: Doubting the Stories of Women
Survivors of Sexual Harassment*, 51 SETON HALL L. REV. 289 (2020) .......... 63, 125

EDR Interpretive Guide & Handbook 32 (Jan. 1, 2020) ................................ *passim*

EEOC Mgmt. Directive 110, Ch. 1 (2015) ................................... 141, 151

Kat Chow, *Gaslighting: How a Flicker of Self-Doubt Warps Our Response To
Sexual Harassment*, NPR (Nov. 25, 2017) ............................................. 82

McGarth, Charles, Rudyard Kipling in America, The New Yorker
(July 8, 2019) ................................................................................. 64

OPM, General Schedule ............................................................... 13, 108

Report of the Federal Judiciary Workplace Conduct Working Group to the
Judicial Conference of the United States (2018) .......................... 106, 137

Report of the Proceedings of the Judicial Conference of the United States (Sept. 2010) ................................................................................... 4, 157

Report of the Proceedings of the Judicial Conference of the United States (Sept. 2021) ......................................................................................... 55

Supreme Court of the United States, 2016–2017 Supreme Court Fellows ............. 2

Supreme Court of the United States, Fellows Program .......................................... 3

Testimony of Hon. Max. O. Cogburn, Ad Hoc Committee to Review the Criminal Justice Act (Jan. 11–12, 2016) .................................................................................. 4

## STATEMENT OF JURISDICTION

Following this Court's ruling reversing the district court's dismissal of Strickland's complaint, the district court entered summary judgment in favor of all Defendants except for Anthony Martinez on her equal protection claim. The district court held a bench trial and ruled in favor of Defendants on the remaining claims, including her due process claim. The district court entered judgment on August 16, 2024 and denied Strickland's motion for reconsideration on September 9, 2024. The district court had jurisdiction under 28 U.S.C. § 1331. Strickland timely appealed on October 15, 2024. This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.  Whether, assuming the district court is correct that Strickland is "without redress under the present legal framework" despite her good faith claim of harassment and Defendants' grossly inadequate response, the exclusion of judiciary employees from Title VII of the Civil Rights Act of 1964 is unconstitutional as applied to her.

2.  Whether the district court erred by excluding MeToo evidence of other complaints of harassment, discrimination, and retaliation, and by refusing even to allow Strickland to file the MeToo evidence in the docket.

3.	Whether Defendants violated Strickland's equal protection rights by engaging in deliberate indifference to sexual harassment and continued sex discrimination and retaliation.

4.	Whether the fundamentally unfair and discriminatory EDR process, which failed to afford Strickland the Title VII rights guaranteed by the Plan, violated her due process rights.

## STATEMENT OF THE CASE

## I.	Summary of Evidence

Strickland graduated *summa cum laude* and Phi Beta Kappa from the University of Vermont.  She earned her law degree from Duke University School of Law, where she served on law review and was elected to the Order of the Coif. Strickland then served as a judicial law clerk for the Chief Justice of the Vermont Supreme Court, a United States District Court judge, and a judge on the Second Circuit Court of Appeals.  She also has published several articles.  JA3535–3536.

Following her clerkships, Strickland "was selected for a prestigious fellowship in the federal judiciary."  JA3536.  Strickland served as a Supreme Court Fellow in the Administrative Office of the U.S. Courts ("AO"), "the central support entity for the judicial branch."  Supreme Court of the United States, 2016–2017 Supreme Court Fellows, *available at* https://tinyurl.com/2wwhn6bx.  Chief Justice Roberts has described the Fellowship as "a unique opportunity for

exceptional individuals to contribute to the administration of justice at a national level." Supreme Court of the United States, Fellows Program, *available at* https://tinyurl.com/4fp6d2zt. During her Fellowship, Strickland worked on projects to support courts and defender offices. JA3536.

The Fellowship was a springboard to pursue Strickland's dream of serving as a federal public defender, a position which she had pursued since law school and in which she hoped to remain until retirement. JA3535–3536; JA2535. Strickland received "encouragement" from supervisors, including Counselor to the Chief Justice Jeffery Minear and AO Associate Director Laura Minor. JA2587. The AO's Chief of Defender Services, Cait Clarke, personally recommended Strickland for a position in the Federal Defender Office for the Western District of North Carolina ("FDO"). JA2843.

Strickland's chosen career, however, was callously derailed by sexual harassment, sex discrimination, and retaliation she suffered at the FDO, as well as supervisory officials' deliberate indifference to the harassment she suffered and fundamentally unfair procedures for redressing her complaints. As a judiciary employee, Strickland was not covered by Title VII of the Civil Rights Act of 1964, unlike other public and private sector employees. Her only recourse was the Fourth Circuit's internal complaint process, the Employment Dispute Resolution Plan ("EDR Plan"), which purports to extend Title VII protections to judiciary

employees. Unlike Title VII, the EDR Plan has no statutory basis and is "strictly administrative." Report of the Proceedings of the Judicial Conference of the United States 25 (Sept. 2010), *available at* https://tinyurl.com/yzpe6xeh.

The EDR Plan prohibits "conduct that would violate Title VII" and "mirrors private employment laws." JA3530. Strickland diligently sought these remedies, but at every turn, she was stonewalled until she was forced to resign and lose her career as a federal public defender. This Court must decide whether the violations of Strickland's civil rights have a remedy under the Constitution.

### A. Hostile Working Environment

#### 1. Misconduct

The FDO was known as a troubled office. Circuit Executive James Ishida, whom the EDR Plan designated as EDR Coordinator, told Strickland that the office had "a lot of serious issues" and the judges were "mindful" of the "need to change the culture." JA1915; *see* JA3534. District Judge Max O. Cogburn testified in a public hearing that the office was a "mess" in "need [of] a change." Testimony of Hon. Max. O. Cogburn 33–34, Ad Hoc Committee to Review the Criminal Justice Act (Jan. 11–12, 2016), *available at* https://tinyurl.com/mputy7fj.

The office was subjected to an "an embezzlement of money," which was "kept from the judges," *id.* at 14, and a discrimination lawsuit, *see Carlin v. Federal Defenders of Western N.C.*, No. 3:13-CV-00365, ECF No. 1-3 (W.D.N.C.)

4

(alleging that after suicide of attorney's wife, supervisors told him to "stop moping and get over it" and fired him).  Supervisors, including First Assistant J.P. Davis, spread vicious and false rumors about employees who complained of mistreatment, including that the attorney who filed suit had "killed his wife."  JA311; *see also* JA4388–4389.  Employees were "afraid that they'll be fired" for speaking out. Cogburn Testimony, at 14.  Client representation was "unsatisfactory."  *Id.* at 33. Judge Cogburn singled out Davis as being "unqualified" for his position and whose hiring showed "bad judgement."  *Id.* at 33–34; *see* JA3915 ████████████████ ████████████████████████████████████████████████

    The problems were so severe that the district's judges exercised their authority under the Criminal Justice Act ("CJA") to convert the office from a Community Defender Office, which is a privately run entity, to a FDO.  Cogburn Testimony 32; *see* 18 U.S.C. § 3006A(g)(2).  Soon before Strickland's hiring, Martinez was appointed by the Fourth Circuit as the office's first Federal Public Defender.  *See* JA3539.  Martinez was selected to "bring about real change." Cogburn Testimony 33.  He didn't.  Martinez read Judge Cogburn's testimony but chose to keep Davis as First Assistant anyway.  JA2846–2848.  Martinez also ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

Martinez applied for a second term, but was not reappointed. *See Strickland v. United States*, 32 F.4th 311, 336 (4th Cir. 2022); JA614. Davis is no longer First Assistant and does not hold any supervisory position. JA2929. Other supervisors Martinez promoted who are discussed in the opinion below, including Peter Adolf and Erin Taylor, also are no longer employed at the FDO. *See* FDO, Our People, *available at* https://tinyurl.com/mtmaty3r.

## 2. EDR Complaints

During Martinez's term, four other employees besides Strickland filed complaints of harassment, discrimination, and retaliation. The district court found that Ishida was "concerned about a pattern of complaints" against Davis and Martinez. JA3691. Ishida testified that "[t]here were multiple [complaints] coming within a relatively short period of time." JA3691. Ishida would let Chief Judge Gregory know "every time [he] received one." JA1927. The Chief Judge "was responsible for administering the EDR Plan" and ensuring that allegations "are appropriately investigated." JA3709.

For example, Attorney A reported to the Fourth Circuit that, after failing to prepare for a life-sentence child pornography case and losing a plea offer due to his mismanagement of plea negotiations, Martinez referred to the female Assistant

United States Attorney as a "***fucking bitch,***" ███████████████████

JA2885; JA3916 (emphasis added).  Defendants have euphemistically described

these comments as "crude language regarding women."  JA461.  Martinez ████

███████████████████████████████████████████

JA3916 (emphasis added).  Defendants have, again euphemistically, publicly

described these comments as "crude language regarding . . . members of the

LGBTQIA+ community."  JA461.

    Attorney A also reported ████████████████████████████

████████ what Defendants refer to as Davis's "sexual hand gestures,"

JA461 ████████████████████████████████

███████████████████████████████████

████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

---

[1] The district court ordered Strickland's "MeToo" evidence to be filed under seal, even though it was proffered as an exhibit in a public trial.  *See* JA3863. Contemporaneously with this brief, she has filed a motion to unseal.

██████ JA3915.  Attorney A warned Martinez that Davis "was not suited to have supervisory authority over other people."  JA2883.

In this toxic workplace culture, bullying, sexism, homophobia, racism, and mockery of disabilities was normalized.  Davis, along with Peter Adolf, a "senior AFPD" who also supervised Strickland (*see* JA3549, JA3578) ███████

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

██████ A3921; *see* JA312 (Adolf mocked his disabled client and repeatedly referred to him as a "retard"). ████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

Attorney A reported ████████████████████████████████

████████████████████████████████████████████████████████████████



JA4042.  As context, during Strickland's EDR proceeding, Fourth Circuit officials were working with Martinez to establish the Circuit's first Capital Habeas Unit ("CHU"), which "would represent individuals in capital habeas cases throughout the Fourth Circuit."  JA136.

Attorney B reported to the Fourth Circuit that, soon after Martinez was hired, he demoted her from ███████████████ a prestigious supervisory position, to a line attorney, ████████████████████████████ ████████████████████████ JA2883; JA3917.  She was replaced by a man.  JA2883.

Attorney C reported ████████████████████████



Attorney D alleged 

## B. First Assistant's Sexual Harassment

### 1. "Classic sexual harassment"

As First Assistant, Davis was the "principal deputy" of the FDO and "supervised" all employees. JA3540–3541; *see also* JA3557. According to the AO's Defender Operations Classifications Manual ("DOCS Manual"), the First Assistant "[i]nitiates personnel actions involving all staff members," including "hiring, performance appraisals, mediation and negotiation, disciplinary actions, and employee job termination." JA3540–3541. "Davis supervised all employees besides Martinez, Davis could refer an employee to Martinez for disciplinary

action, and Martinez trusted Davis's judgment." JA3541. Both Davis and

Martinez told Strickland that Davis was her "supervisor." *See, e.g.*, JA3557,

JA3574 (statements on June 6 and July 5, 2018 that Davis was her "supervisor").

From the start of her employment in August 2017, Davis subjected

Strickland to increasingly inappropriate treatment that was motivated by an interest

in her romantically or sexually. Co-workers told Strickland that Davis was acting

"lustful" towards her, that "they had never seen him act so 'fixated' and sexually

attracted to anyone[,]" and that Davis was "smothering" her. JA3543–3544. Davis

singled out Strickland for "mentoring" at his request, JA3541; made repeated

requests for drinks, meetings, and "mentoring sessions" out of the office, even after

Strickland declined his invitations; and interfered with Strickland's job duties if

she did not comply with his requests. *See, e.g.*, JA3922–3949; *compare* JA3199

(complaint involving federal judge's request "to get drinks" with a former law

clerk before later "kiss[ing] her and grabbing her buttocks" in his chambers).

The district court found that Davis took "actions that reasonably made

Strickland uncomfortable," that he was "preoccupied with Strickland," and that it

"does not appear he was a manager one would want to work under." JA3699,

JA3701. Davis abused his "mentor" role to "put[] her in her place and exert[] his

power over her," exhibited disproportionate anger in an "inappropriate need to

control her," engaged in "irrational" behavior that "suggests he was focused on her

11

and his ability to control her," and tried to "sabotage" her efforts at professional advancement. JA3700–01.

The AO's former Fair Employment Opportunity Officer, Nancy Dunham, the civil rights officer for the federal courts, testified that Davis's conduct was "classic sexual harassment." JA1942. Dunham explained that it is common in sexual harassment cases for people to "have interpersonal relationships that are positive that later change after a boundary is crossed." Further, "warm, interpersonal relationships that are positive [can] be seen or understood as grooming in hindsight for further sexual advances." JA1941.

Dunham explained that Davis's conduct was about his "desire to control" Strickland, "which is very common" in sexual harassment cases, especially when there is a "huge power imbalance." JA1941. She compared Strickland's case to allegations against Governor Andrew Cuomo by a woman "who alleged that he had made her uncomfortable by his obvious sexual and romantic interest in her." As Dunham explained: "There was never any groping or physical assault in that case, and I remember thinking that is exactly what happened with Caryn Devins. No physical touching, no groping, but nevertheless a – a desire to control her and – an obvious interest in her either sexually or romantically." JA1942.

### 2. "*Quid pro quo* request"

On May 18, 2018, Davis sent Strickland an email entitled "Mas Dinero,"
*i.e.*, "more money," in response to her desire for a promotion and, eventually, a
transfer to the other division office. Davis falsely asserted that Strickland was not
eligible for a promotion on her upcoming work anniversary date, but nonetheless
had a "plan" to raise her pay:



**Mas Dinero**
JP Davis  to: Caryn Devins                    05/18/2018 03:56 PM

Dude, you're shooting high with a G15. Not least of all since you'll need 5 more years of fed service to
qualify for it. But fret not, I have a plan... just remember I deal in pay-for-stay :)

J.P. Davis
First Assistant Federal Defender
Federal Public Defender
Western District of North Carolina

JA 1943.

The district court found that "the factual assertion in this email is false;
Strickland would have been eligible for a G15 promotion in August 2018."
JA3548. Strickland's pay was governed by the Judiciary Pay Scale that applies to
judiciary employees. *See* JA3613. This pay scale is based on the Office of
Personnel Management's General Schedule, which applies to federal employees.
*See* OPM, General Schedule, *available at* https://tinyurl.com/muz6vd4b.

In the context of Davis's excessive interest in her, Strickland reasonably
believed that his email was "a quid pro quo request." JA3548. The EDR

13

investigation later found that Davis's "Mas Dinero" email can "clearly be inferred to be a quid pro quo request," and it was "'reasonable' for Strickland to be upset by this email." JA3653. The Fourth Circuit's Chief Judge described this email as an "unsavory quid pro quo proposal." JA3687. The Mediator appointed to Strickland's EDR matter stated that he "just can't believe anybody is going to say it wasn't an improper email." JA3678. Martinez testified that the email could be "misinterpreted" as "sexual favors." JA3685. The district court found that the judiciary had made admissions that Davis "was way out of line." JA2408. It concluded that Davis's actions showed he "was a controlling manager who did anything he could to exaggerate his importance." JA3699.

Dunham testified that it would have been a "reasonable interpretation" of the Mas Dinero email "as a sexual quid pro quo e-mail." JA1945. "[T]he clear implication" of the email is that "if Caryn did what J.P. wanted, then . . . he would pay her more money." The email indicated that Davis was requesting Strickland to "[s]ubmit to his control for a workplace benefit . . . for more salary," and that it "would definitely be a concern" that "she would be submitting to sexual advances at some further date." JA1945.

### 3. Retaliation and hostile working environment

When Strickland did not reciprocate Davis's advances, he became angry and physically intimidating. Davis even told another supervisor, Erin Taylor, that

14

Strickland "***needs to get slapped***" and "***may just need to get smacked a bunch***."
JA3563, JA3700 (emphasis added). Downplaying this offensive conduct, the
district court found that Davis's statement that Strickland "***needs to get slapped***"
may have been "colloquial." JA3559. The court made no similar finding about
whether Davis's statement repeating that Strickland "***may just need to get smacked
a bunch***" was also "colloquial." JA3563.

Davis disparaged Strickland for requesting a promotion for which she was
qualified. His comments were laced with profanity and demeaning gender-based
tropes. Davis was "taken aback by [Strickland's] demands" and mocked and
caricatured her, asserting she would "waive [her offer letter] around." JA3547.
Davis was referring to Strickland's formal offer letter, which offered her a position
as a Research and Writing Attorney with a transition, "pretty soon thereafter," to
an Assistant Federal Public Defender ("AFPD"). JA3537–3538. Strickland was
"on the track" to becoming an AFPD. JA3539–3540.

Davis stated that Strickland was a "manipulative underhanded jackass" and a
"spoiled brat," she was making "demands" and "veiled threats" to quit if she did
not receive a promotion, and she "thought [Davis] was sufficiently wrapped around
her little finger that [he] wouldn't resist." JA3547, JA3563, JA3569. Davis stated
that Strickland "legitimately IS very good" and "[t]he diff[erence] between her and
the others [is] she ha[s] the actual goods to deliver and [is] very good at playing

15

innocent"—as if a female professional must "play innocent" and downplay her perceived threat level to the men with whom she works. JA3554. He stated, "I thought she could be in mgmt. but I don't think so anymore." JA3573.

Davis and Taylor mocked Strickland for "playing the gender card." Davis stated that she "def plays those tears for sympathy." JA3570. Davis stated, "Just depressed at all the time and emotional energy I've spent trying to lift her up. But she isn't the person I was trying to lift." He even stated, "***Jesus, that read like a break-up text***," confirming that his views about Strickland were not based on a professional working relationship. JA3569 (emphasis added).

On June 6, 2018, Davis became so angry with Strickland for not attending a routine presentencing interview with him that he was "pale and shaking." JA3555. Strickland found Davis "extremely aggressive" and felt "threatened." JA3594. Davis reported Strickland to Martinez and threatened disciplinary action, stating, "***[i]f you choose to disobey a direct order, that is an action that I as a supervisor cannot ignore***." JA3557 (emphasis in original). The interview was an optional "shadowing" activity, and Davis had instructed Strickland that "substantive work always takes priority." JA2974–2975; JA3552. The district court found that Davis's actions "demonstrate his inappropriate need to control her," "exhibited further anger," and were a "disproportionate response." JA3700.

Davis admitted to the EDR investigator, Heather Beam, that he was "very upset" and "controlling." Beam testified that it is "likely" that Davis acted as angrily as Strickland described. JA3556.

That evening, Davis wrote personal notes that Strickland was "self-centered and personal goal oriented" and has been "marshall[ing] her forces and plac[ing] herself in position to be indespensible [sic]." JA3557. Davis also stated that Strickland "[had] been avoiding [him]" and "clearly [did] not want to interact with [him]." JA3557. He claimed that this was only after he "questioned her place" as having been assigned as second chair on a trial case by Martinez. JA3557; *see also* JA3549 (acknowledging that he "need[ed] to butt out" of Strickland's case assignments because "he really didn't have a role here"). The district court found that "Davis's decision to take notes on his interactions with Strickland, and the *increasingly irrational tone* of those notes, further suggests he was focused on her and his ability to control her." JA3701 (emphasis added).

Strickland noticed that it appeared that Davis "[knew] [] exactly when [she was] leaving" and made it "seem[] like it [was] a coincidence when he walk[ed] around the corner at the same time." JA3562, JA3701. The district court found that Strickland "believed absolutely that Davis was virtually stalking and harassing her." JA3698. His actions "understandably made her uncomfortable." JA3701. On June 19, 2018, Davis asked Strickland for a "celebratory drink," which

Strickland declined.  Davis testified that he knew she could not go and was "being really passive aggressive" because "I frankly was annoyed with her."  JA3559.

On June 21, 2018, Davis waited for Strickland after work when she was leaving the building alone and continued asking to give her a ride home after she said no.  JA3560.  Strickland rode her bike to work and had accepted rides home from Davis in the past, but no longer felt comfortable.  There was a "5 percent chance of rain" when she left the building.  JA1962.

Davis waited for Strickland in the lobby and asked if she was "sure" she did not want a ride home.  JA3561.  He texted her: "It is currently raining.  Last chance for a ride, tough girl."  JA3560.

Strickland "no longer felt safe around" Davis and "was concerned that [Davis] had a pattern of pushing for her to see him after hours."  She was "physically afraid" of Davis.  JA3562.  As Dunham testified, "[o]ccasionally . . . people are actually in physical danger, and there were some very subtle signs of that in terms of late-night hanging around her when no one else was around."  JA1962.  "If you have been aware that someone has a romantic or sexual interest in you and they're pushing you to be alone in a car when you have said no and you're not comfortable with it, it would have struck me as a possible risk of something happening like a sexual assault."  JA1962; *compare* JA3199 (describing federal

judge giving a law clerk a ride before going inside her house because "it was cold" and then sexually assaulting her).

The district court found that Strickland was "creeped out." JA3698. But the court stated that Davis "noticed" it was "raining heavily" during this incident, presumably accepting his justification that he was offering her a ride home so that she would not get wet. JA3560–3561.

It was not raining, as shown by publicly available weather records. *See United States v. Foreman*, 369 F.3d 776, 786 (4th Cir. 2004) (weather records are subject to judicial notice). It did not rain until long after Strickland left the building at around 6:45 p.m.:



| 6:52 pm | | 88 °F | Broken clouds. |
| 7:35 pm | | 77 °F | Strong thunderstorms. Broken clouds. |

Charlotte Weather History for June 21, 2018, *available at* https://tinyurl.com/5n9b9zce; *see* JA713. Davis's false claims of rain heightened her fear that he had created a contrived excuse to be alone with her. JA1963.

Strickland "decided to modify her work schedule to never leave the office after 5 p.m., in order to avoid being alone with [Davis]." JA3562. Davis continued to press Strickland to meet him alone for another "mentoring session," suggesting "distance from work." JA3564–3565.

### C. Defender's Deliberate Indifference and Sex Discrimination

#### 1. Perpetuating the hostile work environment

On July 2, 2018, Strickland informed Martinez that she would be "drawing boundaries" with Davis and asked for Martinez's support and confidence. She told him she was "leaving the office by 5 every night to avoid issues" with Davis. JA3565–3566. Strickland was following advice from Laura Minor, who, in addition to serving as AO Associate Director, also had been an EEO advisor for the judiciary, to resolve the situation "informally and at the lowest level possible." JA3719. The FDO had provided no notice of the EDR Plan, but the EDR Plan also encourages employees "to report wrongful conduct to . . . their supervisor as soon as possible, before it becomes a [sic] severe or pervasive." JA3531, JA3535.

In response, Martinez forced Strickland to meet *with Davis* to "resolve a breakdown in communication" and "clarify with Caryn any issue about any *harassment* by JP." JA3566–3567 (emphasis added). Martinez "wanted to 'check [] out' potential concerns from Strickland about Davis *harassing* her." JA3570 (emphasis added). He described these events in a "significant events log," which, he testified, is *not* used for "ordinary work disagreements." JA3567; JA2874.

Strickland's workplace investigations expert, Vida G. Thomas of the Oppenheimer Investigations Group, testified that based on her decades of experience in conducting workplace investigations, "a well-trained supervisor"

would know "right from the get-go" that "[t]his must be serious" and would not conclude that this was a "workplace conflict." JA1968; *see* Vida Thomas, Managing Partner, OIG, *available at* https://tinyurl.com/3a2vvbxf. Thomas explained that it is not "unusual" for a complainant to communicate, "I don't want to get the person in trouble, I just want to tell you," because they fear "retaliation." JA1967. However, "once someone comes forward, even if they say, 'Please do nothing,' you can't not do anything." JA1968. "A well-trained supervisor wouldn't stop there," but would ask, "what action can you take?" JA1968.

Strickland repeatedly stated that she was not comfortable meeting with Davis. A "Letter of Counseling" subsequently issued on behalf of Chief Judge Gregory ("Chief Judge's Letter") explained that Martinez "had not abided by [Strickland's] wishes that she meet with him privately to discuss Mr. Davis's conduct." JA3688. "This made Ms. Strickland feel 'uncomfortable' and 'intimidated,' having to confront the person *she accused of sexually harassing her*." JA3688 (emphasis added). Thomas explained that Martinez's actions were "in and of themselves were retaliatory, as Martinez punished Strickland for coming forward by forcing her to engage one-on-one with the person she said was harassing her." JA1971.

During the meeting, Martinez compared Davis's supervisory authority over Strickland to a "*marriage*." JA3571 (emphasis added). He instructed her to

21

"compromise" and "meet in the middle," relying on a sexist stereotype that a female employee relates to her male supervisor like a wife who must "compromise" with a husband's demands. JA3571. Strickland was "shocked" and "offended." JA3688. The Chief Judge's Letter found that the marriage "metaphor was especially inappropriate given the context that Ms. Strickland had raised concerns with Mr. Davis's behavior towards her," JA3688, that is, a meeting intended to address concerns about Davis's potential "harassment," JA3567. Beam's investigation found that "[i]t is evident this claim was mishandled from the beginning by Mr. Martinez and he would benefit greatly with additional training on workplace conduct as well as basic managerial/leadership skills." JA3688.

Martinez assigned Strickland a new "mentor." JA3573. Martinez "told Strickland that Davis 'was a supervisor at this time and he was going to continue being a supervisor.'" JA3574.

## 2. Continued harassment and retaliation

The next day, on July 6, 2018, Davis emailed Martinez. Davis stated that Martinez should reconsider "whether [Strickland] lives up to the title of [Assistant Federal Defender]," a promotion she was actively seeking, *and* that she should be "well on [her] way to a PIP," *i.e.*, a performance improvement plan. Davis also stated that his issues with Strickland "need to be addressed during her annual performance review." JA3574–3575.

Previously, Davis and Martinez had praised Strickland for her "excellent job performance," her ability to work well with other attorneys, and her ability to handle pressure under deadlines.  *See* JA3544, 3573; JA2973–2974 (Davis told Strickland, "[y]ou're not really selling the whole 'I can't handle things at the last minute' line").  Martinez testified that Strickland was "hardworking," "responsible," her work was of "high quality," and she was "praised by attorneys in the office for her performance."  JA3544; JA2855.

On July 8, 2018, Davis emailed Strickland's new mentor, unprompted, with Martinez copied.  Davis told Strickland's new mentor that she "has made some egregious errors in attitude and judgement recently."  JA3575.  The district court described these remarks as professional "sabotage."  JA3701.

On July 20, 2018, Martinez assigned Strickland to work under Davis's supervision as Trial Team Leader.  JA3578.  That evening, Davis emailed Josh Carpenter, the FDO's Appellate Chief, regarding Strickland to "follow up" after he had "reacted a bit strongly on the phone."  JA3579.  Davis told Carpenter that Strickland had a "fuck off attitude" and committed "fireable offenses."  He stated, "To be blunt . . . [Strickland] needs to get the message that she fucked up and she needs to make things better and apologize."  Carpenter responded that he had a "game plan in mind for how to give her a chance—whether deserved or not—to

redeem herself and return to being a productive employee.  If not, we'll encourage [Martinez] to respond appropriately."  JA3580.

### 3.    Civil rights officer's intervention

On July 22, 2018, Davis requested that Strickland meet with him alone, despite knowing that she was avoiding him.   The next day, Strickland called in sick to protect herself from Davis.  Davis knew that Strickland's calling in sick was not "coincidental."  Davis even contemporaneously told Martinez that Strickland's reason for calling in sick was "probably because of [his] email" requesting to meet with her alone.  JA3580–3581.

On July 23, 2018, Strickland reported the harassment, and Martinez's inappropriate response, to Nancy Dunham, who managed the "civil rights office for the federal courts."  JA3581.  Minor had recommended that Strickland report her allegations to Dunham.  JA1983–1984.  At the time, there was no FDO manual providing notice of the applicable EDR Plan.  JA3535.

Dunham had never met Strickland before she reported her allegations.  JA3581.  Because she was afraid and needed "to build up trust," she did not even tell Dunham her name.  JA1984.  Although Dunham did not know who Strickland was, Dunham knew generally from Minor that Strickland was a "rising star" who was "well-respected in the district where she worked [and] also by the AO people that she had come in contact with as a U.S. Supreme Court Fellow."  JA1989.

24

Dunham told Strickland that her allegations constituted "classic sexual harassment." JA1987, JA2001. Dunham was "concerned for her," in part, because of signs of "physical danger." JA1962. Based on her experience of 35 years working in EEOC compliance, Dunham "strongly believed" Strickland's allegations. Dunham had seen many "inherently unreliable" complaints and only intervened "in the few times" when a complaint was credible. JA1986. Dunham believed she "needed to do something as soon as possible." JA1987.

Dunham testified that "one of the first things . . . that the AO should do is look at whether the situation could be resolved informally." JA1965. Dunham encouraged Strickland "to resolve this matter informally" and warned that "the odds were 'stacked against [her].'" JA1990–1991. Specifically, "[r]etaliation is a fact of life," and "there's a lot someone can do . . . when they are in a position of power to either make life difficult for an employee or fail to take action and then have no consequences come from it." JA1991.

### 4. Continued failure to stop the harassment

On July 24, 2018, after Strickland had been out of the office for days, it "dawned" on Martinez "that Strickland was uncomfortable with Davis and that he needed to separate them." JA3582; *see* JA276.

Unbeknownst to Strickland, Martinez *told Davis about Strickland's allegations*, because he claimed that was the only way to ensure that Davis would

not supervise her.  JA3583.  Martinez admitted he was "concerned about violating [Strickland's] confidences" but did so anyway.  JA2874–2875.  Martinez did not consider the possibility that Strickland would be further retaliated against because he had told Davis about her allegations.  JA2875.

Martinez "apologized" and told Strickland he would remove her from Davis's supervision.  JA3582.  However, about a week later, Martinez issued an office chart that continued to list her as reporting to Davis.  JA3586.  Martinez "modified" the chart only weeks later, after she raised further complaints.  Even still, Martinez required her to provide research and writing support to attorneys who reported to Davis, who "supervised the entire FDO trial unit."  JA3608.

Strickland continued to feel unsafe and only reported to work on certain days in August 2018.  Because Strickland's officemate was leaving and she worked in an isolated part of the building, she "began to carry pepper spray to work because of her fear of Davis."  JA3588–3589.

During this time, Strickland confided in her officemate that "Davis was sexually harassing her, and that Mr. Martinez had failed to address her concerns." JA3589.  A few hours later, Davis made a joke in front of his whole trial team that the officemate "should come back to give the sexual harassment training." Another employee later told Strickland that Davis had asked a paralegal to "keep

tabs" on her. It was widely known that the paralegal was "***spying on Ms. Strickland and reporting on her back to Mr. Davis***." JA3589 (emphasis added).

### 5. Retaliation for seeking guidance on her civil rights

In August 2018, Dunham worked with other AO officials to resolve Strickland's complaint, including Deputy Director Lee Ann Bennett and Chief of Defender Services Cait Clarke. JA3590. AO officials had "concerns" because of Strickland's "high reputation, as well as fears that [she] would go public with her claims." JA3582. Dunham's involvement was not "unusual" and it would have been a "breach of [her] obligation or responsibilities" not to proceed. JA1990. With Bennett's approval, Clarke contacted Martinez and recommended that he transfer Strickland to the appeals unit, away from Davis's supervision, and to the other division office. JA3590.

Martinez, however, became furious when he learned that Strickland had reported her allegations of wrongful conduct to the AO. He "called her out on contacting the AO to receive guidance on her civil rights as a federal employee." JA3652, JA3688. He berated her for going to "some other party" and stated that he was being "blamed" and "attacked" for something that was not his "fault." JA3652. At trial, Martinez reiterated that he was "frustrated" and "upset" that Strickland had reported her allegations to the AO. JA3591.

Martinez also minimized the harassment, stating, "but there was no physical contact." JA3593, JA3735. Beam's investigation and the Chief Judge's Letter subsequently found that these were words to the effect that, "at least you weren't touched." The Chief Judge's Letter concluded that Martinez's statements were "callous, minimizing, insensitive, and contributed to the distress that Ms. Strickland felt." JA3689.

Strikingly, the district court rejected these findings and concluded that Martinez's focus on "physical contact," while "minimizing" the harassment, "did not downplay her claim to the level" of other harassment plaintiffs. JA3735–3736, JA3765. Unlike Beam and the Chief Judge, the district court did not grasp the highly offensive implication of his statements, which was that the harassment could not really be that serious if she was not sexually assaulted.

On August 14, 2018, Martinez contacted the Fourth Circuit with a report of "wrongful conduct." JA3599. Circuit Executive Ishida advised Martinez to "recuse[] himself" due to his "involvement" in the matter. JA3600.

On August 15, 2018, Martinez contacted Ishida and informed him that Dunham had ordered him "to give [Strickland] whatever it is that she is asking for—telework, relocation, etc—before [she] hires an attorney or goes to the press." He also stated that "[a]fter some checking," he "discovered" that Dunham "coincidentally is a friend of the complainant." JA3603.

Without contacting Dunham or Strickland, Ishida relayed these allegations to Chief Judge Gregory and described them as "a disturbing incident." Ishida alleged that Dunham had "obstructed an ongoing Fourth Circuit EDR investigation." JA3603. Ishida was "irritated by the fact that there were all these AO employees . . . telling [Martinez] what he needed to do." JA3606; JA2025. Ishida acknowledged that AO officials were not "recommending discipline" against either Davis or Martinez, but he still believed that providing remedies to a complainant before an investigation was complete would be "inappropriate" and "prejudging the outcome." JA3606–3607. Ishida later told Strickland that it was not "'helpful' for her to have reported her complaints to the AO" because "when that happens, 'barriers go up,' walls go up, and people are 'on guard.'" JA3623.

Notably, Ishida should not have been EDR Coordinator. As a unit executive, Ishida "worked closely" with Martinez, a fellow unit executive, and had "both an actual and perceived conflict of interest," as shown by his comments to Strickland disparaging her exercise of protected rights. EDR Interpretive Guide & Handbook 32 (Jan. 1, 2020), *available at* https://tinyurl.com/5dt2e9n8.[2] During this time, Ishida was working closely with Martinez to establish the Fourth

---

[2] Without explanation, the district court excluded the EDR Handbook as an exhibit. JA3122. While the Handbook issued after Strickland's complaint, it provides relevant guidance regarding judiciary policies. Moreover, it is a publicly available government document subject to judicial notice. *See* Fed. R. Evid. 201.

Circuit's first CHU.  The current EDR Plan prohibits unit executives like Ishida from serving as EDR Coordinators.  EDR Handbook 32.

Dunham testified that she was "shocked" to hear these allegations, which were "patently false."  JA3604–3605.  Dunham had never previously met Strickland and was not her "friend."  JA3581.  Dunham's office "regularly guides courts and judicial staff about cases and it has never been considered 'interference.'"  Moreover, Strickland "was right to reach out to the AO for advice on her rights."  JA3605.  Dunham explained how Martinez's false allegations "might interfere with the EDR process," because if Chief Judge Gregory and Ishida were to be neutral adjudicators, "having falsehoods presented to them could interfere with decisions they made in the future" and hurt Strickland's "legitimacy and credibility."  JA3605; JA2024.

### 6.     Discriminatory capstone to *quid pro quo* request

On August 21, 2018, Strickland's work anniversary, she was "not considered for an increase in salary or job responsibilities" despite her excellent work performance.  JA3612–3613.  Strickland "did not receive a formal performance evaluation or performance plan with benchmarks for advancement, nor did she receive any formal performance review during her time at the FDO."  JA3613.  Martinez's stated practice regarding promotions was to "max all my staff to the largest maximum [salary] I could possibly give them."  JA2830.  Strickland,

however, was not even considered for the grade-level promotion referenced in Davis's *quid pro quo* "Mas Dinero" email, in which he proposed a "deal" to "pay" for his inappropriate advances. Martinez was aware of Davis's *quid pro quo* email, because Strickland had reported it. JA3594.

Strickland previously was "on track" to become an AFPD, which requires handling the attorney's "own clients and cases." JA3538–3539. Martinez "reclassified" Strickland to an AFPD, in title only, to benefit the office's "case weight measurement." JA3577–3578, JA3607. Although Strickland was not even considered for a promotion, the reclassification request submitted to the Defender Services Office stated that her "***current promotion potential***" was "***1 grade***." JA1799 (emphasis added). Martinez required Strickland to continue working as a research and writing attorney without her own caseload, in violation of the job requirements for an AFPD in the DOCS Manual. JA3538. She was required to provide research support to attorneys in "the trial unit headed by Davis." JA3608.

Even though Strickland was hired to be an AFPD, Davis and Martinez ridiculed Strickland for seeking an AFPD position and even made a "bet" about whether she would apply. Martinez told Davis that "you could of [sic] played dirty" by encouraging her, "but you played it clean." Davis responded that her "lip was practically quivering." JA3588.

31

The district court found it "regrettabl[e]" that Strickland "faced consequences that negatively affected her career" after reporting her "good-faith harassment claim." JA3744. But the court found it "too much of a stretch" to conclude that this was discrimination or retaliation. JA3748. The court did find it "certainly possible" that Davis's statements that Martinez should "reconsider" whether Strickland "lives up to the title" of AFPD and should be "well on [her] way to a PIP" influenced his "perception" of her. JA3574–3575, JA3747.

Martinez also rejected the Chief of Defender Services' recommendations for resolving Strickland's complaint. Martinez refused to transfer Strickland to the appeals unit, away from Davis's supervision of the trial unit, even though "a position for one-full time employee in the appellate unit" was available. The EDR investigation found that the office "needed more appellate support." JA3577. The district court found that a transfer to appeals would have been "feasible" and "prudent," and "[t]he record is unclear as to why the FDO did not want one full-time person in appeals." JA3750–3752. But the court refused to "speculate as to why," for example, whether Davis's statements to Carpenter—the Appellate Chief—that Strickland had a "fuck off attitude" and had committed "fireable offenses" influenced the decision. JA3580, JA3752.

Martinez also refused to transfer Strickland to the Asheville division office, the FDO's *only* other division office, away from Davis's location in Charlotte.

32

Martinez had a shared office space in Asheville, which he allowed support staff occasionally traveling from Charlotte to use, but not Strickland.  JA3762.  There was also a library and conference room to work.  JA3669.

Strickland worked in a cubicle in Charlotte and did not have her own office.  *See* JA279.  That fall, after Strickland raised her complaints and Martinez rejected a transfer, the FDO began advertising for a "summer intern in the Asheville office."  During the EDR investigation, Carpenter described efforts to set up a "cubicle" for the summer intern, but officials did not make any offer to set up a cubicle for her.  JA3656.  Martinez testified that he did not consider the possibility that advertising for a summer intern in the Asheville office while she was relegated to telework would signal that he prioritized having a summer intern over resolving her sexual harassment claim, would signal to her co-workers that she was less important than an intern, or would be "ostracizing or humiliating."  JA2912–2913.

In an office meeting in July 2018, Carpenter also had stated that the office had a "full-time need for AVL R&W," *i.e.*, a *full-time need for an Asheville Research & Writing Attorney*.  JA3577.  The district court concluded that the office's stated need for a *full-time attorney in Asheville* "weakened," but in its view did not "overcome," Martinez's claim of no space in Asheville, even though the position "would presumably require office space."  JA3656.

Dunham testified that in federal buildings, there are often "multiple federal employees and multiple federal positions." JA2005. Dunham was "skeptical" that there was no office space and noted that claiming a lack of office space is "an excuse" she has seen "in many other cases." JA2005. Thomas explained that Defendants "did not agree to the most straightforward way of protecting her: transferring her to the Asheville location as she requested." JA2041.

Because of Martinez's continued failure to address the harassment, Strickland did not feel safe in the office and requested to work remotely. She worked remotely for nearly seven months while her complaint went unaddressed, which the district court described as "career-ending." JA3761.

### D. Federal Officials' Grossly Inadequate Response

#### 1. Lack of training

Heather Beam, a human resources specialist for the district court, was "formally appointed" by Martinez to investigate Strickland's complaints in mid-August 2018. JA3729. Beam believed she was "reporting" to Martinez. *See* JA3601. This was Beam's first investigation. She did not receive any training or guidance on how to conduct a workplace investigation. JA3704–3705.

None of the officials involved in Strickland's EDR process had any meaningful training. "At the time Strickland reported her claims, there was no FDO manual on sexual harassment." JA3535. Martinez "received 'minimal'

training on the EDR process and how to handle sexual harassment claims." JA3660. Further, "[t]he FDO did not receive any office-wide mandatory sexual harassment training until 2019." JA3535. "Officials involved in the EDR process nationwide did not have mandatory training until 2019," according to testimony from Jill Langley, the former Judicial Integrity Officer ("JIO"). JA3535.

During the EDR investigation, Beam told Strickland that she was involved in the office conversion to the FDO. Beam "expressed surprise" that no one "provided training during the conversion on policies and procedures for handling complaints." She "opined that training would have helped in Strickland's situation—and maybe even 'avoided' it." JA3628.

## 2. Accused supervisors' coordination of testimony

Beam "expressly allowed Davis to speak with Martinez about Strickland's EDR claims." JA3705. In an email to Davis, Beam stated that "if you need to talk keep it to [Administrative Officer] Bill [Moormann] or [Defender] Tony [Martinez] and of course your wife only." JA3648. Thomas explained that the investigation was "not impartial," in part, because of "[t]he fact that Beam permitted the two Respondents to communicate with each other." JA2075. This "leaves open the possibility that those two would coordinate their interview testimony," and that "information wouldn't be kept confidential." JA2075.

Before his EDR interview, Martinez asked Davis "to prepare a timeline of events" for him regarding Strickland's sexual harassment complaint. JA2916. On August 20, 2018, Davis prepared and emailed Martinez "an extensive timeline of events called 'Timeline of Caryn Events for You.'" JA3609. On September 18, Davis provided Martinez another timeline that was "more specific" than the prior timeline, which was "more like a summary." JA2917. Later in the EDR process, Martinez also "shared portions" of Strickland's confidential mediation supplement with Davis, who was not a party to mediation, in violation of the EDR Plan. JA3675. When asked whether he believed that sharing details of Strickland's complaint with Davis was consistent with the EDR Plan, Martinez stated that "[w]hether consistent or not, he's being accused of basically sexually harassing an employee, and as far as I'm concerned, he needed to know that." JA2923.

Martinez's conduct of coordinating with Davis was part of a pattern.



### 3.     Continued obsessive behavior

On August 31, 2018, after Strickland was working remotely and an
investigation had been opened, Davis copied Strickland on an email to a client and
"made obscure, nonsensical references to a law review article" Strickland had
authored, "Against Design."  JA3620–3621.  Against Design is about
constitutional theory and is entirely unrelated to client representation in the FDO.
In his email, Davis told the client that he felt like "the Red Queen from Lewis
Carroll, running eternally just to stay in the same place," and "[i]t's hard to prestate
what the future will look like."  These references "were entirely nonsensical and
inappropriate in the context of a client email," which Strickland believed "showed
his continued obsession with her."  JA3620.

The district court found that Strickland did not report Davis's "strange
email" to Beam.  JA3732.  Strickland did report it; Beam simply failed to address it
in her report.  Strickland described the email as "very creepy" because it showed
that "if he had a chance to start doing this again, he would" and "I don't think he
would stop."  JA1788–1789.

### 4.     Continued inaction after Strickland's formal complaint

On September 10, 2018, Strickland filed her own "report of wrongful
conduct" and a "request for counseling" under the Fourth Circuit's EDR Plan.  She
named both Davis and Martinez as accused violators of the EDR Plan.  Strickland

requested a working environment free of sexual harassment, discrimination, and retaliation, and the opportunity to advance professionally based on merit. Under Chapter X, Section 7 of the Plan, which provides for disqualification of an employee (including a unit executive) who is "involved in" a complaint, Strickland requested to disqualify Martinez from the EDR process. JA3624, JA291; *see also* JA3600 (Ishida had advised Martinez to "recuse" himself because of his "involvement" in the matter).

Thereafter, for more than six months, officials took no meaningful action on Strickland's complaint. The district court found that the investigation "took far too long," which "evidences a ho-hum attitude toward a claim of this magnitude." JA3701, JA3798. It also observed that Chief Judge Gregory "was likely spread thin" and "that it would have been better for a presiding judicial officer to be appointed earlier." JA3710. The court found that "Strickland rightly complains of the process here as compared to the Ninth Circuit's investigation of a similar complaint involving a judicial officer," *i.e.*, Judge Joshua Kindred's actions of creating a hostile working environment and assaulting his law clerk. JA3798; *see* JA3189. During this time, Ishida told Strickland that "reiterating that you want a safe workplace free from harassment isn't helpful because Mr. Martinez," *the accused party*, "already believes that he's done and is doing all he can to provide such a workplace for you." JA2094.

Strickland repeatedly requested assistance with a transfer to a federal defender office outside of the district or a clerkship.  JA3638–3639.  She stated that "[t]his situation has irreparably damaged my relationships with the Federal Defender and my colleagues, and I believe I am no longer welcome in that environment."  JA3638.  She told Beam that the EDR process "was being set up to 'wash [her] out' and 'throw her away.'"  JA3629.

The lengthy period of telework ostracized Strickland from her co-workers.  As Thomas explained, "[b]eing away from the office without direct access to her peers and superiors placed Strickland at a disadvantage professionally."  JA2148.  While recognizing that telework "had the inevitable effect of cutting Strickland off from the day-to-day interaction with her colleagues," the district court found telework "appropriate" because she "requested" it when Martinez rejected an office transfer, since she did not feel safe around Davis.  JA3798–3799.  The court failed to recognize that the issue is not "telework," *per se*, but rather telework combined with the lengthy period of inaction.  This ostracized her and communicated that management supported Davis, who came into work like normal.

As ███████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████

While on telework, Strickland's co-workers mocked and belittled her. Adolf, Strickland's Team Leader, joked that he would have to "meet her at Waffle House."  Others added, "Where's Waldo?".  JA3637.  That fall, Adolf wore a Justice Kavanaugh costume, complete with a Yale-themed beer guzzler helmet, to the office Halloween party:



JA4089.  As ████████████████████████████████

████████████████████████████████████████████

## 5.    Failure to conduct an appropriate investigation

During this period, Beam failed to conduct an appropriate investigation.

Beam did not contact any of Strickland's witnesses, "nor anyone that 'could

substantiate [her] claims.'"  JA3658, JA3705; *compare* JA3197 (stating that 21

individuals were interviewed during the investigation of Judge Kindred's

misconduct).  Instead, Beam interviewed the accused managers and other members

of the all-male upper management team—including Davis, Martinez, Moormann,

and Carpenter—because she "was only focused on the people that were involved

directly in the situation."  JA3658.  An employee on Strickland's witness list, who

Beam did not contact, ███████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████

Beam did not give Strickland any status updates for weeks at time.  JA3629.

Beam did, however, allow Davis to contact her several times, including requesting

that her investigation be completed before the FDO's fall retreat, which Beam and

Davis, but not Strickland, attended.  JA3629–3630.  Davis also noted that "many of

the employees have figured out there is some kind of existing HR matter," but

Beam did not investigate the potential breach of confidentiality.  JA3629.  In

November 2018, Beam emailed Davis, "Hey JP! Haha! Ya know, with every email

you send me it takes me away from working on this report. :) Just Kidding . . . ."

JA3631.  Davis gave Beam a list of his "desired outcomes," including that he "[w]ould like documented [Strickland] was found to be making this up."  JA3658.

The district court found that "[a]round October [2018], Davis was also either shown a copy of the investigation report or told of the investigation's findings."  JA3630, JA3773.  In an email dated February 1, 2019, Davis told Moormann, the FDO's Administrative Officer: "As of this month, it will be six months since [Strickland] falsely accused me of harassment" and "four months since I was informally told that the investigation had found that no harassment occurred."  JA3630.  In December 2018, Davis told Ishida that "Heather has produced a written recitation of facts sufficient, to my understanding, for a decision-maker to immediately conclude there was no sexual harassment (which, from what Heather told me, is the only allegations [sic] that fits into the Plan's definition of 'wrongful conduct')."  JA3630–3631.  The district court found that it is possible either that Beam shared the report with Davis or that the investigation's findings "were shared in an 'informal conversation between [Ishida] and [Martinez],' and then shared with Davis 'in a private conversation' with Martinez."  JA3648, JA3773.

Thomas concluded that "Beam conducted the investigation in a manner that raises questions about her impartiality."  JA4061.  The investigation was not "timely, fair, and thorough."  JA4061.  Among other problems, Beam did not "interview any witnesses" provided by Strickland, which is "not normal"; she

42

"allowed Martinez and Davis to potentially influence her"; and she "took no steps" to investigate a potential confidentiality breach "because she did not consider the possibility" that it "might expose Strickland to retaliation." JA4062, JA4068. Davis "apparently was allowed to read the report," and Beam "appeared to treat Davis more favorably than Strickland." JA4071–4072.

In late November 2018, after Beam finished her report, Ishida sent it back. JA3640–3641, JA3704–3705. Ishida asked Beam to make "findings and recommendations." JA3641. Beam had believed that "her only role was to 'collect' the facts," JA3628, and "she did not feel comfortable making legal conclusions, considering she was not an attorney," JA3633, JA3709.

Beam also failed to investigate Strickland's claims against Martinez. Beam told Strickland that if there was a "'true feeling of retaliation,' then that would have to be investigated 'separately.'" JA3632–3633; *see also* JA3630–3631 (Davis's email). Ishida "reminded" Beam to include Strickland's retaliation claim. JA3640. The district court found that "the record is unclear" whether Beam conducted any further factfinding on retaliation, and that her final report "addressed" retaliation, "although perhaps not thoroughly." JA3654, 3771. In asking male supervisors about Strickland's claims, Beam did not "corroborate" or "investigate the credibility" of their statements, which, Thomas explained, falls below standard accepted practices. JA4084.

43

Beam did not investigate whether Strickland was eligible for a raise. JA3657. She did not recall "whether she investigated Davis's assertion, in the Mas Dinero email, that Strickland needed five more years of federal service to qualify for a GS 15." JA3657. Beam found that the "Mas Dinero" email can "clearly be inferred to be a quid pro quo request" and "supports [Strickland's] claim of sexual harassment." Beam concluded, however, that because Davis said the Mas Dinero email was a "dumb joke" and "admitted it was a 'stupid email to send,'" she "[did] not believe there was an intention of sexual harassment." JA3653. Beam did not consider judicial standards or precedents stating that sexual harassment claims "are not framed in terms of intent" because "[t]he touchstone is what is inappropriate to a reasonable person on the receiving end of the conduct." JA3209; *see, e.g.*, *Ocheltree v. Scollon Prods.*, 335 F.3d 325, 333 (4th Cir. 2003) (harassment is judged from the perspective of "a reasonable person in the plaintiff's position"). Beam had "never" received training about that issue. JA1963.

Despite her finding that Davis made a "quid pro quo request," Beam found that Strickland "has experienced in her mind sexual harassment" but her claim was "flimsy." Beam also found that Strickland "has also exploited poor judgment and decision-making skills of upper management to attain her goal of transfer to Asheville." JA3654. As discussed below, Beam's conclusion parroted, verbatim, Martinez's sexist assumption that Strickland was a gold-digger who was abusing

44

the EDR process for employment advantages—a conclusion informed by Davis, the accused harasser. Beam did not provide Strickland any notice or opportunity to respond to this allegation before disparaging her integrity in a report provided to the Chief Judge of the Fourth Circuit, where she practiced law. Beam thereby placed the blame *on Strickland* for the "poor judgment and decision-making skills" *of her supervisors*. JA3654. She also "documented" that Strickland had fabricated or exaggerated her claim, just as Davis had requested. JA3658.

Thomas explained that Beam "appeared to take at face value [Davis's] claim that sending the email had simply been a foolish error" and "did not seem to seriously pursue" investigating that assertion. Beam thereby "insulated Davis from . . . potential discipline" for "quid-pro-quo sexual harassment, which, for most employers, is a particularly egregious form of sexual harassment that would demand serious discipline, up to and including termination." JA2151.

### 6.  Davis's interference

During the investigation, Davis sent "persistent and inappropriate emails" to Ishida about Strickland's "false harassment claims." JA3644, JA3708. Davis asked Ishida what "remedies" he would have "as the victim of [Strickland's] malicious conduct." JA3644. Davis's emails discussed confidential information about Strickland's EDR proceeding, including the findings he had been told about Beam's investigation report. JA3646.

45

In December 2018, Ishida "expressed concerns" to Martinez that Davis's behavior was "inappropriate." Unlike his reporting of a "disturbing incident" regarding Dunham, Ishida did not notify the Chief Judge that Davis was interfering with Strickland's EDR process or had received confidential information. Ishida was concerned "that the investigation be conducted with integrity," but he did not contact Beam or do anything to "supervise" the investigation. JA3647.

On December 4, 2018, Martinez counseled Davis for "talk[ing] to James Ishida about something that [Martinez] and [Davis] talked about in a private conversation." JA3648. In a "significant event log," Martinez stated that "Davis's 'legal conclusions' about the investigation did not have any basis because 'that was an informal conversation between [Ishida and Martinez].'" JA3648; JA3773. These notes suggest that Ishida had informally shared the investigation's findings with Martinez, who shared them with Davis. They also indicate that Martinez and Davis "had been in contact about the investigation of Strickland's claims." JA3648. Martinez told Davis that if he contacted Beam or Ishida again, "then [he would] walk him out of the office." JA3649.

### 7. Holding disciplinary proceeding "in abeyance"

Beam resubmitted her investigation report on January 11, 2019, four months after the investigation began. JA3651. The report was being used both for Strickland's "dispute resolution" process under Chapter X of the EDR Plan, and

for discipline for wrongful conduct under Chapter IX of the Plan. *See* JA3664.

Chapter X allows employees who "claim[] a denial []of rights granted" under the

Plan to seek "remedies." JA3531–3532. Chapter IX requires allegations of

wrongful conduct to be "appropriately investigated," and provides that

"[e]mployees found by the Chief Judge and/or unit executive to have engaged in

wrongful conduct . . . may be subject to disciplinary action." JA3531.

On January 16, 2019, Ishida told Strickland that the investigation report was

"an internal report" and she would not receive the report or its findings. JA3664–

3665. Ishida also stated that no disciplinary action against the accused parties

would be considered. The Office of General Counsel had recommended that the

parties not receive the investigation report "because the parties would 'fight' about

the report." JA3664. This "would make informal resolution more difficult," even

though six months earlier, Ishida had rejected Dunham's efforts at "informal

resolution" and decided that an investigation would be required before any

remedies could be provided. *Supra*, at 29–30 ("disturbing incident" email).

Ishida acknowledged that without distributing the report, no disciplinary

action could be taken. JA3664. Ishida therefore determined that any disciplinary

proceeding would be held "in abeyance" until Strickland's dispute resolution

process was over. JA3665. In the same conversation, Ishida stated that, based on a

personal conversation with Davis, this had been a "living hell" for him and he "had been suffering physical symptoms." JA3666.

Strickland was in the "counseling" phase under Chapter X of the EDR Plan and was also required to complete *mandatory* "mediation" before she could request a hearing. JA3532. Thus, holding the disciplinary proceeding in "abeyance" meant delaying accountability for her supervisors' misconduct for months, if not indefinitely. *See* JA3800. The only way Strickland could avoid further delays would be to end her EDR process or, as ultimately happened, resign.

Langley, the former JIO, who is considered a "national resource" on the EDR Plan, testified that "the concept of saying something had been abated" in this way "is not something that I have ever heard of or understood as part of the EDR process." JA2168; *see* JA3530. Thomas explained that "Defendants did not respond to or investigate Strickland's complaint promptly," in part, because "[n]o action was taken by Defendants in response to Beam's report, and no resolution came as a result. . . ." JA2148.

### 8. Refusal to disqualify Martinez

Also on January 16, 2019, Ishida told Strickland that Chief Judge Gregory "intend[ed] to deny [Strickland's] request to disqualify [Martinez]," which had been pending for more than four months. JA3662. Previously, Ishida had

emphasized that the Chief Judge was "taken aback" by Strickland's request to disqualify Martinez, because he wasn't "expecting it." JA3625.

After the investigation report came out, on January 13, 2019, Ishida had asked Beam whether Martinez should be disqualified based on her conclusion that he "mishandled [Strickland's claim] from the beginning" and "MUST . . . be counseled and trained on how to handle workplace conduct complaints." JA3653, JA3660. Her answer was an emphatic yes.

Beam explained, "I truly believe [Martinez] is biased" regarding Strickland's sexual harassment claim. She explained, "I know he feels [Strickland] is attempting to exploit this situation to get the transfer to Asheville, however it has created a bias in him to look at this case from a neutral perspective." Beam also explained that Martinez "lacks the experience and understanding of exactly how this process works." Beam was "concerned he could cause more damage if he were involved in the process at this point." JA3660.

Chief Judge Gregory denied Strickland's disqualification request without explanation. He later testified that "the purpose of . . . EDR" was "dispute resolution," and Martinez "was not the person who committed the alleged sexual harassment." JA3662. Ishida testified that "it would depend on the 'context' whether an accused unit executive would need to be disqualified from an EDR

proceeding, even if the unit executive himself was accused of sexual harassment or sex discrimination." JA3663.

The district court found that "it is obvious . . . that Martinez's actions as the unit executive were inappropriate, including his reaction to Strickland's contact with the AO and his use of a marriage metaphor, and his sharing of Strickland's mediation supplement with Davis, among others." JA3777. Further, "[t]he refusal to disqualify [Martinez] created a conflict of interest that infected the entire investigation." JA3777 (quoting *Strickland*, 32 F.4th at 355). Langley, the JIO, also "testified that it would be appropriate to disqualify a unit executive when that executive's personal interests conflict with the best interest of the office." JA3777.

As a result of Martinez's non-disqualification, he had sole decision-making authority during mandatory "counseling" and "mediation." JA3662–3663. The district court also found that in a final hearing, Martinez's "views would be sought as the Unit Executive." JA3795. Thomas explained that "the investigation of Strickland's complaints lacked fundamental fairness," in part, because Martinez was allowed to "act[] as a 'decision maker' who had the authority to approve or disapprove any proposed resolution." JA2161. Moreover, by requiring Strickland to "resolve" her complaint with an accused party, "Defendants did not meet their obligations to Strickland as provided by the well-accepted standards in the human resources industry." As Thomas explained:

> From the beginning, the Defendants treated this matter as an informal work dispute, between Strickland and Davis, one that could be "resolved" through the EDR Plan process. Defendants apparently did not appreciate that Strickland had reported behavior that was potentially illegal under Title VII and that needed to be taken seriously, investigated promptly, and remedied appropriately. . . . This approach not only deprived Strickland of the protections to which she was entitled under Title VII, but it also placed her in the unfortunate position of having to advocate for herself when it was the Defendants who should have been protecting her.

JA2335–2336.

### 9. "Kangaroo court"

On January 30, 2019, nearly five months after Strickland filed her EDR complaint, she proceeded to mandatory mediation. The district court found that Ed Smith, the Chief Circuit Mediator, was "an employee of the Fourth Circuit" who was not "neutral" or "independent" but rather reasonably was seen by Strickland as "a member of the opposing team." JA3707. Smith, like Martinez and Ishida, was also a unit executive. JA3677.

Smith told Strickland that Martinez "is from a 'generation' that doesn't 'get' sexual harassment." JA2177–2178. He stated, however, that "I don't think a judge is going to micromanage this office and tell a federal defender how to do his job and run this office. They'd be better off terminating him." JA3677; JA2177.

Smith stated that he was "not disagreeing" with Strickland's concerns that "the hearing officer can't do anything because they're not going to micromanage the office," and "this all seems like a sham" and a "kangaroo court." JA2180–2182. Smith stated that "you lose a few rights when you become a federal employee." JA2188. He also observed that "there really wasn't a remedy" under the EDR Plan that "fit the situation," because "[n]one of these are going to do anything in this particular case." JA3677. Smith explained that the only remedy that likely could help Strickland was "discipline" for misconduct, but that would require an "internal investigation," which was not available due to the Fourth Circuit's handling of her EDR proceeding. JA3677; JA2184. The district court concluded that Strickland's belief that a hearing officer would not order remedies based on Smith's statements was "unreasonable." JA3779, JA3782.

During mediation, Smith convinced Martinez to allow Strickland to work in the shared office space in Asheville. Smith stated Martinez only changed his mind after Smith got "involved." JA3669. Strickland turned down the offer because of Martinez's evident bad faith in refusing the transfer six months earlier, even though it plainly was possible, and because without any other accountability for wrongful conduct, a transfer would "stigmatize" her and would not resolve the underlying harassment, discrimination, and retaliation. JA3669–3670.

### 10.  JIO's "uncertainty" about remedies

In February 2019, Strickland met with Langley, who recently had been appointed as the judiciary's first JIO.  JA3670.  Langley informed Strickland that she "didn't know what would happen" if "the defender refused to comply" with a presiding officer's order in an EDR hearing.  JA3672–3673.  She explained that unlike other court employees, a defender is not in a "direct employment relationship with the chief judge and the judges on the court."  JA3672.  Specifically, defenders "are different than the unit executive in the court which is clearly governed by, and supervised by, and works at the pleasure of the chief judge and the judges on that court."  JA3674.  "In contrast, if I'm a court employee and the presiding judicial officer orders the clerk of court to provide some remedy, the clerk of court . . . is in a very direct employment relationship with the chief judge and the judges on the court."  JA3672.  Langley questioned "the mechanics" of what "enforcement" of remedies would mean for a defender.  JA3673.

The district court found that these issues "demonstrate a failure of the EDR Plan clearly to articulate the roles, responsibilities, and authorities of the presiding judicial officer and a unit executive like the Federal Defender."  JA3786.  The court found it "regrettably obscure" whether "the EDR Plan . . . vests in [the presiding officer] the authority to make employment decisions" regarding AFPDs,

who are not employed by the Circuit. JA3797; *see* 18 U.S.C. § 3006A (providing the Circuit authority to "appoint" defenders but not AFPDs).

Unlike court employees, federal defenders serve an independent Sixth Amendment function. *See* 18 U.S.C. § 3006A. When Congress created FDOs, it did not see them as directed by the judicial branch. S. Rep. No. 91-790 at 18 (1970) ("It would be just as inappropriate to place direction of the defender system in the judicial arm of the U.S. Government as it would be in the prosecutorial arm."); *see also Polk Cnty. v. Dodson*, 454 U.S. 312, 321 (1981) ("[A] defense lawyer is not, and by the nature of his function cannot be, the servant of an administrative superior."). Given their obligation to advocate for clients before the courts, federal defenders must uphold the independence of their office. Code of Conduct for Federal Public Defender Employees Canon 1.

At the time of Strickland's complaint, a committee appointed by the Chief Justice under the CJA recently had recommended that the federal defender program be "an autonomous entity, not subject to judicial oversight and approval." 2017 Report of the Ad Hoc Committee to Review the Criminal Justice Act (Apr. 2018), *available at* https://tinyurl.com/mrkvs6ej. Decades ago, another appointed committee reported concerns that judges did not have "jurisdiction" to order remedies for defenders' employment matters and "shouldn't be involved," as well as the "inherent potential for judicial interference" when courts "are privy to such

matters as employee grievances." *See* 1993 Report of the Committee to Review the Criminal Justice Act 40–41, 45 (Mar. 1993); *see also id.* at 77 n.37 (recognizing the need for "[e]nforceable regulations" over employment matters in FDOs). After the events in this case, the judiciary adopted a "separate" EDR Plan for federal defenders, recognizing their "distinct employment relationship and mission." Report of the Proceedings of the Judicial Conference of the United States, at 23–24 (Sept. 2021), *available at* https://tinyurl.com/4e9vmff8.

Strickland understood Langley's statements in the context of federal defender independence. She believed Langley was telling her that a presiding officer likely either lacked statutory authority to order remedies a defender did not approve—given that the EDR Plan itself lacks any statutory basis—or else would not "want to be perceived as interfering with the independence of a federal defender office." JA3693. Strickland contemporaneously communicated this belief in a comment submitted on proposed revisions to the Model EDR Plan. Based on this understanding, Strickland believed that a hearing would be futile because, as a practical matter, it would not lead to an order of remedies to effectively address the hostile work environment at the FDO. JA3692–3693.

Following their meeting, Langley sent an email to Strickland in which she reiterated, "I'd like to better understand if FPDs are adequately protected by EDR remedies." She described Strickland's case as a "lesson learned." JA3674. She

explained, "I can't address the whys of what has transpired in your cast [sic] to date, and I know this has been an arduous path for you."  JA1802.

Langley later speculated that the CJA's appointment clause could provide a presiding officer authority over a federal defender, but she never followed up about this with Strickland.  JA3673 (testifying that "as a lawyer" she would make this argument).  The district court acknowledged that there is no current mechanism for a federal defender to be removed as a result of an EDR proceeding.  The court recommended that in future cases, the presiding officer "make[] a written report to the body that makes the decision," like the Court of Appeals.  JA3797–3798.

### E.    Constructive Discharge

Having endured a hostile working environment for more than six months with no meaningful action on her complaints, having been subjected to an unfair and biased EDR process, and having been told that a hearing officer would not, or could not, order remedies even if she prevailed, Strickland had no choice but to resign.  Though Strickland had already clerked for multiple federal judges, including a Second Circuit judge, she accepted a temporary Fourth Circuit clerkship.  Strickland told Smith that the clerkship was a "very nicely packaged constructive discharge."  She "was giving up her career because she was harassed and retaliated against without any accountability."  JA3679.

After Strickland resigned, Martinez was "thrilled" and told Smith, "You must be able to walk on water." JA3680. Ishida told Smith, "I can't tell you how relieved and delighted I am with the news." JA3680–3681. The district court described these messages as "clear and shameful examples of judiciary officials' failure to lead with empathy and respect." JA3783.

Following Strickland's resignation, Beam exchanged emails with the district's Clerk of Court, Frank Johns, mocking and disparaging her.[3] Strickland had withdrawn her application for a *pro se* law clerk position in the district because of the temporary Fourth Circuit clerkship. Beam and Johns were so happy that Johns stated: "***YEA! That one is off the chess board!***" JA3692 (emphasis added). Beam responded: "***Yep – I think she would have been a true pain in the you know what :).***" JA3692 (emphasis added). The district court described these emails as "unprofessional." JA3706. Thomas explained that Beam's email "making fun of Strickland" was "a clear indication that Beam had a bias against her." JA2065.

The FDO was formally notified of Strickland's resignation on March 22, 2019. JA3063. *The next business day*, Martinez awarded a raise of approximately $15,000 to a male attorney, Jared Martin, who had been "reclassified" to an AFPD

---

[3] Johns later directed the sealing of this *entire* case. JA142, JA158, JA159. The district court has not ruled on Strickland's pending motion to disclose all orders and directions sealing this case and the reasons for sealing. ECF No. 447.

at the same time as Strickland.  JA3693.  Martinez awarded this raise "in less than the standard 52 weeks" for a promotion.  The reason given for Martin's promotion was to "*correct*" the fact that "the *usual* Grade and Step pay changes did not occur" due to the August 2018 reclassification.  JA3693–3694 (emphasis added).

Unlike Strickland, Martin was not even eligible for a promotion in August 2018.  Martin had maxed out all grades on the federal pay scale.  *See* JA1800 (Martin's "promotion potential" was "steps only").  At the time, her "promotion potential" was "1 grade."  JA1799.  As a result of the promotion, he was making nearly $40,000 more than her for the same job.  JA3693–3694.  She had alleged more than six months earlier that she was denied a promotion because of ongoing discrimination and retaliation, but her salary was never "corrected" like Martin's.

On June 4, 2019, several months after Strickland resigned, Ishida informed her that "disciplinary action was taken" on her "report of wrongful conduct." JA3691–3692.  Ishida had informed the Chief Judge that "[t]he investigation report recommends that *disciplinary action* be taken" against both Davis and Martinez. JA3683 (emphasis added)).  During trial, however, Ishida disavowed his representation of the action as "disciplinary action" and stated it was "counseling" intended to "inform [Martinez] about a few well-intended mistakes."  JA3687.  A memorandum from Ishida to the Chief Judge confirms that officials did not even

begin the process of considering disciplinary action until March 25, 2019, weeks after Smith "convinced" Strickland to resign and accept a clerkship. JA3683.

Chief Judge Gregory decided what discipline to impose on Martinez. Martinez decided what discipline to impose on Davis, even though Martinez himself was also "counseled." Ishida testified that any disciplinary action against Davis was not the "concern" of the Fourth Circuit, and the Fourth Circuit "had no authority to take any action" regarding Davis because the Court was not his "appointing entity" under the CJA. JA3684. Martinez imposed verbal "counseling." JA3685; JA1163.

Martinez testified that he "always believed" Davis. In his "opinion," the conduct she reported "was not sexual harassment." He believed that Davis's conduct "did not require any disciplinary action" because it was "just emails," and "wasn't as serious as any other action that [Davis] might have taken." JA3685.

## II.    District Court's Rulings

### A.    MeToo Evidence

Before trial, Defendants moved for a protective order to prevent Chief Judge Gregory's deposition. In opposition, Strickland argued that "Chief Judge Gregory was responsible for overseeing all EDR complaints within the Circuit" and had "unique knowledge regarding the Circuit's response to harassment and discrimination that no other official would have." JA3876. With her opposition,

59

Strickland filed MeToo evidence regarding other EDR complaints against the FDO. JA3884–3889. Because Defendants opposed unsealing of the MeToo evidence, Strickland filed it under seal and moved to file it publicly. *See* WDNC LCvR 6.1(d) (stating that a party "may submit an unredacted version of the material under seal" for review pending a sealing determination by the court).

In response, the district court *sua sponte* suspended the district's local rule regarding sealing and ordered that "**[n]othing** is to be filed . . . under seal"—even for the purpose of determining whether sealing was proper—"unless and until this Court upon motion expressly so orders." JA252 (emphasis in original). The court stated that it has "consulted only the redacted filings" and any documents under seal "are to be returned to sender." The court allowed Strickland to depose the Chief Judge regarding his decision not to disqualify Martinez, but not his knowledge of other EDR complaints. JA252.

Subsequently, Strickland filed a redacted summary judgment motion and moved for leave to file MeToo evidence under seal, as the district court had ordered. JA339, JA350, JA 357; *see* JA324, JA329. The district court did not rule on the motion to seal and subsequently granted summary judgment in favor of all Defendants except for Martinez on her equal protection claim. JA468. The court did not even review the MeToo evidence. Strickland moved for reconsideration, arguing that the district court had violated her due process rights by failing to

review her evidence and arguments before it ruled against her. JA539. In a hearing, the district court stated, "the plaintiff is correct, I looked at the redacted data," but it orally denied the motion. JA3132.

During trial, the district court excluded the MeToo evidence as "not relevant" and "hearsay." *See* JA3739. As with prior rulings, the district court did not rule on the parties' motions to seal and did not review their unredacted filings before granting Defendants' motion *in limine*. JA561, JA573, JA578, JA599, JA604, JA617, JA621.

Because the district court did not rule on the motions to seal, the unredacted versions of these documents could never be filed. Therefore, only the redacted versions of Strickland's motion for summary judgment, motion for reconsideration, and opposition to Defendants' motion *in limine* are included in the joint appendix. Months after trial, the district court allowed Strickland to file her unredacted proposed findings of fact under seal for the first time. JA3187.

## B. Opinion

The district court held the trial remotely via Zoom. The presiding judge, who was the factfinder, was not present in person to observe the witnesses' demeanor and credibility. *See* JA1820, JA3818.

After this Court's prior decision, the only remaining defendants were judiciary officials in their official capacities, which is "another way of pleading an

action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). The district court held that Martinez, the only remaining "defendant" on the equal protection claim, was not deliberately indifferent to sexual harassment. In reaching this conclusion, the district court reviewed actions and inactions that were attributable to Martinez personally rather Strickland's employing office, the entity being sued. JA3724. Martinez was not even a defendant, since he was no longer the defender. *See* JA506, JA510.

The district court concluded that Martinez took steps like allowing telework, and Strickland did not personally tell Martinez—the subject of her complaint—that she was "unhappy." JA3762. The court found that Martinez "separated" Strickland from Davis by ordering her to work on trial cases under Davis's supervision, but requiring Martin, the male research and writing attorney, to act as the "gatekeeper" of trial assignments. JA3727–3728; *see supra*, at 26 (Strickland was required to continue working on trial cases until her resignation). Martinez also "reported" Davis's conduct to Ishida in August 2018. JA3728. The district court concluded that flaws in the investigation, like Beam's failure to interview witnesses, had no "bearing on Martinez's *discriminatory* intent." JA3774.

In a footnote, the district court categorically rejected Thomas's expert opinion. JA3769–3770. The court rejected Strickland's argument that a lack of

training of any of the employees involved in her EDR process supported her deliberate indifference claim.  JA3742–3743.

Even remotely, the district court found that Martinez was "quite hostile" towards Strickland.  JA2413.  The court concluded that Martinez was "certainly biased against Strickland," but "there is no evidence that this bias was based on any discriminatory animus."  JA3768.  The court found that Martinez believed she was not a "team player."  *But see Stegall v. Citadel Broad. Co*., 350 F.3d 1061, 1072 (9th Cir. 2003) (discussing "the all too familiar complaints about assertive, strong women who speak up for themselves: 'difficult,' 'negative attitude,' '*not a team player*,' 'problematic[,]'" and urging district courts to "reject such sexual stereotypes" (emphasis added)).  It also found that, "[w]ith Davis's narrative in his ear, Martinez erroneously believed that Strickland was 'exploiting this situation to get the transfer to Asheville.'"  JA3703.  The court found "emphatically that Strickland's claim of sexual harassment was made in complete good faith and for no ulterior motive."  JA3698.  The court reasoned that Martinez's assumption, influenced by Davis, "had nothing to do" with gender.  JA3769; *but see* Deborah Epstein, *Discounting Credibility: Doubting the Stories of Women Survivors of Sexual Harassment*, 51 SETON HALL L. REV. 289, 307 (2020) ("One of the most persistent and virulent stereotypes about women's false allegations about male behavior is the 'grasping, system-gaming woman on the make.'").

With respect to Strickland's due process claim, the district court held that her reliance on statements by Smith and Langley to conclude that remedies would not be available in a final hearing was "unreasonable." The district court concluded that "Langley's uncertainty, as conveyed to Strickland, did not rise to telling Strickland unequivocally that Martinez would be the final decisionmaker on Strickland's remedies following her Chapter X hearing." Even though the EDR Plan failed to articulate the roles of hearing officers and federal defenders, "uncertainty on the outcome does not dictate the outcome." JA3786.

The district court also rejected Strickland's argument that an "accumulation of mistakes" and "'failures to comply' with internal policies" violated due process. *Doe v. Rector & Visitors of George Mason Univ.*, 149 F. Supp. 3d 602, 621 (E.D. Va. 2016). The court acknowledged multiple "routes" to establishing a due process violation, like "a severe deviation" from the EDR Plan or a lack of "remedies as practical matter during the final hearing." JA3528; *see* JA3151–3152. But the court concluded that under this Court's prior decision, the *only* way Strickland could prove a due process violation is if she reasonably believed that Martinez "was the final decisionmaker" in her Chapter X EDR hearing. JA3775. The district court refused to consider Strickland's other arguments, including that she was "coerced to resign" due to a fundamentally unfair EDR process. JA3789. The court also concluded that Ishida's decision to hold disciplinary action "in

64

abeyance," which delayed accountability for wrongful conduct, did not violate Strickland's due process rights.  Rather, it was a "pragmatic" decision.  JA3790.

Having rejected Strickland's constitutional claims, the court gratuitously observed that the flaws in her EDR process stemmed from "well-meaning people trying fairly to implement the EDR plan while 'walking wide' of Strickland."  It quoted Rudyard Kipling's poem, "The Widow at Windsor," which describes solders "walking wide" of Queen Victoria as she exploits them in her reign to expand her empire.  JA3794.  Kipling, whose works include "The White Man's Burden" and "The Female of the Species," has been described as "a racist, an anti-Semite, [and] a misogynist."  McGarth, Charles, Rudyard Kipling in America, The New Yorker (July 8, 2019), *available at* https://tinyurl.com/2scahm3e.

Nonetheless, the court found that "in this case, a young woman with significant professional qualifications made a good faith claim of sexual harassment."  JA3795.  "As a result, she saw her desired career in public service stunted and ultimately withered such that her services have been lost to federal public service."  But the court concluded that no remedy existed for this career-ending wrong.  It stated, "[t]hat she is without redress under the present legal framework cannot be a cause for congratulation on the part of federal judges or administrators."  JA3795.  Instead, it recommended "structural reforms" for "the problems revealed in this case."  JA3796.  It denied reconsideration.  JA3857.

## SUMMARY OF ARGUMENT

This case implicates the rights of the judiciary's approximately 30,000 employees, who lack statutory protection from workplace harassment and discrimination under Title VII. Strickland was subjected to *quid pro quo* sexual harassment and a hostile working environment, which escalated to a point where she felt physically threatened and could no longer come into the office. She was repeatedly retaliated against, and her confidentiality was violated with impunity. Strickland did everything possible to seek remedies to allow her to work safely, including seeking guidance on her civil rights, informal resolution, and eventually, filing a formal complaint. At every turn, she was stonewalled. With a "***ho-hum attitude***"—the district court's words, not Strickland's—Defendants failed to protect her or even comprehend the gravity of her claim. JA3798. Indeed, Martinez's statement, "but there was no physical contact," *i.e.*, "at least you were not touched," illustrates a mentality that, so long as she was not *sexually assaulted* by her supervisor, her allegations were not that serious and could be dismissed.

Defendants failed to conduct an appropriate investigation, failed to provide notice of the EDR Plan or any training to prevent or redress harassment, and failed to provide appropriate remedies that would allow Strickland to continue in her job. In short, Defendants failed to take basic measures to respond to harassment that would be required of any other employer. Instead, Defendants put the burden *on*

66

*Strickland* to "resolve" her complaint with her supervisor, Martinez, who was accused of misconduct. They refused to disqualify Martinez even after the investigation found that he was so "biased" against Strickland that he could "do more damage" if allowed to participate. Beyond failing to take prompt and effective action to remedy harassment, judiciary officials—including the JIO—questioned how a presiding officer could enforce remedies against a federal defender office, even if Strickland "proved" the harassment in a hearing.

Because of Defendants' errors and failures to comply with the EDR Plan, Strickland was left with no remedy for sexual harassment, sex discrimination, and retaliation she suffered. Without any accountability for her supervisors' misconduct, Strickland had no choice but to resign and lose her chosen career.

The district court concluded that Strickland was "without redress under the present legal framework," meaning that, because she is not covered by Title VII, she has no remedy. That is profoundly wrong. The district court misconstrued precedent and failed to apply controlling legal standards to Strickland's equal protection and due claims. But if the district court is right, its ruling raises the profound constitutional question of how it is rational, let alone morally acceptable, to exclude judiciary employees like Strickland from the civil rights protections available to other federal employees. If this Court affirms, it will ensure that judiciary employees like her are second-class citizens stripped of basic civil rights.

## STANDARD OF REVIEW

This Court reviews a grant of summary judgment *de novo*, and draws "[a]ll inferences . . . in a light most favorable to the non-movant." *Okoli v. City of Balt.*, 648 F.3d 216, 220 (4th Cir. 2011).

This Court reviews a judgment following a bench trial under a "mixed standard of review." *Heyer v. United States Bureau of Prisons*, 984 F.3d 347, 355 (4th Cir. 2021). The district's court's legal conclusions are reviewed *de novo* and its findings of fact are reviewed "for clear error." *Id.* "[W]hile clear error review is deferential, it is not toothless." *Id.* (citation omitted). Factual findings "are not 'so sacrosanct as to evade review,' and this Court may reverse those findings when definitely and firmly convinced they are mistaken." *Id.* (citation omitted). Factual findings may be reversed when "they were derived under an incorrect legal standard," they "are not supported by substantial evidence," they ignore "substantial evidence" supporting the opposite conclusion, or they are "contrary to the clear weight of the evidence." *Id.* Moreover, clear-error review does not "inhibit an appellate court's power to correct errors of law, including those that may infect a so-called mixed finding of law and fact, or a finding of fact that is predicated on a misunderstanding of the governing rule of law." *Bose Corp. v. Consumers Union*, 466 U.S. 485, 501 (1984).

This Court reviews the district court's interpretation of the Federal Rules of Evidence *de novo*, and its application of the rules for abuse of discretion. *Cisson v. C.R. Bard, Inc.*, 810 F.3d 913, 923 (4th Cir. 2016). By definition, an error of law is an abuse of discretion. *United States v. Singh*, 518 F.3d 236, 251 (4th Cir. 2008). Questions of constitutional law are reviewed *de novo*. *See, e.g.*, *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 685 (4th Cir. 2018).

## ARGUMENT

### I. Strickland's Exclusion from Title VII is Unconstitutional if the District Court's Legal Reasoning is Correct.

The district court concluded that because Strickland is not covered by Title VII, and in its view, a starkly different legal standard applies to Defendants here, she is without "redress." JA3795. That is fundamentally wrong and amounts to an unconstitutional double standard. Indeed, it effectively concedes that if Strickland were covered by Title VII, she *would* be entitled to redress.

This Court has held time and again that in evaluating claims of deliberate indifference to sexual harassment, courts must rely on standards in analogous civil rights statutes, which are "substantial[ly] similar." *Feminist Majority Found.*, 911 F.3d at 703; *see Ricketts v. Wake Cty. Pub. Sch. Sys.*, 125 F.4th 507 (4th Cir. 2025) (standards are "very similar"); *Jennings v. Univ. of N.C.*, 482 F.3d 686, 701 (4th Cir. 2007) (equal protection sexual harassment claims "are governed by traditional

Title VII . . . jurisprudence"). Moreover, Title VII and equal protection claims enjoy substantial overlap. "Title VII and equal protection cases address the same wrong: discrimination." *Bator v. Hawaii*, 39 F.3d 1021, 1028 n.7 (9th Cir. 1997). Title VII standards thus inform equal protection claims. *See Briggs v. Waters*, 484 F. Supp. 2d 466, 476 (E.D. Va. 2007) ("It is well-settled that this court applies the standards developed in Title VII litigation to similar litigation arising under 42 U.S.C. § 1983." (citing *Beardsley v. Webb*, 30 F.3d 524, 529 (4th Cir. 1994)). In line with this precedent, Title VII principles should have guided the district court's evaluation of Strickland's equal protection claim.

The district court starkly departed from this precedent. It concluded that so long as Defendants did not do *nothing* in response to Strickland's sexual harassment claim, their response was constitutionally adequate. That violates precedent. *See Feminist Majority Found.*, 911 F.3d at 689–90 (a plaintiff need *not* allege that an institution was "entirely unresponsive," and "half-hearted investigation or remedial action" does *not* suffice). The district court's rejection of controlling precedent warrants reversal of its rulings on Strickland's equal protection and due process claims.

But if the district court is correct, then this Court must confront a profound question: *Whether it is constitutional to exclude Strickland from the civil rights protections that apply to other federal employers, simply because she is an*

*employee of a federal public defender office.* There is no legitimate governmental

justification for this deprivation of Strickland's civil rights under any standard.

**A. Defendants' conduct violated Title VII standards.**

Based on the district court's findings, there is no question that Defendants

violated Title VII standards.

**1. Sexual harassment, sex discrimination, and retaliation**

**a. First Assistant**

Strickland was subjected to *quid pro quo* sexual harassment. Strickland's

belief that Davis made a *quid pro quo* proposal was objectively reasonable. The

EDR investigation found that his "Mas Dinero" email can "clearly be inferred to be

a quid pro quo request." *Supra*, at 14; *see Oncale v. Sundowner Offshore Servs.*,

523 U.S. 75, 80 (1998) ("explicit *or* implicit proposals of sexual activity" will

make it "easy" to infer discrimination) (emphasis added)).

Davis's abuse of his supervisory authority to make a *quid pro quo* request

was sexual harassment. "Threats or insinuations that employment benefits will be

denied based on sexual favors are, in most circumstances, quintessential grounds

for sexual harassment claims." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597,

607 (2d Cir. 2006). Moreover, a supervisor's communication that an adverse job

action will follow if sexual favors are denied may cause "real emotional strife,"

including "anxiety, distress, and loss of productivity regardless of whether the

threat is carried out." *Jansen v. Packaging Corp. of Am.*, 123 F.3d 490, 500 (7th Cir. 1997) (en banc) (Flaum, J., concurring).

Davis also created a hostile working environment and took actions that "reasonably made Strickland uncomfortable." JA3699. Factors contributing to a hostile working environment include whether the conduct was "'physically threatening or humiliating," whether it "unreasonably interfere[d] with an employee's work performance," and whether it "affected the employee psychologically." *Flood v. Bank of Am. Corp.*, 780 F.3d 1, 11 (1st Cir. 2015). Because a "supervisor's power and authority invests his or her harassing conduct with a particular threatening character," the status of the harasser is "a significant factor . . . [i]n measuring the severity of harassing conduct." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 278 (4th Cir. 2015) (en banc).

Strickland "believed absolutely that Davis"—the FDO's "principal deputy" in charge of "initiat[ing] employment actions"—was "virtually stalking and harassing her." *See* JA3698. His behavior made her feel "creeped out" and have reasonable concerns for her "personal safety." *See* JA3627. She was so afraid of Davis that she brought pepper spray to work to protect herself.

Moreover, while harassing conduct "may be both [severe and pervasive], only one of the qualities must be proved in order to prevail. The severity . . . may vary inversely with its pervasiveness." *Flood*, 780 F.3d at 11. When allegations of

*quid pro quo* harassment "co-exist" with other allegations of sex discrimination, courts "look to the totality of the circumstances." *Gregory v. Daly*, 243 F.3d 687, 700 (2d Cir. 2001). A *quid pro quo* may reflect a supervisor's attitude that "discount[s] women's abilities to be productive workers," or "an insistence that women relate to men according to sexual stereotypes." *Id.* at 699. This approach "avoid[s] distracting inquiries into whether a supervisor's statement *really* proposed a sexual quid pro quo, and focuses . . . on the core question posed by Title VII: whether plaintiff's sex played a role in the actions at issue." *Id.* at 700.

Sexual harassment also "need not be overtly sexual in nature" if there is "circumstantial evidence" showing that the behavior was triggered by the plaintiff's gender. *Rosario v. Dep't of the Army*, 607 F.3d 241, 247–48 (1st Cir. 2010). Where there is both sexually oriented conduct and unequal treatment based on sex, "[c]ourts should avoid disaggregating a hostile work environment claim, dividing conduct into instances of sexually oriented conduct and instances of unequal treatment, then discounting the latter category of conduct." *Burns v. Johnson*, 829 F.3d 1, 17 (1st Cir. 2016) (citation omitted). "[S]uch an approach not only ignores the reality that incidents of nonsexual conduct—such as work sabotage, exclusion, denial of support, and humiliation—can in context contribute to a hostile work environment, it also nullifies the harassing nature of that conduct." *Id.* Regardless of whether hostile behavior is an expression of "sex-

73

based animus," "misdirected sexual desire," or "power plays," it is actionable as sex-based discrimination. *Smith v. Sheahan*, 189 F.3d 529, 533 (7th Cir. 1999).

Based on the court's findings, Davis was "preoccupied with Strickland" based on his romantic attraction to her, as well as crude sex-based notions of how she should behave in the workplace. Davis subjected Strickland to such controlling behavior that it was reasonable to feel threatened by him. This was "classic sexual harassment." After she distanced herself, he told another supervisor that she "***may just need to get smacked a bunch***" and she "***needs to get slapped***." Beam testified that he "was shaking he was so angry" and Strickland's perception of him was "reasonable." Ishida testified that there was "no reason to doubt" she was "physically afraid of him." Dunham was concerned about "physical danger." Davis's statements that Strickland "[h]as been avoiding me," "[c]learly does not want to interact with me," and her calling in sick was not "coincidental," show that he knew his conduct was unwelcome.

Davis's belittling statements that Strickland "played the gender card" and was a "spoiled brat," "manipulative," and "self-centered" for being professionally focused, show that his hostile behavior was targeted at her sex. *See Burns*, 829 F.3d at 13–15. His attitude invokes stereotypes "exhibit[ing] hostility toward the idea of women exercising power in the workplace," and "invoking a double standard." *Johnson v. J. Walter Thompson U.S.A., LLC*, 224 F. Supp. 3d 296, 309–

11 (S.D.N.Y. 2016); *cf. Parker v. Reema Consulting Servs., Inc.*, 915 F.3d 297, 303 (4th Cir. 2019) (plaintiff stated a claim that she was harassed based on sex-based stereotypes invoking a "double standard").

Davis characterized Strickland as making "veiled threats" and "demand[ing] more $," and stated that she "has clearly organized, marshalled her forces, and placed herself in position to be indispensable." He believed that Strickland could possibly achieve her goals because "she is very good at playing innocent," and was "taken aback" by her "demands" for a promotion for which she was eligible. His gratuitous use of profanity about her ("manipulative underhanded jackass" and "fuck off attitude"), show further anger and aggression.

Further, Davis retaliated against Strickland and engaged in sabotage. After she rejected his advances, Davis told Martinez—the Federal Defender, who was ultimately responsible for determining whether she would be promoted—that he should "reconsider" whether she "lives up to the title" of AFPD and she should be "well on [her] way to a PIP." He told Carpenter—the Appellate Chief—that she had a "fuck off attitude" and had committed "fireable offenses." With Martinez copied, he "sabotage[d]" her relationship with her new mentor. These actions would "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Williams v. Prince William Cty.*, 645 F. App'x 243, 245 (4th Cir. 2016) (unpub.).

The district court did not determine whether Davis committed sexual harassment. The court believed it "unnecessary" to do so and stated that, "for reasons unknown to the Court," Davis "is not a party." JA3697. As with other equitable claims, Davis is not a party because, as the harasser, he is not the employer and lacks authority to implement equitable relief. *See Allen v. Coll. of William & Mary*, 245 F. Supp. 2d 777, 791 (E.D. Va. 2003). Likewise, Title VII claims are brought against the employer. The court's misunderstanding of the parties also tainted its deliberate indifference analysis, as discussed below.

The district court also made contradictory findings about whether Davis was Strickland's supervisor. The court found that Davis was the FDO's "principal deputy" who "supervised" all FDO employees, but also found that Davis had "supervisory authority over Strickland" only during certain periods of time. JA3540–3541. This Court need not resolve these contradictions. As the First Assistant, and pursuant to AO policy, Davis had authority to "initiat[e]" employment actions. *Supra*, at 10. This makes him a "supervisor," even if he did not have the "final say." *Boyer-Liberto*, 786 F.3d at 278. Moreover, Strickland reasonably believed Davis was her supervisor, which is all the law requires. *See Rasi v. Dep't of Corr.*, Civil Action No. 7:08cv00203, 2009 U.S. Dist. LEXIS 2540, at *13 n.3 (W.D. Va. Jan. 13, 2009).

### b.     Federal Defender

Martinez perpetuated the hostile working environment and engaged in sex discrimination and retaliation.  After Strickland told Martinez she was drawing "boundaries" with Davis and leaving the office by 5 p.m. to avoid being alone with him, Martinez forced her to meet directly with Davis.  He compared her relationship with her harassing supervisor to a "marriage" and instructed her to "meet in the middle."  Martinez was furious that Strickland reported her claims to a "some other party," *i.e.*, civil rights officers at the AO.  He stated he was being "blamed" and "attacked."  He downplayed the harassment, stating, "but there was no physical contact," *i.e.*, "at least you were not touched."

After Martinez was advised to recuse himself, he sabotaged the investigation by disparaging Strickland's character and integrity to the decisionmakers.  His false accusations were relayed directly to the Fourth Circuit's Chief Judge, with potentially long-term negative impacts on her career.  *See infra*, at 136 (explaining how these *ex parte* communications were an "oppressive act of retaliation").

Martinez also knew that Davis was retaliating and sabotaging Strickland's advancement.  He did nothing to stop it and even participated.  Davis told Martinez directly that his issues with Strickland should be considered in deciding whether to promote her.  Davis *copied Martinez* on his email to her new mentor stating that she had made "egregious errors."  Davis and Martinez even mocked Strickland for

seeking an AFPD position—the position for which she was hired. Martinez told Davis he would be "playing it dirty" if he encouraged her to apply for an opening.

Unsurprisingly, in August 2018, Strickland was not even *considered* for the grade-level promotion referenced in Davis's *quid pro quo* "Mas Dinero" email. The district court concluded that this was a "regrettabl[e]" "oversight." JA 3744, JA3748–3749. But the record facts, which are not even cited in the court's opinion, do not support this conclusion. *Heyer*, 984 F.3d at 355 (findings are unsupported if they ignore "substantial evidence" to the contrary). The court found that Martinez was unaware that Strickland was eligible for a promotion because Moormann, the FDO's Administrative Officer, did not tell him. JA3748. The court did not discuss the fact that Moormann had prepared the August 2018 reclassification paperwork stating that Strickland's "***current promotion potential***" was "***1 grade***." *Supra*, at 31. This exhibit, which was admitted at trial, shows that Moormann *knew* that Strickland was eligible. However, he did not tell Martinez, in violation of his job responsibilities and regular practice. JA3613. He provided no reason for not disclosing Strickland's promotion eligibility, even after he was interviewed by Beam for her investigation. JA3658.

That was discrimination by a supervisor, at a minimum. *See Faragher*, 524 U.S. at 790 (employers are liable for discriminatory acts by supervisors). After all, "'[n]o reason' cannot serve as a 'legitimate, nondiscriminatory reason.'" *Johnson*

*v. Johnson*, 923 F. Supp. 2d 984, 998 (S.D. Tex. 2013) (quoting *Prudencio v. Runyon*, 986 F. Supp. 343, 350 (W.D. Va. 1997)). "When all legitimate reasons" for an adverse action "have been eliminated, . . . it is more likely than not" that the action was discriminatory. *Okoli*, 648 F.3d at 223.

Moormann was someone who Davis confided in about Strickland's "false" harassment claims, which Beam even recommended. Martinez was aware in August 2018 that Davis was harassing her, but he put no policies or practices in place to protect her from retaliation. *Supra*, at 34 (noting that FDO had no manual on sexual harassment). Moreover, these officials were on notice over the next six months of her claim that the promotion denial was discriminatory and retaliatory and *still* did not correct it. The alleged "oversight" was not "resolved" even when it was brought to their attention. *Suteerachanon v. McDonald's Rests. of Md., Inc.*, No. RWT-13-2889, 2014 U.S. Dist. LEXIS 164419, at *9 (D. Md. Nov. 24, 2014).

Martinez also ostracized Strickland. He told her no office space was available in Asheville, even though a full-time attorney position was available in Asheville, the office's only other duty station. This left Strickland with no choice but to telework for nearly seven months, since she did not feel safe near her harasser. This was discriminatory, as she was treated "worse" because of her sex. *Muldrow v. City of St. Louis*, 601 U.S. 346, 354 (2024). Compounding matters, during this time, Martinez advertised for a "summer intern" in Asheville. Officials

discussed setting up a "cubicle" for the summer intern, but they did not even offer to set up a cubicle for Strickland.  This was part of a campaign to ███████ and stigmatize her—particularly given the repeated breaches of her confidentiality— and was a retaliatory adverse action.  *See Williams*, 645 F. App'x at 245 (retaliatory adverse actions may include having an "office . . . taken away").

Martinez did nothing to prevent Strickland's co-workers, including her Team Leader, Adolf, from mocking and belittling her, stating they would have to meet her at Waffle House and comparing her to "Where's Waldo" (the children's book where the reader must pick "Waldo" out from a crowd).  Adolf wore a beer guzzler helmet for the office Halloween party—mocking allegations of sexual assault—which was ████████████ but Martinez did nothing to stop it.

## 2. Failure to take prompt and effective action

An employer must exercise "reasonable care" to "prevent and correct promptly" sexually harassing behavior.  *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998).  The EDR Plan also requires allegations of wrongful conduct to be "appropriately investigated."  *Supra*, at 47.  Here, Defendants did not meet accepted standards for preventing and redressing harassment or follow the procedures required by the EDR Plan.

The FDO had no office manual on sexual harassment.  *See Brown v. Perry*, 184 F.3d 388, 396 (4th Cir. 1999) (harassment policy should be "reasonably

designed and reasonably effectual"). Defendants did not provide any anti-sexual harassment training. They also did not appropriately investigate Strickland's claims. An investigation is adequate if it is thorough enough "to arrive at a reasonably fair estimate of truth." *Baldwin v. Blue Cross/Blue Shield*, 480 F.3d 1287, 1304 (11th Cir. 2007). Here, Beam was not trained and had no experience investigating wrongful conduct complaints. The Fourth Circuit allowed Martinez to "formally appoint" Beam, who believed that she was reporting to him, and allowed him to make decisions about disciplinary action, even though he was an accused party. *See also infra*, at 123–24. Although Strickland provided a witness list, no witnesses who could have substantiated the harassment were interviewed. Beam allowed the accused male supervisors—the only individuals she interviewed besides Strickland—to coordinate their testimony. Beam also treated Davis more favorably than Strickland, including potentially sharing the investigation's findings. Beam even told *the Clerk of Court* in the district where Strickland practiced law that Strickland was a "***true pain in the you know what***." She thus retaliated against Strickland *and* violated her confidentiality.

Beam did not properly investigate the central allegation in the case—whether the "Mas Dinero" email was *quid pro quo* sexual harassment. Because she had received no training, Beam failed to understand the significance of her own finding that Davis's email can "clearly be inferred to be a quid pro quo

81

request," which is an egregious form of harassment. Instead, Beam concluded that the harassment was "flimsy" and "in her mind." This is gaslighting to protect an accused manager, not an impartial finding. *See* Kat Chow, *Gaslighting: How a Flicker of Self-Doubt Warps Our Response To Sexual Harassment*, NPR (Nov. 25, 2017), *available at* https://tinyurl.com/5byvembe (gaslighting is used to make "a woman believe she's crazy" and "hypersensitive"). Beam's failure to investigate properly insulated Davis from appropriate discipline, up to and including his termination. Regardless, Beam's lack of training did not excuse Defendants' failure to apply legal standards regarding harassment to her findings. Thus, Defendants failed to prevent and redress harassing behavior.

Defendants did not take timely action. They dragged their feet for more than six months and did not take disciplinary action even after the investigation report—which found that Davis "clearly" made a "quid pro quo request"—came out. *Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 954 (7th Cir. 2005) (a prompt investigation is a "hallmark of reasonable corrective action"). Indeed, nearly a full year passed between when Strickland first reported her allegations to Martinez in July 2018 and "counseling" was imposed in May 2019. This is not "prompt." *Faragher*, 524 U.S. at 807. Strickland's confidentiality also was repeatedly violated, and Defendants took no steps to protect her confidentiality rights. This violated the EDR Plan, which provides that "all parties involved in the

investigation must protect the confidentiality of the allegations." JA3683; *see Autozone, Inc. v. EEOC*, 421 F. App'x 740, 742 (9th Cir. 2011) (failure to provide confidentiality during investigation was unreasonable).

The corrective action that was taken—including verbal "counseling" for *quid pro quo sexual harassment* by someone who was counseled themselves—was wholly inadequate for the severity of the offense. *EEOC v. Cromer Food Servs.*, 414 F. App'x 602, 608 (4th Cir. 2011) (unpub.) ("[C]orrective action is not enough if it is too little, too late."). There is no indication that Defendants considered the "seriousness" of the harassment or Davis's abuse of his supervisory authority. *Pryor v. United Air Lines, Inc.*, 791 F.3d 488, 498 (4th Cir. 2015). Defendants' response was not only ineffective, but it emboldened Davis. Following Strickland's resignation, ███████████████████████████████████

███████████████████████████████████████████████████

████████████████████ *Supra*, at 9.

Defendants did not provide appropriate interim remedial measures, like a transfer to a different duty station, even though a position was available. The Supreme Court has held that a "disadvantageous" change in employment conditions based on sex violates Title VII, even if the harm is not "significant." *Muldrow*, 601 U.S. at 354. Here, the harm was not just significant, but "career-ending." *Supra*, at 34. Defendants were even willing and able to set up a cubicle

for a summer intern, but not Strickland.  Based on Martinez's false allegation that

Strickland was manipulating the EDR process with Dunham, her "friend," Ishida

rejected the possibility of informal resolution and even alleged that doing so would

be "obstructing" the investigation.  Ishida's belief that providing interim remedies

would be "inappropriate" and "prejudging the investigation" is contrary to

established precedent.  *Cromer*, 414 F. App'x at 608 (requiring employee to endure

"months of inaction" when "alternatives" were available was unacceptable).

Defendants also did not remove Strickland from Davis's supervision.  While

she nominally "reported" to Carpenter, she was required to continue working for

attorneys "in the trial unit headed by Davis."  This was especially unreasonable

because a full-time appellate position was available, and the district court was

unable to articulate any reason why transferring her to appeals was not feasible.

The measures that Defendants did take—long term telework that ostracized

Strickland from her co-workers, and relegating her to research and writing status

beneath a male "gatekeeper" attorney—made her "worse off" and were "per se"

ineffective.  *Cromer*, 414 F. App'x at 608.

Instead of investigating promptly and taking corrective action, Defendants

viewed the matter as a dispute that Strickland should "negotiate" with an accused

party.  Again, counseling and mediation were *mandatory* under the EDR Plan.

JA3532.  The district court criticized mandatory mediation in cases involving

84

alleged sexual harassment, like this one, because it is "designed to maximize resolution with the least damage to the judiciary's reputation." JA3800. The court stated that the mediation requirement "parallels" private industry, but notably, Congress has banned forced arbitration in sexual harassment cases. *See Diaz-Roa v. Hermes Law, P.C.*, No. 24-cv-2105 (LJL), 2024 U.S. Dist. LEXIS 212472, at *33 (S.D.N.Y. Nov. 21, 2024). Mediation also is no longer mandatory under the current EDR Plan. JA3796. Because of Defendants' failure to timely investigate and take corrective interim action, Strickland languished on telework for more than six months, until she was forced to resign.

## B. The district court's ruling hinged on perceived differences between Title VII and equal protection claims.

In concluding that Strickland was "without redress under the present legal framework," the district court relied on what it believed were differences between equal protection and Title VII standards. JA3795.

First, the district court stressed that the "actual notice" standard required for deliberate indifference is a "high bar." *See* JA3725–3726. Notably, this standard developed in contexts like schools, where courts must "bear in mind that schoolchildren may regularly interact in ways that would be unacceptable among adults," and correctional facilities. *Grabowski v. Ariz. Bd. of Regents*, 69 F.4th 1110, 1119 (9th Cir. 2023); *S.B. v. Bd. of Educ.*, 819 F.3d 69, 76 (4th Cir. 2016) (a

school is not liable "for what its students do"); *see also Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) (deliberate indifference towards arrestee).

This case does not involve inmate care or bullying among schoolchildren, but rather *quid pro quo* sexual harassment by an attorney who was the principal deputy—that is, second in charge—of a federal defender office. At a minimum, the deliberate indifference standard must account for the "known circumstances" in which misconduct occurs. *Feminist Majority Found.*, 911 F.3d at 702.

Strickland told Martinez in July 2018 that she was drawing "boundaries" with Davis and was leaving the office early to avoid being alone with him. Martinez memorialized that he wanted to clarify "any harassment by [Davis]" in a "significant event log," which is not "used for ordinary work disagreements." *Supra*, at 20. By his own admission, Martinez had notice.

The district court, however, concluded otherwise. It reasoned that notice of "potential harassment" is not notice of harassment. JA3720. This allowed the district court to downplay or dismiss Martinez's sex-discriminatory conduct, like forcing her to meet directly with the accused harasser, comparing her relationship with the accused harasser to a marriage, and not removing her from his supervision. *See infra*, at 121. This debate would be irrelevant under Title VII, because the standard is whether an employer knew or *should have known*. *Burlington Indus. v. Ellerth*, 524 U.S. 742, 759 (1998). Clearly, Martinez should

86

have known, as his own contemporaneous notes show. As Thomas explained, any reasonable employer would be on notice based on her complaints. *Supra*, at 20.

Second, the district court construed the deliberate indifference standard to construct such a high bar that it would be effectively impossible to prove deliberate indifference unless a defendant did *nothing* in response to a sexual harassment complaint. JA3725–3726. That is a distortion of the law. Regardless, under Title VII, this would be no justification for Defendants' conduct, either. Under Title VII, once an employee proves sexual harassment, the *employer*, not the plaintiff, has the burden to prove that its response was reasonable. *Faragher*, 524 U.S. at 807. Defendants cannot come close to meeting this burden.

The district court's ruling, if accepted, amounts to a run-around. Strickland was *entitled* to the protections of Title VII under the judiciary's EDR Plan. JA3530. These protections conferred a property interest that is equivalent to a "cause of action and one that is vitally important considering the lack of alternative means of seeking relief for employees of the federal judiciary." *Strickland*, 32 F.4th at 351. Yet, the effect of the district court's ruling is that, if an employee is deprived of Title VII protections during the EDR process, when they come to federal court to enforce those rights, they will have no "redress" because Title VII does not apply. That circular reasoning is the same as concluding that the employee has no Title VII protections at all. And it is unconstitutional.

**C.** **Excluding Strickland, a federal public defender employee, from Title VII is arbitrary and infringes on her fundamental right to be free from sex discrimination.**

If the district court's holding is affirmed on Strickland's equal protection and due process claims, then this Court must hold that Title VII's exclusion of judiciary employees is unconstitutional as applied to her.

At a minimum, the law is subject to rational-basis review because it involves a classification based on Strickland's status as a federal public defender employee within the judiciary, a component of the federal government, which is subject to the Bill of Rights. Title VII covers employees of "executive agencies" and other government agencies, but it excludes excepted service employees in the judicial branch, including federal public defenders. 42 U.S.C. § 2000e-16(a); *see generally id.* § 2000e. Legislative branch employees have been covered by equivalent civil rights legislation since 1995. *Strickland*, 32 F.4th at 321. Therefore, this case involves the exceptional treatment of the judicial branch in being exempted from the civil rights laws that apply to other major public and private employers.

Even when a group discriminated against "is not a 'suspect class,' courts examine, and sometimes reject, the rationale offered by government for the challenged discrimination." *Baskin v. Bogan*, 766 F.3d 648, 654 (7th Cir. 2014). The government "may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *City of*

*Cleburne, Tex. v. Cleburne Living Center, Inc.*, 473 U.S. 432, 446 (1985). Thus, "arbitrary and irrational discrimination violates the Equal Protection Clause under even [the] most deferential standard of review." *Bankers Life & Casualty Co. v. Crenshaw*, 486 U.S. 71, 83 (1988).

However, strict scrutiny should apply. First, the classification being challenged here involves Strickland's fundamental right to be free from sex discrimination in federal employment. *Davis v. Passman*, 442 U.S. 228, 234, 272 (1979); *see Bolling v. Sharpe*, 347 U.S. 497 (1954). The Supreme Court has long held that the government cannot discriminate against individuals with respect to the exercise of fundamental rights. *See M.L.B. v. S.L.J.*, 519 U.S. 102, 114 (1996).

In *M.L.B.*, the Supreme Court held that a law requiring indigent mothers to pay to appeal their termination of parental rights violated equal protection and due process. *Id.* While poverty is not a suspect classification, the Court explained, the right to parent is a fundamental right. *Id.* at 116–17. Therefore, "although the Federal Constitution guarantees no right to appellate review, once a State affords that right . . . the State may not 'bolt the door to equal justice.'" *Id.* at 110 (citation omitted). A state cannot condition access to appellate review of termination of parental rights based on wealth. This reflects "both equal protection and due process concerns," and the "essential fairness" of judicial proceedings. *Id.* at 120.

The logic of *M.L.B.* applies here.  When Congress extended Title VII to federal government employees, it found it necessary to enforce "[t]he prohibition against discrimination by the Federal Government, based upon the due process clause of the fifth amendment." *Koger v. Ball*, 497 F.2d 702, 704 n.7 (4th Cir. 1974).  Although the right to be free from discrimination was "judicially recognized," its enforcement was "uncertain and ineffective." *Id.* at 704, n.7. Thus, the purpose of extending Title VII to the federal government was to enforce fundamental rights.  Likewise, the judiciary's extension of Title VII principles under the EDR Plan is "vitally important." *Strickland*, 32 F.4th at 351.  Indeed, in an amicus brief filed in this litigation, Members of Congress explained that current statutes were not intended to preclude judiciary employees from vindicating their Fifth Amendment rights.  Roe v. United States, *Brief of Members of Congress as Amicus Curiae in Support of Neither Party*, No. 21-1356, Doc. 56-1, at 6 (4th Cir.).

Congress may not have been constitutionally required to extend Title VII protections to federal employees.  But once it did so, it could not arbitrarily "bolt the door to equal justice" based on the status of certain classes of employees, like federal public defenders.  *M.L.B.*, 519 U.S. at 110.  Likewise, the judiciary cannot arbitrarily deny Title VII protections it has repeatedly promised to enforce.

Second, "a law nondiscriminatory on its face may be grossly discriminatory in its operation." *Griffin v. Illinois*, 351 U.S. 12, 17 n.11 (1956).  The effect of

90

Title VII's exclusion of judiciary employees is to deny crucial remedies for discrimination—remedies that Congress *recognized* were necessary to enforce equal protection under the Fifth Amendment—to employees who suffer discrimination based on race, sex, and other suspect classifications. Because even Congress recognized that judicial enforcement of these rights was "uncertain and ineffective," a law that, in its operation, burden judiciary employees based on suspect class must be analyzed with the highest scrutiny. *Koger*, 497 F.2d at 704.

The judiciary has offered two rationales for not extending Title VII to judiciary employees. Under any standard of scrutiny, these rationales fail as applied to the circumstances of this case.

First, the judiciary has stated that applying employment statutes is "unnecessary" because "the federal judiciary already provide[s] its employees" with protections comparable to Title VII. *Strickland*, 32 F.4th at 321. The EDR Plan "prohibit[s] discrimination, harassment, and retaliation, including conduct that would violate Title VII." JA3530. This rationale fails because Title VII protections were denied in this case. And when Strickland came to federal court to remedy the violations of her civil rights, the district court refused to afford her relief because there is "no redress under the present legal framework," meaning that she is not covered by Title VII. JA3795.

The district court's reasoning, if upheld, proves the arbitrariness of the Title VII exclusion, as well as the infringement of Strickland's fundamental right to seek redress for sex discrimination. It demonstrates that, despite the EDR Plan's guarantee of Title VII protections, Strickland cannot obtain those protections anywhere—not in the EDR process, and not in federal court.

Second, the judiciary has relied on "judicial independence." *Dotson v. Griesa*, 398 F.3d 156, 175 (2d Cir. 2005). This rationale does not apply to Strickland, a federal public defender. Even assuming that "judicial independence" is a legitimate purpose for excluding certain judicial employees from Title VII, applying that rationale to federal defenders is "so attenuated as to render the distinction arbitrary or irrational." *Cleburne*, 473 U.S. at 446. Federal defenders are not court employees and exercise an independent Sixth Amendment function. *See* 18 U.S.C. § 3006A. Allowing federal defenders to sue for employment discrimination under Title VII would not impede any judicial function.

Indeed, a few years before Strickland's employment, the defender office in this case *was sued* under a civil rights statute. *Supra*, at 4 (discussing Carlin lawsuit). As a community defender office, the office was covered by Title VII. *Cf.* 18 U.S.C. § 3006A(g)(2). That office did not cease to function because it was covered by civil rights laws, nor did the judicial branch suffer a loss of its independence.

92

This Court should reverse the district court's rulings on Strickland's equal protection and due process claims. However, if the Court affirms, it must confront the question of whether the exclusion of Strickland, a federal defender employee in the federal government, from Title VII is constitutional.

## II.    The District Court Erred by Refusing to Consider MeToo Evidence.

The district court excluded evidence of harassment, discrimination, and retaliation suffered by other FDO employees. According to Defendants' public representations, this evidence includes formal reports under the EDR Plan that Martinez used "*crude language regarding women and members of the LGBTQIA+ community,*" including by referring to a female Assistant United States Attorney as a "*fucking bitch*," and that Davis used "*sexual hand gestures*." *See* JA3853–3854. The evidence also includes far more, as discussed above.

The district court erred by refusing to consider this evidence for *any* purpose under the Rules of Evidence. The district court also erred by refusing even to allow Strickland to file the MeToo evidence in the docket and refusing to review it before ruling against her. Thus, the district court erred by (1) granting summary judgment against Strickland on the equal protection claim without even reviewing her evidence and arguments, and (2) excluding the evidence from trial. Moreover, the court erred in limiting the scope of the Chief Judge's deposition by not allowing any questioning about his oversight of other EDR complaints.

**A.** **The district court erred by granting summary judgment in favor of all Defendants except for Martinez on the equal protection claim without even reviewing the MeToo evidence.**

Due process requires an "opportunity to be heard." *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970). A party must have an opportunity to "present[] his own arguments and evidence." *Id.* Moreover, on summary judgment, the court must determine whether the movant has shown "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court "need consider only the cited materials" but may also "consider other materials in record." Fed. R. Civ. P. 56(c)(3). To consider "cited materials" in determining whether there are genuine disputes of material fact, a district court obviously must consider the evidence presented by the parties.

Here, the district court did not rule on Strickland's *unopposed* motion to seal the MeToo evidence, without explanation. Because the district court had suspended the local rules regarding sealing, Strickland was not allowed to file the evidence under seal for review pending a sealing determination. *Cf.* WDNC LCvR 6.1(d). Thus, she was not allowed to file the evidence at all. Indeed, the joint appendix includes 77 blank pages, which are entirely redacted, for "Exhibit P," the MeToo evidence. Strickland's summary judgment memorandum, likewise, contains redactions. *Supra*, at 60. The unredacted versions of these documents were never filed, because the district court did not allow it. Moreover, this was not

94

an inadvertent omission. After Strickland moved to reconsider, the district court conceded, "I looked at the redacted data," but it still denied the motion.

This violated Strickland's due process rights and Rule 56. There is no possibility that the district court fairly could have considered Strickland's "arguments and evidence," *Goldberg*, 397 U.S. at 268, or "cited materials," Fed. R. Civ. P. 56(c), that it purposefully did not review.

The MeToo evidence regarding EDR complaints filed by other employees is relevant to Strickland's equal protection claim. "[A]s a general rule, the testimony of other employees about their treatment by the defendant is relevant to the issue of the employer's discriminatory intent." *Calobrisi v. Booz Allen Hamilton, Inc.*, 660 F. App'x 207, 210 (4th Cir. 2016) (citation omitted) (unpub. per curiam); *see also Mullen v. Princess Anne Volunteer Fire Co.*, 853 F.2d 1130, 1133 (4th Cir. 1988) ("Where a plaintiff seeks to prove discriminatory intent, the probative value of statements revealing the racial attitudes of the decisionmaker is great."). In determining whether this evidence is admissible, courts consider "whether the other discriminatory behavior described 'is close in time to the events at issue in the case, whether the same decisionmakers were involved, whether the witness and the plaintiff were treated in a similar manner, and whether the witness and the plaintiff were otherwise similarly situated.'" *Calobrisi*, 660 F. App'x at 210. A

court errs when, at the summary judgment stage, it excludes MeToo evidence without "individually analyz[ing] each piece of other employee evidence." *Id.*

Moreover, a pattern of violations is "relevant evidence" to proving deliberate indifference. *Basta v. Novant Health Inc.*, 56 F.4th 307, 317 (4th Cir. 2022). The Fourth Circuit has recognized that "intentional discrimination can be proven via deliberate indifference," which "lies 'somewhere between the poles of negligence at one end and purpose or knowledge at the other.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)); *cf. Baynard v. Malone*, 268 F.3d 228, 236 (4th Cir. 2001) (applying *Farmer* to sexual harassment deliberate indifference claim). This standard, is "at bottom, an actual-notice standard." *Basta*, 56 F.4th at 317 (citation omitted). "[A] history of violations is relevant evidence to proving deliberate indifference," though not required to succeed. *Id.*

The district erred by refusing to consider MeToo evidence at the summary judgment stage, let alone "individually analyz[ing]" the evidence. *Calobrisi*, 660 F. App'x at 210. The complaints are relevant to establishing equal protection violations by supervisory officials who were aware of the complaints and responded with deliberate indifference. *See Strickland*, 32 F.4th at 359 ("judiciary employees who occupy supervisory roles" can "be held liable" for deliberate indifference). Indeed, Ishida was "concerned about a pattern of complaints" against Davis or Martinez, and the Chief Judge was aware of "every" one.

96

The evidence is relevant because it is close in time to the events in this case and involves the same decision makers, similar treatment, and similarly situated complainants.  For example, Martinez's use of terms like "fucking bitch" and ██████████ o describe female attorneys illustrates his sex-discriminatory attitude. Davis's use of sexual hand gestures, ████████████████████ ██████████████████████████████████████████████ ███████████████████ are relevant to Strickland's claim of sexual harassment and sex discrimination.  The complaints also corroborate Strickland's allegations about a toxic workplace culture, as well as her fears of being subjected to vicious rumors for complaining of mistreatment.

This evidence is also directly relevant to officials' handling of Strickland's complaint.  For example, the evidence reveals that, had witnesses been interviewed who could substantiate Strickland's claims, her allegations would have been corroborated that Davis █████████████████████████████████████ █████████████████████████████████ Moreover, the complaints corroborate the ostracization of Strickland and lack of confidentiality, including tha ████████████████████████ about Strickland's harassment claim and ███████████████████████████████ The complaints also corroborate that Martinez had a pattern of interfering with, and undermining the integrity of, wrongful conduct investigations to protect

himself and others in management. Further, the evidence establishes that Fourth Circuit officials received other complaints of harassment, discrimination, and retaliation, both before and after Strickland's complaint, which is evidence that their response to discrimination was ineffective.

## B.     The district court erred by excluding MeToo evidence at trial.

At trial, the district court excluded the MeToo evidence as "not relevant" and "hearsay." JA3738. Again, however, the court did not allow the parties to file unredacted motions *in limine*, and did not even review Strickland's arguments before ruling against her. The court's ruling may be vacated on this ground alone. Regardless, the court was wrong to exclude the evidence for any purpose.

### 1.     The evidence was relevant.

The district court recognized that a pattern of complaints is "relevant [circumstantial evidence] to proving deliberate indifference." In addition, MeToo evidence is relevant to the issue of "discriminatory intent." But the district court concluded that the MeToo evidence was not relevant here, because "there is no indication that these complaints were meritorious (they were allegations) or sufficiently similar to Strickland's claims." JA3738–3739.

This reasoning is flawed. First, the court cites no authority for the proposition that MeToo complaints must be proven "meritorious" to be admissible. To the contrary, determining the credibility of the evidence is the factfinder's role.

Moreover, MeToo evidence is relevant for purposes other than the truth of the allegations, such as proving that Defendants were on notice of other complaints. *See United States v. Ayala*, 601 F.3d 256, 272 (4th Cir. 2010) ("[E]vidence is not hearsay when it is used only to prove that a prior statement was made and not to prove the truth of the statement." (citation omitted)).

Second, the district court's cursory rejection of the complaints as not being "sufficiently similar" is unsupported. Indeed, earlier in the case, the district court characterized the evidence as "cumulative," meaning that it relates to "the same facts." ECF No. 233, at 1; *United States v. Bellinger*, 652 F. App'x 143, 149 (4th Cir. 2016). In *Calobrisi*, the district court erred by rejecting MeToo evidence "in a single sentence" without "individually analyz[ing]" each piece of evidence, including "how closely related the evidence [was] to [the plaintiff's] circumstances and theory of the case." *Calobrisi*, 660 F. App'x at 210 (quoting *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008)). Here, the district court similarly rejected the MeToo evidence without analyzing each piece of evidence. The evidence was closely related to Strickland's circumstances and supported the theory of her case, as discussed above.

The district court also stated that MeToo complaints would "only be circumstantial evidence." JA3738. The word "only" implies that circumstantial evidence is entitled to less weight. *Id.* But "[i]n fact, circumstantial evidence is

99

treated no differently than direct evidence." *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 764 (4th Cir. 2021). Circumstantial evidence is "often" used in cases involving discrimination and may even "be more persuasive" than direct evidence. *Bennett v. CSX Transp., Inc.*, 552 F. App'x 222, 227 (4th Cir. 2014).

## 2. The evidence was not inadmissible hearsay.

The evidence was admissible for several purposes.

### a. Notice to employer

"[A] statement is not hearsay when the statement is offered to show that the [employer] was on notice of the statement." *Bland v. Fairfax Cty.*, No. 1:10cv1030 (JCC/JFA), 2011 U.S. Dist. LEXIS 47164, at *11 (E.D. Va. May 3, 2011). Therefore, evidence of other complaints is not hearsay because it is offered to show that the employer was on notice. *Id.*; *Green v. Adm'rs of the Tulane Educ. Fund*, 284 F.3d 642, 660 (5th Cir. 2002); *see also Southerland v. Sycamore Cmty Sch. Dist. Bd. of Educ.*, 125 F. App'x 14, 22 (6th Cir. 2004) (rumor testimony and notes were admissible as non-hearsay because they were not offered to prove the truth of the matters they asserted, but instead were used to show that government officials had knowledge of the problem).

An employer's notice of prior similar complaints is "highly relevant" to whether the employer should have anticipated further discriminatory conduct. *Bland*, 2011 U.S. Dist. LEXIS 47164, at *44 (quoting *Paroline v. Unisys Corp.*,

879 F.2d 100, 107 (4th Cir. 1989), *vacated and remanded on other grounds*, 900 F.2d 27 (4th Cir. 1990) ("[A]n employer's knowledge that a male worker has previously harassed female employees other than the plaintiff will often prove highly relevant in deciding whether the employer should have anticipated that the plaintiff too would become a victim of the male employee's harassing conduct."). Further, when other similar complaints are raised after the harassment of the plaintiff, that fact is "[a]lso significant" because a reasonable factfinder could conclude that the "Defendant knew or should have known about the harassment and failed to take effective action to stop it." *Id.* at 44–45. Indeed, the MeToo complaints also contain statements showing that Defendants' response to Strickland's complaint, specifically, was inadequate. *Supra*, at 6–10. Those statements can be considered for non-hearsay purposes.

### b. Admissions by a party opponent

"Federal Rule of Evidence 801(d)(2)(D) excludes from the hearsay rule 'a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship.'" *Geleta v. Gray*, 645 F.3d 408, 415 (D.C. Cir. 2011). That includes statements by employees related to adverse employment actions or acts of discrimination by the employer, which "concern[] a matter within the scope of their employment." *Id.*

101

Here, two of the complaints—those filed by Attorneys A and B—were filed during their employment at the FDO and are party admissions. *See* JA570.

"[R]eporting workplace sexual harassment is so clearly a part of an employee's duties." *Brown v. United States*, 933 F. Supp. 2d 780, 785 (E.D. Va. 2013). When an employee, "consistent with [an agency's] Policy on Harassment, reports an incident of sexual harassment, the employee is acting within the scope of her employment." *Id.* at 785; *Grantham v. Durant*, 471 F. Supp. 2d 1069, 1075 (D. Nev. 2006) ("Reporting sexual harassment in the workplace . . . and is committed in the course of the very task assigned to the employee."). Thus, allegations reported pursuant to an employer's "sexual harassment policy" are "party-opponent admissions." *Cole v. Tenn. Watercraft, Inc.*, No. 3:06-CV-381, 2008 U.S. Dist. LEXIS 54231, at *16 (E.D. Tenn. July 15, 2008).

Indeed, employees' statements about their employer's violations of policies are "'related to a matter' within the scope of their employment." *Vaughan v. Boeing Co.*, 229 F. Supp. 3d 339, 348 n.14 (E.D. Pa. 2017). The purpose of Rule 801(d)(2)(D) was to move away from the "traditional, agency-based view of 'scope of employment,'" because "few principals employ agents for the purpose of making damaging statements." *Id.* (quoting Rule 801(d)(2)(D) advisory comm. notes). Accordingly, "[a] substantial trend . . . favors admitting statements

102

[merely] *related to a matter* within the scope of the . . . employment," including "adherence (or lack thereof)" to employer policies. *Id.*

The EDR Plan states that employees are "encouraged to report wrongful conduct" and creates a mechanism for seeking remedies and ensuring that complaints are investigated. *See supra*, at 46–47. The EDR Plan makes unmistakably clear that reporting allegations is not only within the scope of employment, but strongly encouraged. Statements reporting wrongful conduct pursuant to this policy are admissible as party admissions.

### c.  Impeachment

"[W]hen the impeachment tends to show the witness's untruthfulness, it is not hearsay, as it is not primarily offered to prove the truth of the matter asserted." *Bratt v. Genovese*, 782 F. App'x 959, 967 (11th Cir. 2019); *Behler v. Hanlon*, 199 F.R.D. 553, 557–58 (D. Md. 2001) (discussing "impeachment by contradiction").

Martinez filed a sworn declaration stating that he had "never witnessed or *even heard of* any gender-based discrimination" in the FDO. ECF No. 245-4, ¶¶ 124–27 (emphasis added). Martinez stated, "[h]ad I observed or even heard rumors or speculation about any such conduct, I would have immediately followed all steps to ensure the issues were investigated and handled accordingly." *Id.* These statements are untrue in light of uncontradicted evidence of complaints of gender discrimination against the FDO. Indeed, Martinez was ██████████

███████████████████ which contained allegations that he had referred to women as "fucking bitch" and ████████████████████████████████████ ██████████████ *Compare* ECF No. 78-3 *with* JA4407.

Similarly, Moormann filed a sworn declaration stating that "[n]o employee has ever reported to me, as the human resources contact for the FDO-WDNC or otherwise, any type of harassment, discrimination, or retaliation they have witnessed or experienced in the FDO-WDNC." ECF No. 245-2, ¶ 54. This is untrue in light of other EDR complaints filed against the FDO. Moormann was even ███████████████████████████████████████████████ JA4374.

The MeToo evidence impeaches the credibility of these false statements. Moreover, Strickland is entitled to use the MeToo evidence as extrinsic evidence because it does not involve collateral matters. *Behler*, 199 F.R.D. at 558. The evidence is independently admissible to support her equal protection claim.

### d. Residual clause

The residual exception applies if (1) a "statement is supported by sufficient guarantees of trustworthiness," considering the "totality of the circumstances" and any "corroborating" evidence, and (2) it is more "probative" than other evidence that can be reasonably obtained. Fed. R. Evid. 807. The rule is not "narrowly construed, as it "rejects formal categories in favor of a functional inquiry into trustworthiness." *United States v. Clarke*, 2 F.3d 81, 83 (4th Cir. 1993)).

104

The MeToo evidence is material to the issues in this case and has circumstantial guarantees of trustworthiness. Indeed, two of the complaints were filed by employees during their employment and contain statements against the employer's interests, which could expose the employees to retaliation. *Cf. Goode v. United States*, 730 F. Supp. 2d 469, 474 (D. Md. 2010) (evidence is admissible under residual exception "especially where it also satisfied the requirements of the 'statement against interest' exception" (citing *United States v. Workman*, 860 F.2d 140, 144 (4th Cir. 1988)); *La Day v. Catalyst Tech. Inc.*, 302 F.33 474, 481 at n.7 (5th Cir. 2002) (business records with statements against the employer's interest "are trustworthy"). In addition, Attorney C █████████████████ ████████████████████████████████████████████████ Ironically, Attorney C's ████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████

The MeToo complaints are also remarkably consistent. Heightening their trustworthiness is officials' response—Martinez was not reappointed, and Davis is no longer in any supervisory position.

The MeToo evidence is more "probative" than any other evidence that can reasonably be obtained. In this case of first impression involving constitutional claims against the judiciary, requiring MeToo complainants to testify live, which

105

would require identifying themselves publicly, would expose them to retaliation. The judiciary has recognized that employees' concern about retaliation, and the commensurate "reluctance to report misconduct," warrants "special attention" given the "acute 'power disparit[ies]'" involved in the judiciary. Report of the Federal Judiciary Workplace Conduct Working Group to the Judicial Conference of the United States 12–13 (2018), *available at* https://tinyurl.com/mwta3kpb. Moreover, Defendants—including Fourth Circuit officials—have "vigorously dispute[d] the veracity" of the MeToo evidence, despite their role as neutral adjudicators in the EDR process. JA461, JA568. That high-level judiciary officials have effectively accused the MeToo complainants of being liars heightens the risk of retaliation if forced to identify themselves. Defendants also had the opportunity to test their credibility through depositions, but declined to do so.

### 3. The error was not harmless.

Proving an error was not harmless is not an "onerous requirement." *Sea "B" Mining Co. v. Addison*, 831 F.3d 244, 253 (4th Cir. 2016). In this case, credibility determinations swayed the district court's decision. The court repeatedly dismissed irregularities as "mistakes," "coincidences," "missteps," or "errors in judgment" rather than intentional conduct. *See* JA3703, JA3749, JA3758, JA3793 ("mistakes"); JA3759, JA3760 ("coincidence"); JA3726, JA3733, JA3734, JA3738 ("missteps" or "errors in judgment"). If the district court had

considered evidence that Martinez ███████████████████████████████

casually referred to women as "fucking bitch" and ████████ and falsely denied

the existence of other complaints under penalty of perjury, it would not have been

reasonable for the court to give him the benefit of the doubt on why he did not do

more to protect Strickland, like transferring her duty station or to appeals.

Moreover, the district court found that while the timing of Strickland's

promotion denial "certainly gives the Court pause, it is too much of a stretch" to

infer sex discrimination or retaliation. JA3748. During this litigation, Defendants

provided at least four different explanations why they did not promote Strickland.

If the district court had considered the MeToo evidence, it could have "reasonably

infer[red] from the falsity of the explanation that the employer is dissembling to

cover up a discriminatory purpose." *Okoli*, 648 F.3d at 223.

Before trial, Defendants asserted that Strickland was "not eligible" for a

promotion, including in their Answer and sworn declarations. *See, e.g.*, JA286;

JA3611. This explanation was blatantly false, as recognized by the court. JA3548.

During trial, Moormann testified that there was a "continuing resolution" in

effect in August 2018 that prevented the promotion. This testimony, elicited under

penalty of perjury, was also false, as Defendants were later forced to admit.

JA1823, JA2384.

Moormann also testified that a promotion would be "extraordinary" unless the employee first completed all steps within a grade. According to government policy and FDO practice, this assertion was also nonsensical and false, and yet the district court seemed to accept this explanation. JA3748–3749; *see* OPM General Schedule, *supra*, at 13 (GS employees "may advance to higher grades . . . generally after at least a year"); *supra*, at 31 (reclassification request stating that Strickland's "current promotion potential" was "1 grade"). Martinez also testified that his practice was to "max all my staff to the *largest maximum [salary]*." *Supra*, at 30 (emphasis added); *supra*, at 58 (discussing the "*usual* Grade and Step pay changes" that should have occurred in August 2018). The district court did not consider or weigh Martinez's testimony, and so its finding that a promotion would have been "unlikely" is unsupported. *Heyer*, 984 F.3d at 355.

The district court settled on a fourth explanation, finding that the failure to promote Strickland was a "mistake" and "oversight." JA3744, JA3749. The court rejected circumstantial evidence tending to show that the promotion denial was intentional. For example, Strickland's reclassification was *backdated* to August 20, 2018, the *day before* she became eligible for a promotion. JA3746. Martinez and Moormann had an obvious motive to backdate the reclassification, which was to provide a ready-made excuse for not promoting her on her anniversary date. Indeed, Defendants repeatedly (and again, falsely) asserted that once Strickland

was reclassified, she was not eligible for a grade-level promotion. JA458. The district court dismissed the backdating as a "coincidence." JA3759–3760.

Additionally, Martinez and Moormann requested to *eliminate* Strickland's locality pay during the reclassification, which would have resulted in a pay cut of *nearly 15 percent*. JA3757–JA3758. During this litigation, Moormann stated in a sworn declaration, again falsely, that Strickland "was not eligible" for locality pay because she was on telework. JA3052–3054. This strongly suggests that the attempted removal of Strickland's locality pay was intentional, and likely punitive, and officials intended to use the excuse that she was on "telework." The district court found that the attempted locality removal was another "mistake." JA3758.

Moormann also provided several different explanations of what Strickland's pay should have been when she was converted to an AFPD. On the August 2018 reclassification forms, he twice stated that she should be placed in Grade AD-28 on the pay scale for AFPDs. JA3617. However, Moormann told Beam during the EDR investigation that Strickland was in AD-25. JA3615. At trial, Moormann testified that she was in AD-23. JA3614. The district court found these repeated errors to be "inadvertent[]," "mistake[s]," and "typographical errors." JA3615, JA3617. Considering the MeToo evidence of a toxic working environment, of which Moormann was part, it would have been reasonable for the court to find, instead, that he was scrambling for an explanation that would stick.

The district court also rejected Strickland's argument that Martinez's decision to give a promotion to Martin—her male co-worker—*one business day* after she forcibly resigned was evidence of sex discrimination. JA3749. Martin's promotion is evidence that Martinez anticipated that Strickland would resign and waited her out so that he could promote Martin—who was not even eligible for a promotion—in "less than the standard 52 weeks." JA3693–3694.

The district court concluded that "[w]hile the timing of this, again, gives the Court pause, it would be unreasonable to infer that Martinez delayed giving Martin a promotion until after Strickland resigned solely to stick it to Strickland for reporting her claims." JA3749. But it provided no other explanation for this highly suspicious timing—*one business day* after her resignation. Its conclusion also rests on factual errors, including its belief that Martin and Strickland "both were soon eligible for pay increases that did not occur" at the time of reclassification. JA3749. Martin was *not* eligible for a promotion in August 2018, while Strickland was. This heightens the inference of sex discrimination. Had the district court considered the MeToo evidence, it would have tipped the balance. At a minimum, it would have provided a factual finding for this Court's review.

Beyond the continuing sex discrimination and retaliation, the MeToo evidence provides context for a hostile working environment. "[E]vidence about how other employees were treated in that same workplace can be probative of

whether the environment was indeed a sexually hostile one, even if the plaintiff did not witness the conduct herself." *Ziskie v. Mineta*, 547 F.3d 220, 225 (4th Cir. 2008). The MeToo evidence demonstrates that the conduct Strickland experienced is not "isolated" or "unrelated to gender." *Id.*

For example, Martinez's use of terms like "fucking bitch," ████████████ ████████████ is similar to the crude and offensive language used by Judge Kindred. *See* JA3197 (describing comments that he was "a huge hit at dinner Partly due to how much shit I talked about Sarah palin [sic]," not being "hoe-ignorant," and that in his opinion his law clerk "might be better in the butt leagues"). Likewise, Davis's crude and sexist conduct, like using sexual hand gestures at work and expressing that ████████████████████ ████████████████ are similar to Judge Kindred's inappropriate language like "encouraging rating people based on 'fuckability.'" JA3197.

As the Ninth Circuit concluded that these comments created a "hostile work environment," *id.*, the district court could have concluded that the FDO was a hostile working environment, which provided relevant context for her claims of harassment, discrimination, and retaliation. The district court likewise could have concluded that, instead of merely believing Strickland was not a "team player," Martinez acted with discriminatory intent. *Cf. Stegall*, 350 F.3d at 1072 (identifying "not a team player" as a "sexual stereotype").

**III. Defendants Were Deliberately Indifferent to Sexual Harassment and Subjected Strickland to Continuing Sex Discrimination and Retaliation.**

In granting judgment in Martinez's favor, the district court made threshold legal errors that tainted its analysis of the equal protection claim. Thus, its findings were "derived under an incorrect legal standard." *Heyer*, 984 F.3d at 355. The court also erred in concluding that the equal protection claim against the other defendants did not survive summary judgment.

**A. The undisputed facts support Strickland's equal protection claim.**

Deliberate indifference means that an institution's response was "clearly unreasonable." *Strickland*, 32 F.4th at 359. A plaintiff must prove that the officials "knew about harassment of the plaintiff and acquiesced in that conduct by refusing to reasonably respond to it." *Feminist Majority Found.*, 911 F.3d at 702–03. In evaluating the reasonableness of the response, courts look to analogous civil rights statutes for guidance. *See id.*; *supra*, at 69–70.

A plaintiff need not allege that the defendant was "entirely unresponsive to allegations of harassment" but rather that the defendant "did not engage in efforts that were 'reasonably calculated to end [the] harassment.'" *Feminist Majority Found.*, 911 F.3d at 689 (quoting *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 669 (2d Cir. 2012)). "[H]alf-hearted investigation or remedial action" does not suffice to shield a defendant from liability. *Id.* at 689. The fact that a

defendant "dragged its feet" and delayed before implementing remedial action shows deliberate indifference. *Zeno*, 702 F.3d at 669; *see id.* at 669 n.13 (listing cases in which delays of up to six months constituted deliberate indifference).

Even taking "an important step in seeking to rectify a sexually hostile environment" may not suffice if that step "is not a remedy in and of itself." *Feminist Majority Found.*, 911 F.3d at 690; *Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 273 n.11 (4th Cir. 2021) (the provision of basic accommodations to a victim does not foreclose a finding of deliberate indifference). And once a defendant "is aware of its ineffective response," its failure to do more may be deemed to have "effectively caused" further harassment. *Zeno*, 702 F.3d at 670; *see also Wills v. Brown Univ.*, 184 F.3d 20, 26 (1st Cir. 1999).

Defendants were deliberately indifferent to sexual harassment. Defendants failed to take steps reasonably calculated to stop the harassment, and subjected Strickland to continuing sex discrimination and retaliation, for the same reasons that Defendants violated her Title VII rights. *See Beardsley*, 30 F.3d at 530 (a "mixture" of "retaliation and continued sexual harassment" violates equal protection). Strickland incorporates by reference Section I.A of her brief, which describes these civil rights violations.

After Defendants were on notice, they failed to investigate appropriately, failed to take appropriate corrective action, and failed to provide appropriate

interim remedies.  They failed to protect Strickland's confidentiality rights, which

exposed her to further retaliation.  They allowed Martinez to make decisions about

discipline, even though he was "counseled" based on the same complaint.  Most

egregiously, they allowed the investigation to end with *verbal counseling* for *quid*

*pro quo sexual harassment* by someone who was *counseled himself.*  This was

clearly unreasonable and effectively caused further harassment.  The fact that

Defendants did not do *nothing* does make their response reasonable.

    *Feminist Majority Foundation* held that a plaintiff also must allege that an

administrator's "deliberate indifference was motivated by a discriminatory intent."

911 F.3d at 703.  This Court has since clarified that deliberate indifference *is* a

means of proving discriminatory intent.  In *Basta*, the Court explained that

"intentional discrimination *can be proven* via deliberate indifference."  *Basta*, 56

F.4th at 316 (emphasis added).  The Court relied on Supreme Court precedent

defining deliberate indifference in the Eighth Amendment context.  *See id.* (citing

*Farmer v. Brennan*, 511 U.S. 825, 836 (1994)).  In prior cases, this Court has

likewise stated that institutions can be liable for "intentional . . . conduct in the

form of 'deliberate indifference.'"  *S.B.*, 819 F.3d at 75; *Jennings*, 482 F.3d at 701

(for equal protection claim, defining deliberate indifference as "fail[ing] to act and

thereby allow[ing] [the supervisor's] sexual harassment to continue unchecked").

At bottom, this is an "actual-notice standard."  *Basta*, 56 F.4th at 317.

Sexual-harassment plaintiffs are not required to prove an added element of "discriminatory intent," beyond deliberate indifference, that is not required for other plaintiffs, like bullied students and prisoners being denied medical needs. Singling out harassment plaintiffs for a higher burden would be inconsistent with Supreme Court precedent. *Compare Farmer*, 511 U.S. at 836, *with Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 643 (1999). It would also create a circuit split. *See Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1135 (9th Cir. 2003) (agreeing with "other circuits" that "plaintiffs must show *either* that the defendants intentionally discriminated *or* acted with deliberate indifference" (emphasis added)). Moreover, it is hard to imagine a case where administrators knew of harassment and refused to reasonably respond to it, but did *not* act with discriminatory intent. The refusal to act *is* discriminatory.

Regardless, Defendants acted with discriminatory intent. An intent to discriminate based on sex does not require the discrimination to be "maliciously motivated." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993). Rather, the test is whether the defendant acted "because of" sex. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). Here, Defendants "sought to downplay the harassment and threats, and . . . made no effort to stop them." *Feminist Majority Found.*, 911 F.3d at 703. Defendants "ratified" the harassment and failed to curtail it "over a period of months." *Id.* They "ignored" the

harassment even after they received the investigation's findings. *Ricketts*, 125 F.4th 507. Indeed, *nearly a year* passed before they took any corrective action.

Martinez compared Strickland's relationship with Davis to a "marriage" and ordered her to "compromise." He trivialized the harassment by implying that, at least, she had not been sexually assaulted. He encouraged, and even participated in, Davis's efforts to sabotage Strickland's career. In imposing verbal "counseling," he repeated that Davis's conduct was not "sexual harassment" because it was "just emails." This attitude underscored the sex-discriminatory motivation for his unreasonable response, including his sexist belief that sexual harassment does not exist unless there is a physical assault.

Martinez also prejudged the harassment claim, having been personally involved in the facts. He "always believed" Davis, the accused male harasser. He even deemed it appropriate to disregard the EDR Plan's procedures, repeatedly violating Strickland's confidentiality, because Davis is "being accused of basically sexually harassing an employee, and as far as I'm concerned, he needed to know that." This is clear evidence of gender bias, as he felt he needed to protect the accused male supervisor from Strickland's claim.

Moreover, "[a] departure from typical adjudicatory or procedural norms might be so perplexing that it supports an inference of gender bias." *Doe v. Coastal Carolina Univ.*, No. 4:18-cv-268-SAL, 2021 U.S. Dist. LEXIS 82292, at

*7 (D.S.C. Mar. 8, 2021) (citing *Doe v. University of Purdue*, 928 F.3d 652, 669 (7th Cir. 2019); *Menaker v. Hofstra University*, 935 F.3d 20 (2d Cir. 2019)).

When Strickland sought guidance from the AO, Ishida sided with Martinez, her male supervisor. He uncritically relayed Martinez's false allegations to the Chief Judge, impugning her integrity and implying that she had manipulated Dunham, her "friend," to get what she wanted. He rejected Dunham's efforts to provide her interim relief—contrary to best practices—stating that would be "inappropriate." He even told her that it was not "helpful" to have reported her complaints to the AO because "barriers go up" and people are "on guard." Strickland had a right to seek advice from civil rights officers at the AO, which was protected activity. Similarly, when Strickland requested a "safe workplace free from harassment," Ishida told her this was not "helpful" because Martinez, *the accused party*, was unwilling to do anything more to protect her.

In contrast, Ishida did not report Davis's conduct in interfering with the EDR process or receiving confidential information about the investigation to the Chief Judge. Ishida also did nothing to supervise the EDR investigation and ensure its integrity, even after he was aware that Davis had been told its findings, in violation of the EDR Plan. Ishida himself may have shared the investigation's findings, in violation of Strickland's confidentiality; at a minimum, he did nothing to investigate. Plainly, the accused male supervisors were treated more favorably.

117

The Chief Judge also refused to disqualify Martinez, even though he was on notice of Martinez's inappropriate response to the harassment. Allowing a "biased" party to exercise "significant influence" over the process is evidence of sex discrimination. *Doe v. Columbia Univ.*, 831 F.3d 46, 59 (2d Cir. 2016). The Chief Judge testified that Martinez "was not the person" who committed the harassment, which prejudged his discriminatory conduct. *Supra*, at 49.

The refusal to disqualify Martinez was a severe irregularity given that it is "obvious" that his actions were inappropriate, and he was so "biased" against Strickland that he could "cause more damage if he were involved in the process." *Supra*, at 50. Moreover, requiring Strickland to engage in "dispute resolution" with an accused party, rather than promptly investigating and taking corrective action, downplayed the seriousness of her claim. This did not meet "well-accepted standards," as Thomas explained, because it placed her "in the unfortunate position of having to advocate for herself when it was the Defendants who should have been protecting her." *Supra*, at 51.

At the conclusion of the investigation, Defendants counseled Martinez for a few "well-intended mistakes." It was also not their "concern" whether appropriate action was taken against Davis, despite the EDR Plan's language requiring complaints to be "appropriately investigated." *Supra*, at 58–59. This hands-off approach, again, deviated from the EDR Plan, and is evidence of gender bias.

118

**B.  Legal errors tainted the district court's analysis.**

The district court's erroneous holding that Strickland was not subjected to
deliberate indifference to sexual harassment and a continued mixture of
discrimination and retaliation, in violation of her equal protection rights, was based
on several critical threshold legal errors.

**1.  Notice**

The district court erred by holding that Martinez lacked actual notice of
Strickland's sexual harassment claim in July 2018.  The court found that Martinez
"had suspicions" about harassment, including creating a "significant event log"
stating that he "wanted to clarify with [Strickland] any issue about any harassment
by [Davis]."  JA3567.  Martinez testified that it is not his "normal practice" to
create significant event logs about "ordinary work disagreements."  JA2874.  But
the court concluded that her report regarding "harassment by Davis" was not
sufficient notice because "a plaintiff indicating a 'possible' claim of harassment is
not enough to be considered a report, especially when it is not (yet) followed up by
a formal complaint."  JA3720.

This conclusion is chilling and contrary to precedent.  The Fourth Circuit has
held, in line with Supreme Court precedent, that "actual notice means being
'alerted' to the 'possibility' of sexual harassment occurring."  *Doe*, 1 F.4th at 266

119

(quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 291 (1998)). The fact that Martinez was on notice of "possible" harassment *is* actual notice.

In denying Strickland's motion to reconsider, the district court described this portion of *Doe* as "dicta." JA3859. However, district courts within this Circuit have concluded that *Doe* held that "actual notice" includes "being 'alerted' to the 'possibility' of sexual harassment." *Grier v. Gray*, No. 3:17-cv-00486-FDW-DSC, 2021 U.S. Dist. LEXIS 203724, at *13 (W.D.N.C. Oct. 21, 2021).

The law does *not* require that Martinez believed that Strickland was experiencing harassment—clearly, he disbelieved her complaints from the outset because he "always believed" Davis—but only that he was on notice of a "substantial risk." *See Doe*, 1 F.4th at 267 (rejecting administrators' argument that they lacked actual notice because they did not believe the student had been sexually assaulted). Martinez wanted to "clarify . . . any *harassment* by [Davis]," as stated in his "significant event log." JA3567 (emphasis added). This is knowledge of a "substantial risk" of harassment. Indeed, the Chief Judge's Letter found that Martinez's reaction was "inappropriate" because he forced her "to confront the person *she accused of sexually harassing her*." JA3688. On July 24, 2018, Martinez *told Davis* about Strickland's allegations to prevent Davis from contacting her, which further shows his knowledge.

The district court's erroneous holding allowed it to improperly dismiss acts of sex discrimination, including Martinez's use of a "marriage metaphor" to describe the relationship between Strickland and Davis, which the court recognized "is not appropriate in any situation, let alone here, where Martinez admittedly had *suspicions* of *potential* harassment." JA3734–3735, JA3765 (emphasis added).

Moreover, if accepted, the district court's conclusion would incentivize employers to bury their head in the sand when employees attempt to resolve their concerns directly with a supervisor rather than escalating to a formal complaint. Employers may not avoid liability "by adopting a 'see no evil, hear no evil' strategy." *Ocheltree v. Scollon Prods.*, Inc., 335 F.3d 325, 334 (4th Cir. 2003) (en banc); *see also Duch v. Jakubek*, 588 F.3d 757, 765 (2d Cir. 2009) (when employee asked for change in schedule to avoid working with supervisor at night, became "teary and red" and did not want to talk about it, employer's response of stating "[t]hat's good because I don't want to know what happened" was unreasonable). The EDR Plan encourages employees to resolve their concerns informally. Indeed, a recent Government Accountability Office study described how "using options outside of the EDR process gives employing offices an opportunity to address workplace conduct issues informally and at the 'lowest possible level.'" JA3489. As the district court recognized, Strickland was

following advice to resolve her complaints informally.  JA3719.  Requiring more would also unnecessarily expose complainants to retaliation, like Strickland.

The fact that Strickland was trying to resolve her concerns informally, as the EDR Plan advises, is no justification for Martinez to ignore the situation or even make it worse.  As Thomas explained, "a well-trained supervisor" would not conclude that her report was a "workplace conflict," and would attempt to determine "what action can you take."  *Supra*, at 21.

### 2.    Official capacity standard

The district court erroneously analyzed Strickland's claim as if it were a *Bivens* individual liability claim against Martinez personally, instead of an official liability claim against officials acting on behalf of her employer.  Because an official capacity claim is "another way of pleading an action against an entity," *Graham*, 473 U.S. at 165, the district court should have reviewed the response of "supervisory officials and/or officials responsible for overseeing the court's EDR plan."  *Strickland*, 32 F.4th at 359; *Feminist Majority Found.*, 911 F.3d at 696 (reviewing the response of "the institution's administrators").  The purpose of the inquiry is to determine whether the entities responsible for implementing the EDR Plan should provide "equitable relief."  *Strickland*, 32 F.4th at 364–66.

The district court myopically focused only on the acts and omissions of Martinez personally, even though Martinez is not a defendant and can no longer

provide equitable relief. This allowed the court to improperly discount instances of deliberate indifference and sex discrimination, including officials' collective acts.

For example, the FDO had no sexual harassment manual, training, or policies to prevent retaliation. This likely contributed to officials' discriminatory conduct in failing even to consider Strickland for the promotion at issue in Davis's *quid pro quo* "Mas Dinero" email, which effectively facilitated and ratified his harassing conduct. But the court dismissed this conduct because it concluded that one supervisor, Moormann, was responsible instead of another, Martinez.

Similarly, the court concluded that Beam's flawed investigation "does not have any bearing on Martinez's discriminatory intent" because he was purportedly "only involved . . . as a witness." JA3771–3774. Martinez was not involved "only" as a witness. To begin with, he "formally appointed Beam" as the FDO's investigator. JA3771. The district court failed to explain why Beam could not be "formally appointed" by officials outside of the FDO, even though Ishida purportedly "chose" her. Appointing Beam was not a "technicality." *See* JA3601. Under agency principles, Beam was acting on behalf of Martinez, the FDO's "unit executive" and the person who appointed her. Martinez's role as "unit executive" was significant, as it gave him exclusive authority over personnel actions resulting from the investigation. His appointment of Beam signaled that he was in charge, and Beam believed she "was reporting to Martinez." JA3601. Moreover, Martinez

influenced the investigation in other ways. He coordinated his testimony with Davis, the accused harasser. And following the investigation, he decided whether Davis should be disciplined—consistent with his role as the unit executive—which Fourth Circuit officials believed was not their "concern." Regardless, Beam's failure to properly investigate is attributable to "officials responsible for overseeing the court's EDR plan," *Strickland*, 32 F.4th at 359, and those "responsible for ensuring that allegations are appropriately investigated," JA3709.

Finally, Strickland teleworked for *over seven months* with no resolution of the investigation and no corrective action. The court recognized the delay was "far too long," but downplayed it because Strickland did not tell Martinez personally, the *accused party*, that she was "unhappy." JA3761–3762. Notably, the court did not account for Strickland's repeated requests for a transfer made to Fourth Circuit officials. This, again, fails to recognize the responsibility of officials overseeing the EDR Plan to investigate promptly and take appropriate corrective action.

### 3. Discriminatory intent

Even in a remote trial, the district court found that Martinez was "quite hostile" towards Strickland. *Supra*, at 63. The court concluded that, while Martinez "was certainly biased against Strickland," this bias was not "based on any discriminatory animus" because he "believed that Strickland was exploiting this situation to secure a transfer to Asheville to be closer to her husband." JA3768.

In fact, "[o]ne of the most persistent and virulent stereotypes about women's false allegations about male behavior is the 'grasping, system-gaming woman on the make'":

> The social myth of the gold digger is particularly lethal for women seeking protection and redress for workplace harassment. . . . [M]any women who pursue . . . compensation through the courts end up being perceived as "gold diggers" who are exaggerating or fabricating their story of harassment for money. The gold digger stereotype, in turn, results in women being treated with skepticism about their credibility. In fact, all these women are actually doing is seeking the full scope of remedies that the law provides and trying to regain the position they would have been in but for the discriminatory harassment to which they were subjected.

Epstein, *supra*, at 307–10.

It is facially self-evident that Martinez's reliance on this virulent "gold-digger" stereotype proves his discriminatory intent. That is especially true because Martinez leaped to this assumption based on the "narrative" of Davis—the male accused harasser, who he "always believed"—"in his ear." JA3685, JA3703. Moreover, this pernicious stereotype tainted the investigation. Beam's report repeated Martinez's victim-blaming narrative, reinforced by Davis's improper lobbying, essentially verbatim. JA3654 (finding that Strickland "exploited poor judgment and decision-making skills of upper management"); *see* JA 3660.

### 4.    Lack of training

The district court was also wrong to conclude that a lack of training of *any* employees in this case had no role in "caus[ing]" harassment or making Strickland "more vulnerable to it." JA3740–3741 (citation omitted). This conclusion defies precedent and common sense.

A failure to train for an "obvious" risk can "properly be characterized as 'deliberate indifference' to constitutional rights." *Simpson v. Univ. of Colo. Boulder*, 500 F.3d 1170, 1179 (10th Cir. 2007) (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989)). Deliberate indifference occurs when an incident was a "highly predictable consequence" of a failure to train. *Id.* (citation omitted).

The district court found that "[a]t the time Strickland reported her claims, there was no FDO manual on sexual harassment." Further, "[t]he officials designated to investigate and mediate Strickland's claims received little training on how to handle a sexual harassment claim." JA3535.

This lack of training "caused" and made Strickland "more vulnerable" to harassment. Beam did not properly investigate Strickland's *quid pro quo* harassment claim, in part, because she did not receive "any training" about the standards for evaluating sexual harassment, nor did she understand the significance of her finding that Davis's Mas Dinero email can "clearly be inferred to be a quid pro quo request." Ironically, Beam found that "[i]t is evident this claim was

126

mishandled from the beginning by Mr. Martinez and he would benefit greatly with additional training." Beam even stated that training would have "helped" in Strickland's situation and even "avoided" it. The lack of training demonstrates deliberate indifference to an "obvious" and "highly predictable" risk.

### 5. Expert testimony

A district court's "arbitrary" exclusion of an expert's report is reversible error. *Mt. Valley Pipeline, LLC v. 0.19 Acres of Land*, No. 23-1348, 2025 U.S. App. LEXIS 1722, at *6 (4th Cir. Jan. 27, 2025). In cases involving deliberate indifference to sexual harassment, expert testimony is "commonplace" regarding whether an institution's response to harassment "was clearly unreasonable." *Pogorzelska v. VanderCook Coll. of Music*, No. 19-cv-05683, 2023 U.S. Dist. LEXIS 97170, at *20 (N.D. Ill. June 5, 2023) (citing cases); *see also Doe v. Coastal Carolina Univ.*, No. 4:18-cv-268-SAL, 2021 U.S. Dist. LEXIS 82292, at *7 (D.S.C. Mar. 8, 2021); *Doe v. Russell Cty. Sch. Bd.*, 292 F. Supp. 3d 690 (W.D. Va. 2018). "[T]he standard for admitting expert testimony is liberal, and 'rejection . . . is the exception rather than the rule.'" *Pogorzelska*, 2023 U.S. Dist. LEXIS 97170, at *18 (quoting Rule 702 advisory comm. notes).

The district court rejected Thomas's expert conclusion that "the investigation 'fell below well-accepted HR practices.'" JA3769. It did not state the legal basis for doing so. Presumably, the court did not find her testimony

reliable, stating it is not based on "actual facts." *See* Fed. R. Evid. 702. But in substance, its opinion *agrees* with many of Thomas's concerns about the EDR process and investigation, including that they lacked impartiality and "took far too long." Moreover, the court failed to explain why many of Thomas's conclusions, including that Beam failed to properly investigate *quid pro quo* sexual harassment, were mistaken. The court's conclusion that her testimony was "unreliable in its entirety" was arbitrary. *Mt. Valley Pipeline,* 2025 U.S. App. LEXIS 1722, at *6.

Had the court considered Thomas's expert opinion, it would have provided guidance about the "standards of care" and "departure[s] from typical adjudicatory or procedural norms." *Doe*, 2021 U.S. Dist. LEXIS 82292, at *7. For example, the court found that Strickland "appeared to resolve the EDR process at the mediation stage before the question of remedy was formally determined." JA3770. The court did not explain why forcing her "to resolve" her claims with an accused party, rather than investigating promptly and taking corrective action, was reasonable. Thomas raised this problem with the EDR process in her report.

The court further stated that "there is no indication that Beam thinking Strickland was a 'pain' affected the quality of the investigation." JA3770. But again, the court *agreed* with Thomas that Beam's investigation was flawed and lacked impartiality.

Finally, the court found that "Martinez did not retaliate against Strickland." JA3770. But the record does show that Strickland was retaliated against. Martinez knew that Davis was sabotaging the investigation and Strickland's career. He did nothing to stop it and even added fuel to the fire, disparaging her reputation to high-level officials. Martinez also ostracized Strickland by refusing to consider an office transfer, even though he had an open position and physical space. He allowed Adolf, her supervisor, to mock allegations of sexual assault in front of her colleagues, which was ███████████████████ He repeatedly violated Strickland's confidentiality rights by sharing information with the accused harasser, which exposed her to retaliation, ridicule, and humiliation. Thomas's conclusion that Defendants "failed to protect Strickland from retaliation" was well-supported.

### 6. Vulnerability to further harassment

The district court recognized that "[a] clearly unreasonable response causes [victims] to undergo harassment *or* makes them more vulnerable to it." JA3725 (emphasis added and citation omitted). But the court failed to apply that standard to the facts of this case.

An institution may be liable for "pre-notice" harassment that is "severe," where the institution's "deliberate indifference to that incident made the plaintiff more vulnerable to future harassment." *Doe*, 1 F.4th at 273–74. *Quid pro quo* sexual harassment is "severe." *Id.* As Thomas explained, it is a "particularly

egregious form of sexual harassment."  Moreover, Davis created such a hostile environment that Strickland was "physically afraid" of him.

Contrary to precedent, the district court held that Defendants could not be liable for deliberate indifference unless the sexual harassment "continued" after Strickland's report.  JA3730–3731.  The court rejected the idea that Defendants could be liable for failing to investigate and take corrective action on a high-level supervisor's *quid pro quo* sexual harassment.  The court stated, without any citation, that "the language of Title IX allowing for liability based on a single pre-notice instance of harassment is not applicable here, in addressing an equal protection claim made by a government employee."  JA3731.

That is wrong.  In *Feminist Majority Foundation*, this Court recognized that "deliberate indifference can be shown through failure to investigate or failure to attempt to remedy harassment."  *Feminist Majority Found.*, 911 F.3d at 690 (citations omitted).  That is true in both the equal protection context and under Title IX, which the Court stated are "substantial[ly] similar."  *Id.* at 703 (citation omitted); *see Flores*, 324 F.3d at 1135–26 (failure to "follow-up or conduct an independent investigation" stated an equal protection claim).  By failing to investigate properly or remedy the harassment, Defendants made Strickland vulnerable to further harassment.  That is true regardless of whether Davis made a *second* quid pro quo proposal after her report.

130

Moreover, the harassment was ongoing.  As Thomas explained, "[t]here are many ways to harass someone other than through direct communication."  JA962. After Martinez told Davis about Strickland's allegations to prevent further contact, Davis chose other methods.  Davis asked a paralegal to "***spy***" on Strickland and "***report back to him.***"  Hours after Strickland confided in her officemate about the harassment, Davis ridiculed him in a team meeting, suggesting he give the "sexual harassment training."  This was humiliating and mortifying.  Davis sent a "strange" email *to a client* "with obscure references" to Strickland's *law review article*, showing his continued obsession.  Davis also interfered with Beam's investigation, inappropriately contacted Martinez about Strickland's claims, and sent "persistent and inappropriate" emails to Ishida, causing Martinez to threaten to fire him.  His obsessive and controlling behavior continued until she forcibly resigned.

The court's finding that Strickland was not subjected to further harassment because she was teleworking and "did not see Davis again" displays a fundamental misunderstanding of sexual harassment.  JA3728.  Strickland was afraid to be in the same office as Davis—a fear which the court and other judiciary officials recognized was reasonable.  Telework was not a remedy, but rather evidence that officials' inaction left Strickland vulnerable to further harassment.

### 7. Constructive discharge

The district court recognized that Strickland's situation was "likely excruciating." JA3792. Her long-term ostracization on telework was "*career ending.*" *See* 3761 (emphasis added). But the court concluded that she resigned because of "damaged relationships" with colleagues and because "her career was going nowhere." JA3793, JA3795. This grossly misstates the evidence and misapplies the legal standard. *Heyer*, 984 F.3d at 355.

In evaluating a constructive discharge claim, courts must account for "co-worker conduct, unofficial supervisory conduct, or official company acts" resulting in the employee's resignation. *Penn. State Police v. Suders*, 542 U.S. 129, 148 (2004). Strickland diligently sought remedies for *quid pro quo* and hostile working environment that was so severe that it fundamentally altered the conditions of her employment. In response to her claim, Defendants failed to take prompt and effective corrective action and failed to provide any meaningful review or remedies. Indeed, they did not do any of the things that a responsible employer would do to protect the employee. Instead, they protected the accused male supervisors. This was not a resignation because Strickland's "career was going nowhere." The totality of conduct made the working environment so intolerable that she was forced to resign and lose her chosen career as a federal defender.

**IV. By Failing to Enforce the EDR Plan's Guarantees, Defendants Violated Strickland's Due Process Rights.**

**A. Defendants denied Strickland the Title VII protections to which she was entitled under the EDR Plan.**

The EDR Plan "affords employees with the substantive right to work under conditions free from discrimination and harassment," as well as "retaliation." *Strickland*, 32 F.4th at 349. The EDR Plan prohibits "conduct that would violate Title VII." JA3530.

The Plan also "creates a clear and specific set of procedures that are to be followed in the event that an employee claims that his or her substantive rights afforded under the EDR Plan have been violated." *Strickland*, 32 F.4th at 349–50. Thus, the EDR Plan provides "a right to redress injuries caused by workplace discrimination, a right that is functionally equivalent to a cause of action and one that is vitally important considering the lack of alternative means of seeking relief for employees of the federal judiciary." *Id.* at 351.

The district court's findings establish that Defendants denied Strickland the Title VII protections to which she was entitled under the EDR Plan. Strickland was subjected to workplace sexual harassment, sex discrimination, and retaliation. When Strickland sought remedies for the violations of her substantive right to be free from discrimination, Defendants failed to follow the "clear and specific set of procedures" set forth in the Plan. *Strickland*, 32 F.4th at 349–50.

Defendants failed to investigate appropriately, in violation of the Plan's requirement that officials "shall ensure that the allegations in the report are appropriately investigated." JA3599. Defendants also failed to take prompt and effective corrective action that would allow her to work safely. Indeed, after they were on notice of findings that Davis's Mas Dinero email can "clearly be inferred to be a quid pro quo request," they did nothing because they believed the parties would "fight" about the report. *Supra*, at 47. As a result of Defendants' failure to enforce the EDR Plan's substantive and procedural guarantees, Strickland was forced to resign and forgo her chosen career as a federal defender.

Defendants could "have chosen not to provide a right to combat the harassment of federal judiciary employees." *Strickland*, 32 F.4th at 352. But once they did so, they could not constitutionally disregard the EDR Plan's guarantees. Defendants' denial of Title VII protections violates Strickland's due process rights and entitles her to an equitable remedy.

## B. The EDR process was fundamentally unfair.

The EDR process was tainted by an accumulation of errors that made it so fundamentally unfair that Strickland was coerced to end the process and resign. The district court failed to consider these errors. Thus, its ruling was "predicated on a misunderstanding of the governing rule of law." *Bose Corp.*, 466 U.S. at 501.

Whether a resignation is "involuntary" must be determined based on the "totality of circumstances." *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 174–75 (4th Cir. 1988). The plaintiff must show that resigning "was reasonable given the totality of circumstances." *Suders*, 542 U.S. at 139 (citation omitted). As stated above, this inquiry considers the totality of "co-worker conduct, unofficial supervisory conduct, or official company acts." *Id.* at 141.

Moreover, an "accumulation" of "failures to comply" with policies can result "in a violation of procedural due process." *Doe*, 149 F. Supp. 3d at 621; *Furey v. Temple Univ.*, 884 F. Supp. 2d 223, 259 (E.D. Pa. 2012) ("[T]he accumulation of mistakes at each step of the process and failures to comply with the [internal code] resulted in a violation of procedural due process."). "At every stage of the process," due process "require[s] impartiality and a lack of bias by the decision makers." *Furey*, 884 F. Supp. 2d at 259.

The district court found many errors and failures to comply with the EDR Plan. However, the district court did not consider these errors because it concluded, wrongly, that it was prohibited from doing so by this Court's prior opinion. This Court held that Strickland stated a claim that she was "coerc[ed] . . . to end the investigation." *Strickland*, 32 F.4th at 355. Fourth Circuit and Supreme Court precedent firmly establishes that due process coercion claims are evaluated based on the totality of the circumstances.

135

## 1. *Ex parte* communications

*Ex parte* conversations violate due process if "the integrity of the process and the fairness of the result" is tainted by the communication. *Furey*, 884 F. Supp. at 257 (citation omitted).

### a. "Disturbing incident" email

Ishida relayed to Chief Judge Gregory Martinez's false allegations that Strickland was exploiting the EDR process, using her "friend" Nancy Dunham, for employment advantages. Martinez had already initiated a wrongful conduct investigation and been advised to "recuse" himself due to his involvement. He should not have been allowed to communicate disparaging information about her to the decisionmakers, particularly without providing her notice and an opportunity to respond. *See Doe*, 149 F. Supp. 3d at 619 (failure to provide plaintiff notice of *ex parte* meetings "fell short of constitutionally adequate due process"). As Dunham stated, "having falsehoods presented" to the EDR Coordinator and Chief Judge "could interfere with decisions they made in the future." *Supra*, at 30.

This was not just egregiously unfair, it was an oppressive act of retaliation. A reasonable person would not bring a complaint if they knew that doing so would expose themselves to having their character and integrity disparaged to the Chief Judge of the Court *where they practiced as an attorney*, without even having an opportunity to defend themselves. *See Williams*, 645 F. App'x at 245. This is

precisely the reason, identified by the judiciary's Workplace Conduct Working Group, that employees *do not bring* complaints—because they fear that doing so "will subject them to retaliatory action or affect future job prospects" and incur "rancor" from judges. Working Group Report, *supra*, at 12–13. Indeed, Strickland's complaint alleged that she was "profoundly humiliated and demoralized by having to bring her complaint directly to the Chief Judge," because "instead of being known for a brief she wrote or an oral argument she gave, this complaint would be [her] first impression on the Chief Judge." JA102. But she had no idea how "devastating" this truly was for her "professionally," given Martinez's vindictive actions in smearing her reputation. JA102.

Martinez's false allegation demonstrated that he was biased against Strickland and had prejudged her complaint, and should have been disqualified from the EDR process. His bias also infected the decision-making process.

Ishida, in his capacity as EDR Coordinator, unsurprisingly rejected Dunham's attempts to resolve Strickland's complaint informally, which would have promptly afforded her remedies that would have allowed her to work safely. He told Strickland that it was not "helpful" to report her complaints to the AO because "people are on guard." Similarly, he stated that it was not "helpful" to request a workplace "free of harassment" when Martinez was unwilling to do

anything more for her.  Moreover, the Chief Judge was "taken aback" by Strickland's disqualification request and ultimately denied it without explanation.

The district court downplayed this incident.  It reasoned that Martinez had "exaggerated," but not "fabricated," his allegation because Strickland did have "contacts" at the AO, and someone at the AO did ask Beam temporarily to stop her investigation until Strickland could be helped.  JA3773.  This reasoning fails to appreciate the damaging effect of Martinez's specific accusation, which was not about whether Strickland had "contacts" at the AO or whether someone at the AO asked that the investigation not escalate further until she was protected (something Strickland did not know about and had no control over).  Rather, Martinez denigrated Strickland's character and integrity to the decisionmakers by suggesting she had ulterior motives for bringing her EDR complaint and was conspiring with high-level AO officials to serve her ends.  This was conspiratorial and outlandish.

As the district court found, Strickland's claim "was made in complete good faith and for no ulterior motive."  JA3698.  Strickland went to Dunham based on the advice of Minor.  Strickland's office had provided no notice of the applicable EDR Plan.  Dunham did not know who Strickland was, and Strickland did not even tell Dunham her name, at first, because she was too afraid.  Contrary to "obstructing" an investigation, Dunham was acting consistently with her role in providing guidance to judiciary offices about employment matters.  Martinez's

inappropriate anger at Dunham's involvement did not give him license to sabotage the EDR process with falsehoods about Strickland.

### b.    Sharing the investigation's findings

The district court found that the investigation's findings were prematurely shared with Davis. *Supra*, at 42. As the accused harasser, Davis obviously is not a "need to know" party under the EDR Plan. JA3534.

This breach of the investigation's integrity was never investigated or even shared with the Chief Judge. Indeed, it is possible that Ishida himself shared the investigation's findings in a "private conversation" with Martinez. Though Ishida and Martinez denied discussing the investigation's findings, they did not explain what else could have happened in a "private conversation" about Strickland's case that would have led to Davis's threatened firing. Further, Ishida did nothing to supervise Beam's investigation. *Supra*, at 45–46.

This *ex parte* communication demonstrates that the investigation lacked integrity. It was also biased in favor of the accused male supervisors. Ishida uncritically reported an alleged "disturbing incident" involving Strickland to Chief Judge Gregory, but he did not report Davis's interference with the EDR process. Ishida also was concerned about Davis receiving the investigation's results, but he did not allow Strickland to receive the report or its findings even after the investigation was over. Unlike Davis, Strickland was a "need to know party"

139

because the investigation was being used to adjudicate her rights under Chapter X's dispute resolution process.  *Cf.* EDR Handbook 100 (investigator "must" provide report to the parties *before* "any adjudication" of the complaint).

## 2.    Conflicts of interest

Defendants' "refusal to disqualify [Martinez] created a conflict of interest that infected the entire investigation."  JA3777 (quoting *Strickland*, 32 F.4th at 355).  Martinez's conduct "obvious[ly]" was "inappropriate, including his reaction to Strickland's contact with the AO and his use of a marriage metaphor, and his sharing of Strickland's mediation supplement with Davis, among others."  Moreover, Martinez was so "biased" against Strickland that he could "cause more damage if he were involved in the process."   JA3777.

There was no reason not to disqualify Martinez.  The plain text of the EDR Plan provides for disqualification of an employee, *including a unit executive*, who is "involved in" a complaint.  *Supra*, at 38.  Under the Plan, it is "appropriate to disqualify a unit executive when that executive's personal interests conflict with the best interest of the office," as Langley testified.  JA3777; *see* EDR Handbook 67 ("[I]f the Complainant alleges that the Unit Executive sexually harassed her, the personal interests of the Unit Executive likely conflict with the Employing Office's interests, and someone other than the Unit Executive should likely act on behalf of the Respondent Employing Office.").  Federal regulations provide the same.

EEOC Mgmt. Directive 110, Ch. 1 (2015), *available at*

https://tinyurl.com/ms3xmkkx ("[W]hen an EEO complaint alleges that the agency

head . . . has engaged in discrimination, the agency head should recuse

himself/herself from the decision-making process.").

Martinez's bias denied Strickland the "impartiality and . . . lack of bias" to

which she was entitled "[a]t every stage." *Furey*, 884 F. Supp. 2d at 259.

### a.    Investigation

Martinez's bias infected the investigation of Strickland's claims.  Martinez

was allowed to "formally appoint" Beam, in his role as unit executive, which

signaled from the outset that he was no ordinary party.  Indeed, Beam believed she

was reporting to him.  *Supra*, at 123–24.

Martinez also coordinated his testimony with Davis, the accused harasser.

This is not consistent with participating only "as a witness," as the district court

found.  JA3660.  As Thomas explained, it is not normal for accused supervisors to

"coordinate their interview testimony," and doing so risks that "information

wouldn't be kept confidential."   *Supra*, at 35.

Davis provided Martinez "an extensive time of events called 'Timeline of

Caryn Events for You."  Davis later provided another timeline that was "more

specific," as if the prior timeline was not enough.  Martinez also repeatedly

violated Strickland's confidentiality by sharing the details of her complaint and her

confidential mediation supplement with Davis. Martinez testified that he shared this information because Davis was "accused of basically sexually harassing an employee" and "needed to know." *Supra*, at 36. This indicates that Martinez believed he was entitled to violate the EDR Plan precisely because he was the unit executive and Davis's supervisor. Martinez's coordination with Davis violated the EDR Plan and made the investigation fundamentally unfair.

### b. "Mandatory" counseling and mediation

The EDR process lacked "fundamental fairness" because Martinez was allowed to "act[] as a 'decision maker' who had the authority to approve or disapprove any proposed resolution, as Thomas explained. During mandatory counseling and mediation, Martinez was the "fulcrum," meaning the *only* official with authority to resolve her claims. JA3662. This included her concerns about her "promotion, the work conditions," and so forth, the same acts of discrimination in which Martinez had participated, or condoned. JA3663. Strickland had no other option but to negotiate a resolution with him. Officials would not take disciplinary action, and mediation was "mandatory" under the EDR Plan.

Officials allowed Martinez to serve in this role despite his severe bias against Strickland. They testified that Martinez was not required to be "neutral." JA3662. Strikingly, Ishida even testified that if Martinez was "neutral," he would "'question' whether Martinez was properly representing the employing office."

142

JA3663.  This reasoning fails to appreciate the difference between Martinez's

personal interests, as an accused party, and his role as a unit executive.  Under the

EDR Plan, Martinez was required to disqualify himself if he could not be "neutral"

because his personal interests conflicted with the best interests of the office.

Martinez's participation clearly was prejudicial because he "always believed"

Davis and consistently downplayed the sexual harassment.

### c.    Final hearing

The district court found that in a final hearing, Martinez's "views would be

sought as the Unit Executive."  JA3795.  Thus, Martinez would have "significant

influence" over the final decision, at a minimum, even though he was so "biased"

he could "cause more damage" if allowed to participate.  *Doe*, 831 F.3d at 59.

Allowing a "biased party" to exercise "significant influence" is evidence of sex

discrimination.  *Id.*  For the same reasons, it is fundamentally unfair.  *Cf. Furey*,

884 F. Supp. at 259 (decisionmaker's undue "deference" to official and

"imbalanced questioning" contributed to violation of due process).

### d.    Disciplinary action

Martinez was allowed to make decisions about discipline of Davis, even

though Martinez was involved in, and "counseled" for, the same allegations.

Martinez prejudged Strickland's claim because he "always believed" Davis.

Martinez's decision-making role compounded the unfairness of the investigation

and denied Strickland her "substantive right to work under conditions free from discrimination and harassment." *Strickland*, 32 F.4th at 349.

The district court rejected the argument that Martinez's role as final decisionmaker in the investigation was problematic. But this Court held that precisely this showing would prove her due process claim. *See Strickland*, 32 F.4th at 355 (holding that Defender's conflict of interest "infected the entire investigation when Strickland was led to believe that [he] would be the final decisionmaker"). The district court stated that Martinez was acting "within his role as unit executive." JA3774. The court appeared to accept Defendants' argument that Strickland had no due process rights in the Chapter IX disciplinary process, and so Martinez could properly control the outcome of that process, even though he was also a subject of it. *See* JA3531 (stating that "Chapter IX does not provide any employee with any rights or remedies").

This reasoning misconstrues the property interest conferred by the EDR Plan, as previously identified by this Court. The EDR Plan conferred a "substantive right to work under conditions free from discrimination and harassment." *Strickland*, 32 F.4th at 349. Disciplinary action to prevent and remedy harassment is integral to enforcing this substantive right. Indeed, the EDR Plan recognizes that "preventing and addressing" the "harassing conduct" may be the "only" relief available to a complainant. EDR Handbook 72.

Defendants' argument that Chapter IX discipline is separate from Chapter X dispute resolution does not lessen the fundamental unfairness of Martinez's role. As this Court recognized, the "minimum procedural requirements are a matter of federal law" and are "not diminished by the fact" that an agency has its own procedures. *Strickland*, 32 F.4th at 352. Defendants do not "alone" decide "what is required to vindicate the substantive rights" under the Plan. *Id.* Thus, declaring that Strickland lacks rights under Chapter IX does not diminish the fundamental unfairness of allowing an accused party to act as a decisionmaker. *Goldberg*, 397 U.S. at 267–68, 271 (due process requires an "impartial decision maker" who has not "participated in making the determination under review").

Moreover, the district court's finding that Martinez acted "within his role as unit executive" is unsupported. JA3774. The EDR Plan states that "[e]mployees found by the *Chief Judge and/or unit executive* to have engaged in wrongful conduct . . . may be subject to disciplinary action." JA3531 (emphasis added). Nothing in the EDR Plan required Martinez to be the final decisionmaker.

The district court discounted Martinez's severe conflicts of interest because it believed they did not matter unless Martinez was the decisionmaker in a Chapter X final hearing. JA3778. That cramped view has no support in this Court's prior decision. Indeed, this Court specifically used the term "investigation" to describe Martinez's conflict, not "hearing." *Strickland*, 32 F.4th at 355 (describing due

145

process claim as "the refusal to disqualify the FPD from the investigation and the alleged coercing of Strickland to end the investigation").

Strickland did believe that as a practical matter, Martinez would be the decisionmaker in a final Chapter X hearing, as discussed below. Regardless, the district court erred because it failed to examine how the "accumulation" of errors caused by Martinez's conflict denied her an impartial process "[a]t every stage." *Furey*, 884 F. Supp. 2d at 259; *Doe*, 149 F. Supp. 3d at 621.

### 3. Fundamentally unfair treatment

When administrators violate standards by treating one party more favorably than another, those irregularities will contribute to a due process violation. *Doe*, 149 F. Supp. 3d at 620 (informing accuser of decision to grant an appeal two days before informing the accused contributed to due process violation).

Here, the accused male supervisors were given preferential treatment compared to Strickland. As discussed above, Davis was told the investigation's findings, in violation of the EDR Plan, while Strickland was not even allowed to see the report or know its findings for her dispute resolution process. Moreover, disparaging allegations about Strickland were shared *ex parte* with the Chief Judge, while reports that Davis had interfered with the EDR process and received confidential information were not reported or investigated. Strickland was not given any notice or opportunity to respond to allegations disparaging her integrity

to the Chief Judge of the Fourth Circuit, where she practiced law. This was a double standard and fundamentally unfair.

When Ishida informed Strickland that any discipline for sexual harassment would be held in "abeyance," he told her that this had been a "living hell" for Davis, who "had been suffering physical symptoms." Ishida admitted that he learned this based on an inappropriate conversation with Davis. JA3666. Ishida apparently did not consider whether Strickland, too, would suffer due to the months of inaction on her report of *quid pro quo* sexual harassment and a hostile working environment.

The fundamental unfairness extended to the investigation. Beam did not interview Strickland's witnesses, and instead only interviewed Strickland and her male supervisors. This violated the EDR Plan's requirement that allegations be "appropriately investigated." *Supra*, at 47. Beam was unduly deferential towards Martinez—who "formally appointed" her—and Davis. She did not adequately consider whether their description of events was untrue. *Furey*, 884 F. Supp. 2d at 259 ("deference" based on party's status as police officer was unfair and contributed to due process violation). Instead, she took the credibility of their assertions at "face value," as Thomas explained. *Supra*, at 45.

Without informing Strickland or providing her with a chance to respond, Beam's report repeated Martinez's false accusation—informed by Davis's

147

"narrative"—that Strickland "exploited poor judgment and decision-making skills of upper management to attain her goal of a transfer." JA3654. Instead of determining whether Strickland was attempting to seek remedies for sexual harassment, Beam blamed *Strickland* for her supervisors' poor judgment and decision-making. These severely damaging allegations, again, were shared with high-level officials in the court where Strickland practiced law. *Doe v. Alger*, 175 F. Supp. 3d 646, 661 (W.D. Va. 2016) (university violated student's due process rights by "severely limit[ing] his ability to defend himself"). Because the investigation was being used to adjudicate Strickland's Chapter X rights, the report also would have been provided to the presiding officer in a final hearing. JA3664.

### 4.  Violations of confidentiality

The EDR Plan requires that "all parties involved in the investigation must protect the confidentiality of the allegations." JA3683. There are "important reasons to protect confidentiality," including that an employee may "fear retaliation" and because "personnel matters are entitled to the highest privacy protection." EDR Handbook 20.

Strickland's confidentiality rights were repeatedly violated. This not only undermined the integrity of her EDR process, but it exposed her to being humiliated, vilified, and retaliated against. *Supra*, at 39 (employee's report that

████████████████████████████████████ Strickland).

## 5.     Holding discipline "in abeyance"

After the investigation report came out, more than four months after the investigation began, Ishida determined that the parties would not receive the report, and no disciplinary action would be taken.  Rather, the disciplinary proceeding would be held "in abeyance."  *Supra*, at 47–48.

This decision violated standard practices for addressing allegations of workplace sexual harassment, which require prompt and effective action.  *See* EDR Handbook 72 (office must "promptly correct" harassing behavior).  Officials were on notice of *quid pro quo* sexual harassment, but they did not want to pursue disciplinary action because they thought the parties "would fight about the report," and they preferred to force Strickland to "negotiate" the matter.  *Supra*, at 47.

Because no disciplinary action would even be considered until Strickland ended her dispute resolution process, this decision had the effect of "coercing . . . [her] to end the investigation" and resign.  *Strickland*, 32 F.4th at 355.  Indeed, officials did not even begin the process of considering disciplinary action until after Strickland resigned.  *Supra*, at 59.

The district court found that Ishida's decision to hold discipline in "abeyance" did not violate Strickland's due process rights because it was a "pragmatic" decision.  JA3790.  The court explained that Ishida had combined the investigation for Chapter IX discipline and Chapter X dispute resolution into one

149

proceeding. Because it would be unfair to provide the investigation report to Martinez for Chapter IX, but not to Strickland for Chapter X, Ishida decided the better course was to withhold the report entirely. This meant not considering any disciplinary action. The court stated that this conduct was not "malicious[]" and did not "evince a desire to coerce Strickland to resign." JA3789–3790.

This reasoning fails on several grounds. First, decisions are no less discriminatory, or unfair, because they are made for "pragmatic" reasons. A "defendant is not excused from liability . . . because the discriminatory motivation does not result from a discriminatory heart, but rather from a desire to avoid practical disadvantages that might result from unbiased action." *Doe*, 831 F.3d at 58 n.11. The fact that Ishida may have had pragmatic reasons for violating Strickland's rights does not make it any less of a violation.

Second, intent is not an element of a due process claim. *Lewis v. Frayne*, No. 3:12-cv-1070 (VLB), 2016 U.S. Dist. LEXIS 92867, at *31 (D. Conn. July 18, 2016). Nor is intent necessary to prove a constructive discharge. *Green v. Brennan*, 578 U.S. 547, 560 (2016) (employee need not prove that "quitting was his employer's plan all along"). Therefore, it is irrelevant whether Ishida's actions were "malicious" or evinced a "desire to coerce Strickland to resign." *See id.*

Third, the fact that Ishida had combined Chapter IX discipline with Chapter X remedies bolsters the due process violation. "Keeping the EDR process separate

from misconduct and disciplinary actions . . . ensures that all involved (i.e. Employing Offices, Complainants, and alleged violators) have an opportunity to assert their rights through a process that takes into account all interested individuals' rights before an appropriate authority." EDR Handbook 72. If any portion of the proceeding is held "in abeyance," it should be the formal complaint process so the employing office can "prevent and promptly correct the harassing or abusive behavior." *Id.* Similarly, federal regulations provide that processing of complaints must be kept separate from personnel actions "to maintain the integrity of the EEO investigative and decision-making processes." EEOC Mgmt. Directive 110, Ch. 1 (2015), *supra*, at 141.

By explicitly conditioning any disciplinary action on Strickland concluding her EDR process, Defendants "coerc[ed]" her "to end the investigation" and resign from the FDO. *Strickland*, 32 F.4th at 355. Moreover, "[a]s a matter of law," the "significant anomalies" denied Strickland a "meaningful opportunity to be heard." *Alger*, 228 F. Supp. 3d 713, 724, 731.

### C. Strickland reasonably believed that the Defender would be the final decisionmaker.

Martinez *was* the final decisionmaker regarding discipline for Davis's conduct, even though he was an accused party. This conflict of interest "infected the entire investigation." *Strickland*, 32 F.4th at 355.

151

Strickland also reasonably believed that Martinez, as a practical matter, would have the final say over any recommendations made by a presiding officer in a Chapter X hearing. The district court found that "Strickland did believe that Martinez was the final decisionmaker" in a Chapter X hearing, but it concluded that her belief was not "reasonable." JA3778. Again, the court failed to consider the totality of the circumstances leading to Strickland's belief.

### 1. Mediator

The district court found that Ed Smith, the Mediator, made statements intended to encourage the parties "to settle" and did not lead Strickland to believe that remedies would not be ordered in a hearing. JA3780–3784. This finding "ignor[es] substantial evidence" and is "contrary to the clear weight of the evidence." *Heyer*, 984 F.3d at 355.

First, the district court acknowledged that Smith "expressed frustration" with remedies. The court found that these frustrations would not have reasonably influenced Strickland's belief because they related to the "remedies available to all complainants." JA3782. Smith told Strickland that "[n]one" of the remedies under the Plan are "going to do anything" because the only remedy that would be effective was "discipline" for misconduct. JA3677. That remedy was not available because of officials' decision to hold discipline in "abeyance." Thus,

Smith's frustration was not general about the remedies available to all complainants, but rather specific to the procedures in Strickland's case.

Second, the court did not consider Smith's statements that he was "not disagreeing" with concerns that "the hearing officer can't do anything," and a hearing would be a "sham" and a "kangaroo court." Smith also stated that Martinez is "from a 'generation' that doesn't 'get' sexual harassment." He cynically stated that "you lose a few rights" as a federal employee. These comments, made by an official who was not "neutral" or "independent," reasonably could be construed as communicating that it was a foregone conclusion that Strickland's allegations would not be taken seriously. *Supra*, at 51–52.

Third, the district court pointed to Smith's statement that "[Martinez] does have a boss. It's the chief judge. He can be removed." The court found that this statement "unequivocally refuted" any concern that a presiding officer would not order remedies. JA3783.

However, as described below, it does not follow that because the CJA allows the Fourth Circuit, acting *collectively* as a court, to remove a defender for "incompetency, misconduct in office, or neglect of duty," 18 U.S.C. § 3006A(g)(2)(A), a presiding officer in an EDR proceeding can order a defender to take specific personnel actions regarding employees. Indeed, the district court stated that the employment relationship between AFPDs and the Circuit is

153

"regrettably obscure."  JA3797.  Proving the point, the court acknowledged that there is no mechanism for a federal defender to be removed as a result of an EDR proceeding, and recommended that the presiding officer "make[] a written report to the body that makes the decision."  JA3797–3798.  Given continued uncertainty over how remedies can be enforced against defenders—even in the ruling below— Strickland's belief that Martinez was the *de facto* decisionmaker was reasonable.

## 2.    JIO

The district court found that Langley's "uncertainty, as conveyed to Strickland, did not rise to telling Strickland unequivocally that Martinez would be the final decisionmaker on Strickland's remedies following her Chapter X hearing, and any belief otherwise based on these statements was unreasonable."  It concluded, "uncertainty on the outcome does not dictate the outcome, and Strickland's assumptions otherwise were unreasonable."  JA3786.

This reasoning misconstrues the legal standard.  *Heyer*, 984 F.3d at 355. This Court defined the issue as whether "Strickland was *led to believe* that the FPD would be the final decisionmaker."  *Strickland*, 32 F.4th at 355 (emphasis added). Thus, the issue is not whether Langley was certain about her convictions, but rather whether it was reasonable *for Strickland* to rely on her statements expressing uncertainty about how personnel actions could be enforced against federal defender offices, given their independence from courts.  *Stone*, 855 F.2d at 174–75.

154

Strickland's reliance was reasonable.  A plaintiff is "entitled to reasonably rely" on a government official's statements regarding matters that are not "common knowledge."  *Spreen v. Brey*, 961 F.2d 109, 113 (7th Cir. 1992).  As the JIO, Langley was a "national resource" on the EDR Plan.  Strickland cannot be expected to have knowledge about the enforceability of EDR remedies that the JIO, a subject matter expert, does not have.  It is not a matter of common knowledge how the CJA, which limits the Circuit's authority over defenders, interacts with the EDR Plan, which lacks any statutory basis.  The district court found that these issues reflect a "failure of the EDR Plan" and even described this point as "regrettably obscure."  JA3797.  Therefore, Strickland "was entitled to reasonably rely" on Langley's statements.  *Spreen*, 961 F.2d at 113.  The court was incorrect to conclude that Strickland was required to make a leap of faith about EDR remedies that the JIO would not.  Indeed, *that* would be unreasonable.

Strickland's belief was especially reasonable in the context of federal defender independence.  For decades, federal judges have publicly questioned whether they have "jurisdiction" to order remedies for defenders' employment matters and noted the "inherent potential for judicial interference."  In 2017, a committee appointed pursuant to the CJA recommended that the federal defender program be removed from the judiciary to protect its independence.  This report was publicly released soon before the events in Strickland's case and informed her

155

understanding of officials' statements.  As Strickland testified, ███████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████

JA4346.  The judiciary has since adopted a separate EDR plan for federal

defenders, based on concerns about independence.  These structural concerns exist

regardless of whether the EDR Plan's text provides for remedies.  *Supra*, at 54–55.

Indeed, the actions of judiciary officials in this case demonstrate a reluctance

to interfere with defender operations, even when the plain text of the EDR Plan

provides otherwise.  Ishida believed that the Fourth Circuit lacked authority to

order any action regarding Davis because the Court was not his "appointing

entity."  Ishida even told Chief Judge Gregory, "You cannot decide any

disciplinary action against Mr. Davis—that is within the authority of the unit

executive."  JA3683.  However, the plain text of the EDR Plan provides that

disciplinary action may be taken "by the Chief Judge and/or unit executive."

JA3683.  Thus, the Plan provides that the Chief Judge may order disciplinary

action.  If Fourth Circuit officials did not believe they had the authority to order

Martinez to take disciplinary action, despite the Plan's text, then it was reasonable

for Strickland to believe that a presiding officer would not have authority to order

Martinez to implement other actions to which he did not agree.

### 3. Other authorities

The district court found that Strickland did not seek "clarification" from Ishida or other officials who could have "assisted in clearing up any confusion." JA3787–3788. However, this was not a matter of simple "confusion" that could be cleared up with "clarification." Rather, this matter involved profound questions about the relationship between courts and independent defender offices, which the court, and Fourth Circuit officials, found "obscure." JA3797.

The district court also criticized Strickland for not applying canons of statutory construction to the EDR Plan. It stated that "the EDR Plan would be the 'statute' by which the presiding judicial officer could order remedies" and expressed "surpris[e]" that "as an attorney, Strickland would choose to ignore the plain text of the Plan." JA3788. But as the court presumably recognized in using scare quotes around the term "statute," the EDR Plan is not a statute. Judicial Conference policy provides that "EDR proceedings are strictly administrative," and "[j]udges' decisions in EDR matters must be in conformance with all statutes and regulations that apply to the judiciary." Report of the Proceedings of the Judicial Conference of the United States 25 (Sept. 2010), *supra*, at 4.

The text of the EDR Plan does not answer the question of how remedies are enforced pursuant to statutes and regulations that govern the judiciary, including

the CJA.  Strickland reasonably relied on statements by high-level judiciary officials, including the JIO, expressing uncertainty about that question.

### D. The district court had broad discretion to order equitable remedies.

A district court must shape an equitable remedy "to do justice on the specific facts of the instant case."  *Doe*, 149 F. Supp. 3d at 624 (citing *Bowen v. Hockley*, 71 F.2d 781, 786 (4th Cir. 1934)); *cf.* Fed. R. Civ. P. 54(c).  Strickland's preferred remedy was front pay, in part, because Defendants have *never* offered her reinstatement over more than five years of litigation.  *See Ford Motor Co. v. EEOC*, 458 U.S. 219, 232 (1982) (an unconditional offer of reinstatement will "toll" the employer's liability).  Strickland would have accepted an offer of reinstatement if Defendants had corrected the hostile working environment.  *See* Case No. 21-1346, Doc. 90-2.  Instead of offering reinstatement to a safe working environment, Defendants chose to continue to vilify Strickland during this litigation.  An employer's "hostility" may make reinstatement "inappropriate." *Hunter v. Town of Mocksville*, 897 F.3d 538, 562 (4th Cir. 2018); *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 847 (2001).  Front pay is therefore an "equitable remedy" for ongoing constitutional violations when reinstatement is not feasible.  *Strickland*, 32 F.4th at 366; *see Pollard*, 532 U.S. at 853 (noting that

denying front pay when reinstatement is infeasible would lead to the "strange result" of subjecting the "most egregious offenders . . . to the least sanctions").

But the district court was not limited to this remedy. *Cf. Franks v. Bowman Transp. Co.*, 424 U.S. 747, 764 (1976) (Title VII principles are "intended to give the courts wide discretion exercising their equitable powers to fashion the most complete relief possible"). For example, Defendants conceded below that "more process" is a "remedy for a due process violation." JA2419; *see Doe*, 179 F. Supp. 3d at 588. The district court found many errors and failures to comply with the EDR Plan. If the court believed that Strickland's reinstatement to the FDO was not feasible or front pay was not appropriate (which it did not explain), it could have returned the matter to the EDR process with instructions to allow Defendants to provide her with other remedies available under the Plan, such as "placement in a comparable alternative position" within the judiciary. JA 3533.

Instead, the court concluded that Strickland is "without redress," even as it acknowledged that she is "a young woman with significant professional qualifications" who "made a good faith claim of sexual harassment," and "[a]s a result, she saw her desired career in public service stunted and ultimately withered." JA3795. It recommended "reforms" for future cases, while not

ordering any relief for her.[4]  JA3796.  That was legally wrong and inequitable.  At a minimum, this Court should remand and order the court to consider equitable remedies for the violation of due process.  *See Doe*, 149 F. Supp. 3d at 624.

## CONCLUSION

This Court should reverse, or alternatively vacate, and remand.

## STATEMENT REGARDING ORAL ARGUMENT

Because this case involves profound constitutional questions with significant implications for all judiciary employees, Strickland respectfully submits that oral argument should be heard under Local Rule 34(a).

Respectfully submitted,

/s/ Caryn Strickland
Caryn Strickland
Law Office of Caryn Strickland
PO Box 92
Lynn, NC 28750
828-388-7337
caryn.strickland@outlook.com

February 18, 2025

---

[4] The district court has not ruled on Strickland's pending motion for public disclosure of information regarding whether Defendants brought full settlement authority to the parties' prior mediation, which she intended to use in support of a request for mediation filed in this Court.  ECF No. 448.  Regardless, Strickland desires a settlement that would remedy the harm done to her career and would participate in mediation if ordered by the Court.

**CERTIFICATE OF SERVICE**

I certify that on this 18th day of February, 2025, I filed this brief with the

Clerk of Court using the CM/ECF system, which will automatically serve

electronic copies on all counsel of record.

/s/ Caryn Strickland
Caryn Strickland